RECORD NO.

# 14-2637

In The

# United States Court of Appeals
### For The Second Circuit

## FRANK OWENS,

*Plaintiff – Appellant*,

**v.**

## TEXTRON FINANCIAL CORPORATION,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
AT WHITE PLAINS**

_____

## APPENDIX

_____

| | |
|---|---|
| Morton I. Baum | Mitchell A. Karlan |
| BAUM LAW OFFICES, LLP | GIBSON, DUNN & CRUTCHER LLP |
| 438 Broadway | 200 Park Avenue, 47th Floor |
| Monticello, New York 12701 | New York, New York 10166 |
| (845) 791-1000 | (212) 351-4000 |
| | |
| *Counsel for Appellant* | *Counsel for Appellee* |

# TABLE OF CONTENTS

**Appendix Page**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Amended Complaint**
      **filed October 18, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Defendant's Motion to Dismiss the Amended Complaint**
      **filed December 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

**Declaration of Mitchell A. Karlan in Support of**
**Defendant's Motion to Dismiss the Amended Complaint,**
**With Exhibits,**
      **filed December 13, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

      **Exhibits:**

    **A.**    **Amended Complaint**
          **dated October 18, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . **24**

    **B.**    **Superseding Indictment in United States v. Barriger**
          **dated February 26, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . **41**

    **C.**    **Corrected Judgment in Owens v. Barriger, et al.**
          **dated February 2, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . **71**

    **D.**    **Loan and Security Agreement between**
          **Textron Financial Corporation and**
          **Gaffken & Barriger Fund, LLC**
          **dated January 25, 2006** . . . . . . . . . . . . . . . . . . . . . . . . . **73**

**Memorandum Decision of**
**The Honorable Vincent L. Briccetti**
**Re: Granting Defendant's Motion to Dismiss the Amended Complaint and**
**Denying Plaintiff's Request for Further Leave to Replead**
      **filed July 14, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **196**

**Judgment**
filed July 15, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

**Plaintiff's Notice of Appeal**
filed July 25, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:13-cv-05948-VB

Owens v. Textron Financial Corporation
Assigned to: Judge Vincent L. Briccetti
Case in other court: Supreme Court-Sullivan, 13-01993
Cause: 28:1332 Diversity-Other Contract

Date Filed: 08/22/2013
Date Terminated: 07/15/2014
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Frank Owens**                    represented by   **Morton I. Baum**
                                                    Baum Law Offices, LLP
                                                    438 Broadway - Po Box 1260
                                                    Monticello, NY 12701
                                                    (845)-791-1000
                                                    Email: baumlawoffices@verizon.net
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Textron Financial Corporation**   represented by   **Mitchell Alan Karlan**
                                                     Gibson, Dunn & Crutcher, LLP (NY)
                                                     200 Park Avenue, 48th Floor
                                                     New York, NY 10166
                                                     212-351-3827
                                                     Fax: 212-351-5254
                                                     Email: mkarlan@gibsondunn.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/22/2013 | 1 | NOTICE OF REMOVAL from Supreme Court, County of Sullivan. Case Number: 2013-1993. (Filing Fee $ 350.00, Receipt Number 465401075235).Document filed by Textron Financial Corporation. (Attachments: # 1 Exhibit A)(rj) (Entered: 08/23/2013) |
| 08/22/2013 | | Case Designated ECF. (rj) (Entered: 08/23/2013) |
| 08/22/2013 | | Magistrate Judge George A. Yanthis is so designated. (rj) (Entered: 08/23/2013) |
| 08/29/2013 | 2 | CERTIFICATE OF SERVICE of Notice of Removal, Civil Cover Sheet and Rule 7.1 Statement served on Frank Owens on 08/22/2013. Service was made by First Class Mail. Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 08/29/2013) |
| 09/05/2013 | 3 | STIPULATION EXTENDING TIME TO FILE RESPONSIVE PAPERS: IT IS HEREBY STIPULATED, by and between the undersigned counsel for the parties, that Defendants time to answer, move, or otherwise plead in response to the Complaint is extended until September 30, 2013. SO ORDERED. Textron Financial Corporation answer due 9/30/2013. (Signed by Judge Vincent L. Briccetti on 9/5/2013) (lnl) (Entered: 09/05/2013) |
| 09/30/2013 | 4 | MOTION to Dismiss / *NOTICE OF DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS.* Document filed by Textron Financial Corporation.(Karlan, Mitchell) (Entered: 09/30/2013) |
| 09/30/2013 | 5 | MEMORANDUM OF LAW in Support re: 4 MOTION to Dismiss / *NOTICE OF DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS..* Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 09/30/2013) |

**A-1**

Case: 14-2637     Document: 38     Page: 5     09/03/2014     1310409     212

| | | |
|---|---|---|
| 09/30/2013 | 6 | DECLARATION of MITCHELL A. KARLAN in Support re: 4 MOTION to Dismiss / *NOTICE OF DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS*.. Document filed by Textron Financial Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Karlan, Mitchell) (Entered: 09/30/2013) |
| 09/30/2013 | 7 | CERTIFICATE OF SERVICE of Defendant Textron Financial Corporation's Notice of Motion to Dimsiss, Memorandum of Law in Support and Declaration of Mitchell A. Karlan in Support served on Plaintiff on 09/30/2013. Service was made by overnight mail, postage prepaid. Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 09/30/2013) |
| 10/02/2013 | 8 | ORDER: Defendant's having filed a motion to dismiss the complaint on September 30, 2013 (Doc.#4), it is hereby: ORDERED that, by no later than October 10, 2013, plaintiff must notify the Court by letter, with copies simultaneously delivered to all counsel, whether (i) he intends to file an amended complaint, or (ii) he will rely on the complaint that is the subject of the motion to dismiss. If plaintiff elects not to file an amended complaint, the motion to dismiss will proceed in the regular course and, absent special circumstances, no further opportunities to amend will be granted. The time to file opposing and reply papers shall be governed by the Federal Rules of Civil Procedure and the Local Civil Rules, unless otherwise ordered by the Court. If plaintiff elects to file an amended complaint, he must file the amended complaint by no later than 14 days after notifying the Court of his intent to do so. Defendant may then either (i) file an answer to the amended complaint, or (ii) file a motion to dismiss the amended complaint, or (iii) notify the Court by letter, with copies simultaneously delivered to all counsel, that it is relying on the initially-filed motion to dismiss. If defendant chooses to file an answer to or motion to dismiss the amended complaint, the time to do so shall be governed by the Federal Rules of Civil Procedure, unless otherwise ordered by the Court. (Signed by Judge Vincent L. Briccetti on 10/1/2013) (rj) (Entered: 10/02/2013) |
| 10/09/2013 | 9 | LETTER addressed to Judge Vincent L. Briccetti from Morton I. Baum dated October 8, 2013 re: intention to file amended complaint. Document filed by Frank Owens.(Baum, Morton) (Entered: 10/09/2013) |
| 10/10/2013 | 10 | ENDORSED LETTER addressed to Judge Vincent L. Briccetti from Morton I. Baum dated 10/8/2013 re: Per your October 2, 2013 Order, plaintiff intends to file an amended complaint. ENDORSEMENT: Plaintiff's amended complaint must be filed by 10/23/2013., ( Amended Pleadings due by 10/23/2013.) (Signed by Judge Vincent L. Briccetti on 10/10/2013) (rj) (Entered: 10/11/2013) |
| 10/18/2013 | 11 | AMENDED COMPLAINT against Textron Financial Corporation.Document filed by Frank Owens.(rj) (Entered: 10/22/2013) |
| 10/22/2013 | 12 | CERTIFICATE OF SERVICE. Textron Financial Corporation served on 10/22/2013, answer due 11/12/2013. Document filed by Frank Owens. (Baum, Morton) (Entered: 10/22/2013) |
| 10/22/2013 | 13 | DEMAND for Trial by Jury. Document filed by Frank Owens (Baum, Morton) (Entered: 10/22/2013) |
| 10/22/2013 | 14 | CERTIFICATE OF SERVICE of Demand For Jury Trial served on Textron Financial Corporation on 10/22/2013. Document filed by Frank Owens. (Baum, Morton) (Entered: 10/22/2013) |
| 10/24/2013 | 15 | LETTER MOTION for Extension of Time to File Answer re: 11 Amended Complaint addressed to Judge Vincent L. Briccetti from Mitchell A. Karlan dated October 24, 2013. Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 10/24/2013) |
| 10/24/2013 | 16 | ORDER granting 15 Letter Motion for Extension of Time to Answer: Defendant's time to answer, move or otherwise respond to the amended complaint is extended to December 13, 2013. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (Briccetti, Vincent) (Entered: 10/24/2013) |
| 12/13/2013 | 17 | MOTION to Dismiss / *DEFENDANT TEXTRON FINANICAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT*. Document filed by Textron Financial Corporation.(Karlan, Mitchell) (Entered: 12/13/2013) |
| 12/13/2013 | 18 | MEMORANDUM OF LAW in Support re: 17 MOTION to Dismiss / *DEFENDANT TEXTRON FINANICAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT*.. Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 12/13/2013) |
| 12/13/2013 | 19 | DECLARATION of MITCHELL A. KARLAN in Support re: 17 MOTION to Dismiss / *DEFENDANT TEXTRON FINANICAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT*.. Document filed by Textron Financial Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Karlan, Mitchell) (Entered: 12/13/2013) |

Case: 14-2637    Document: 38    Page: 6    09/03/2014    1310409    212
https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?851914474083994-L_1_0-1

| | | |
|---|---|---|
| 12/20/2013 | 20 | FIRST MEMORANDUM OF LAW in Opposition re: 17 MOTION to Dismiss *DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT*.. Document filed by Frank Owens. (Baum, Morton) (Entered: 12/20/2013) |
| 12/26/2013 | 21 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Vincent L. Briccetti from Mitchell A. Karlan dated December 26, 2013. Document filed by Textron Financial Corporation.(Karlan, Mitchell) (Entered: 12/26/2013) |
| 12/27/2013 | 22 | ORDER granting 21 Letter Motion for Extension of Time to File Response/Reply re 17 DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT. Reply due 1/13/2014. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (Briccetti, Vincent) (Entered: 12/27/2013) |
| 01/13/2014 | 23 | REPLY MEMORANDUM OF LAW in Support re: 17 MOTION to Dismiss *DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT*.. Document filed by Textron Financial Corporation. (Karlan, Mitchell) (Entered: 01/13/2014) |
| 05/08/2014 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Judith C. McCarthy. Please note that this is a reassignment of the designation only. (pgu) (Entered: 05/08/2014) |
| 07/14/2014 | 24 | MEMORANDUM DECISION: Defendant's motion to dismiss the amended complaint is GRANTED. Plaintiff's request for further leave to replead is DENIED. The Clerk is instructed to terminate the pending motion (Doc. #17) and close this case. SO ORDERED. (Signed by Judge Vincent L. Briccetti on 7/14/2014) (lnl) (Entered: 07/14/2014) |
| 07/14/2014 | | Transmission to Judgments and Orders Clerk. Transmitted re: 24 MEMORANDUM DECISION, to the Judgments and Orders Clerk. (lnl) (Entered: 07/14/2014) |
| 07/15/2014 | 25 | JUDGMENT: ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Memorandum Decision, dated July 14, 2014, Defendants' Motion to dismiss is granted; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 7/15/2014) (lnl) (Entered: 07/15/2014) |
| 07/25/2014 | 26 | NOTICE OF APPEAL from 24 Order on Motion to Dismiss,. Document filed by Frank Owens. Filing fee $ 505.00, receipt number 0208-9927360. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Civil Cover Sheet Letter to Clerk, # 2 Affidavit Certificate of Service)(Baum, Morton) (Entered: 07/25/2014) |
| 07/25/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 26 Notice of Appeal. (tp) (Entered: 07/25/2014) |
| 07/25/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 26 Notice of Appeal, filed by Frank Owens were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/25/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/20/2014 14:17:07 | | |
| PACER Login: | tl0027:2646207:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 7:13-cv-05948-VB |
| Billable Pages: | 4 | Cost: | 0.40 |

United States District Court
for the
Southern District of New York

FRANK OWENS,                  )
                              )
                   Plaintiff,    )
v.                           )     Civil Action No: 7:13-cv-5948 (VB)
                              )
TEXTRON FINANCIAL CORPORATION,  )
                              )
                  Defendant.  )

**AMENDED COMPLAINT**

Plaintiff for his amended complaint alleges:

1.      On August 13, 2013, Plaintiff commenced an action, Index No. 2013-1993, in the Supreme Court of the State of New York, County of Sullivan.  The action was removed by Notice of Removal dated August 22, 2013 and filed on August 22, 2013 pursuant to 28 U.S.C. §1446(b).

2.      This Court has original jurisdiction over this civil action: (1) Plaintiff and Defendant are "citizens of different States," and (2) the amount in controversy "exceeds the sum or value of $75,000.00, exclusive of interest and costs."  28 U.S.C. §1332(a).  This Court is the district court "for the district and division embracing the place where such action is pending," and defendant is not a citizen of the State in which this action was brought.  28 U.S.C. §1441.

3.      Frank Owens resides at 4585 State Route 97, Narrowsburg, New York, 12764.

4.      Textron Financial Corporation is a Delaware corporation with principal place of business at 40 Westminster Street, Providence, Rhode Island 02903 and with an additional office for the conduct of business at 11575 Great Oaks Way, Suite 210, Alpharetta, GA 30022.

1

5.      Textron Financial Corporation is a highly sophisticated money lender skilled in the business of making high interest loans to high risk borrowers, a business usually not engaged in by conventional national and state banks.

6.      Gaffken & Barriger Fund, LLC is a New York limited liability company with principal place of business at 198 Bridgeville Road, Monticello, New York 12701.

7.      Lloyd Vernon Barriger presently resides at 73 Clover Hill Road, Damascus, Pennsylvania 18415-3534, previously had a principal place of business at 198 Bridgeville Road, Monticello, New York 12701, and is about to go to jail.

8.      Lloyd Vernon Barriger was an unregistered investment advisor, conducting business at 198 Bridgeville Road, Monticello, New York 12701 and was the President and Chief Executive Officer of Gaffken & Barriger Fund, LLC.

9.      This is an action by a crime victim to recover the proceeds of the crime from the beneficiary and recipient of the proceeds of that crime.

10.     Lloyd Vernon Barriger and Gaffken & Barriger Fund, LLC perpetrated the crime.

11.     Frank Owens was the victim of the crime.

12.     Textron Financial Corporation is the direct beneficiary of the crime and received the proceeds.

13.     The sole purpose of the crime was specifically to obtain money to give to Textron Financial Corporation.

14.     The crime proceeds were reserved to Textron Financial Corporation and not used or absorbed in the Ponzi Scheme hereinafter referred to.

2

**A-5**

15.     Gaffken & Barriger Fund, LLC had brief possession of the proceeds of the crime by virtue of a wire pass-through occurring simultaneously with or minutes after the commission of the crime itself.

16.     A criminal who profits by and has possession of the proceeds of his or her crime does not obtain title to those proceeds of the crime.

17.     By the commission of the crime, Lloyd Vernon Barriger and Gaffken & Barriger Fund, LLC stole Two Million ($2,000,000.00) Dollars from Frank Owens and immediately handed it over to Textron Financial Corporation through intra-bank transfer and wire transfer as hereinafter alleged.

18.     Gaffken & Barriger Fund, LLC is now in the hands of a receiver appointed by Supreme Court, Sullivan County, by order dated August 10, 2011 and entered on August 12, 2011.

19.     Textron Financial Corporation and Gaffken & Barriger Fund, LLC are parties to a Loan and Security Agreement dated as of January 25, 2006 (as amended, restated or otherwise modified from time to time) pursuant to which Textron Financial Corporation has made certain loans and other financial accommodations to Gaffken & Barriger Fund, LLC.

20.     The loans made by Textron Financial Corporation to Gaffken & Barriger Fund, LLC are high interest loans with high interest rates and high penalties for default.

21.     Prior to receivership, Gaffken & Barriger Fund, LLC was generally engaged in a business of holding primarily real estate collateralized commercial mortgage loans, other mortgages, real estate related and non-real estate assets, and making loans at high interest rates to high risk borrowers.

22.     Gaffken & Barriger Fund, LLC raised capital for its operation through sales of securities to public investors and private borrowing.

23.     Under provisions contained in the Loan and Security Agreement dated as of January 25, 2006 as alleged in paragraph "19", supra, Textron Financial Corporation had the right to review and audit and did review and audit the financial records and books maintained by Gaffken & Barriger Fund, LLC.

24.     The underlying Loan and Security Agreement gave Textron Financial Corporation all of the tools with which it could thoroughly understand the financial and illegal activities of the Gaffken & Barriger Fund, LLC and its President Lloyd Vernon Barriger and it did employ those tools.

25.     The Loan and Security Agreement between Textron Financial Corporation and Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.1    Financial Statements.    Borrower shall deliver to Lender, within one hundred twenty (120) days following the close of each Fiscal Year thereafter, Borrower's audited financial statements, certified by a recognized firm of independent certified public accountants acceptable to Lender as having been prepared in accordance with GAAP and as presenting fairly the financial condition of Borrower as of the date thereof and for the period then ended, and including a management letter to Borrower from such accounts. Borrower shall deliver to Lender such other financial information as Lender shall reasonably request, including, (i) within thirty (30) days after the close of each month, reasonably detailed monthly and fiscal year-to-date financial statements, including income statement, balance sheet, and statement of cash flow, prepared in accordance with GAAP (subject to the absence of notes and to annual audit adjustment), certified by the chief executive officer or chief financial officer or other authorized individual of Borrower as presenting fairly the financial condition of Borrower, which, for the end of each month, shall also include a Covenant Compliance Certificate, setting forth a calculation of the financial covenants

4

described in Section 7.6 below, and the status of all other monetary covenants set forth in this Agreement, and (ii) at least sixty (60) days prior to the end of Borrower's Fiscal Year thereafter, an annual operating budget, prepared in accordance with GAAP, showing a projected income statement, balance sheet and cash flows as of each Fiscal Quarter end of the forthcoming Fiscal Year."

26.     The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.2     Books and Records.     Borrower shall keep accurate and complete records, including accurate and complete books and records of the Collateral, maintained in accordance with GAAP as acknowledged by Lender, including without limitation observing reasonable practices for monitoring and managing Borrower's loans to Clients, and shall permit Lender to: (a) visit Borrower's business locations during normal business hours upon two (2) days' prior notice, but without notice at any time during the existence of an Event of Default; (b) inspect, audit and make extracts from or copies of Borrower's books, records, journals, receipts, computer tapes and disks; (c) to accompany Borrower on its field examinations with respect to any Client; (d) to inspect all records available to Borrower including without limitation field examination reports, borrowing base certificates, appraisals, credit reports, credit approvals, and financial statements with respect to any Client and to examine and make copies of any such records; (e) to inspect all records available to Borrower from any credit reporting service, bureau or similar service with respect to any Client and to examine and make copies of any such records; provided that Borrower makes no representation to Lender regarding the accuracy or veracity of such reports; and (f) to attend, for the purpose of monitoring only and not for participating in, any and all meetings of Borrower the purpose of which, in whole or part, is to discuss the status of any and all Client Loans that are or may be delinquent or otherwise in default.     All governmental authorities are authorized to furnish Lender with copies of reports of examinations of Borrower made by such parties. Banks, Clients and other third parties (without waiving any attorney-client privilege) with whom Borrower has contractual relationships pertaining to the Collateral or the Loan Documents, are authorized to furnish Lender with copies of such contracts and related materials.     Lender is authorized, in its own name or any other name, to communicate with Clients in order to verify the existence, amount and terms of any

Receivable. Lender may exhibit a copy of this Agreement to any party with whom Lender contacts pursuant to this Section 6.2 and such party shall be entitled to rely on the provisions hereof in providing access or information to Lender as Provided herein."

27.   The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.3   Additional Documentation.   Borrower shall execute and deliver to Lender all additional documents that Lender may, from time to time, reasonably determine are necessary or appropriate to evidence the Loans or to continue or perfect Lender's Security Interest in the Collateral."

28.   The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.7   Reporting as to Revenues and Receivables.

(a)   With such frequency as Lender shall direct, Borrower shall shall deliver to Lender such information as Lender shall request with respect to the Revenues, Receivables and Inventory, including, but not limited to:

(i)   no later than 1:00 p.m., East Coast time on the first to occur of (A) the day on which Borrower requests a Revolving Loan Advance or (B) Wednesday of each week, a weekly Borrowing Base Certificate based on the Receivables as of the end of the preceding day, together with a detailed summary of sources of all of the Revenues and credits and collections associated with Receivables.

(ii)   no later than the fifteenth (15th) day of each month, a monthly Borrowing Base Certificate based on the Receivables as of the end of the preceding month, and detailed reports and schedules showing the aging of Receivables and Borrower's accounts payable as of the end of the preceding month;

(iii)   no later than 1:00 p.m., East Coat time on Wednesday of each week (or more often as the Lender may request) daily sales and collections reporting as of the end of the preceding day, in form and substances acceptable to Lender; and

6

**A-9**

(iv)    no later than ten (10) days following Lender's request therefor, complete and updated list of Borrower's Clients, including the name, address and telephone number of each customer.

(h) [sic]   Borrower shall notify Lender promptly if:

(i)    Borrower or any Client enters into a long-term contract with the United States of America, and, if requested by Lender, Borrower shall execute and shall cause such Client to execute all instruments and take all steps necessary to insure that all amounts due and to become due under such long-term contract are property assigned to Lender pursuant to the Assignment of Claims Act of 1940 or otherwise;

(ii)    Borrower receives information with regard to any type or item of Collateral which might have in any way a Materially Adverse Effect on the value of the Collateral as a whole or the rights and remedies of Lender with respect thereto; and

(iii)    any accounts due and owing in which amounts in excess of $20,000 are in dispute by any single Client on an Eligible Receivable, and Borrower shall explain in detail the reason for the dispute, all claims related to the dispute, and the amount in controversy."

29.    The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.13   Disclosure.   Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, Borrower shall (i) notify Lender if any written information, exhibit, or report furnished to Lender contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and (ii) correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgment, filing or recordation thereof."

30.    Textron Financial Corporation did, prior to April 18, 2007, and from time to time

thereafter, conduct a review and audit of the financial records and books maintained by Gaffken &

Barriger Fund, LLC, thereby becoming fully familiar with the financial condition of Gaffken &

Barriger Fund, LLC , the condition of its distressed collateralized commercial mortgage loans and

other mortgages, as well as making payments to existing investors from funds obtained from new

investors, and the manner in which it was conducting business.

  31.  Textron Financial Corporation knew or should have known that Gaffken & Barriger

Fund, LLC was a criminal enterprise engaged in the operation of a Ponzi Scheme, making payments

to existing investors from funds obtained from new investors and attracting new investors by

manipulative and deceptive device.

  32.  Textron Financial Corporation was aware of the nature of the business conducted

by Gaffken & Barriger Fund, LLC, that it was insolvent at least as of April 18, 2007 or earlier,

and that it continued its business while insolvent.

  33.  Textron Financial Corporation knew that Gaffken & Barriger Fund, LLC

guarantied a return of eight (8%) percent on investment for anyone investing in Gaffken &

Barriger Fund, LLC and that any investment was returnable on demand.

  34.  By reservation of rights letter dated April 18, 2007 from Textron Financial

Corporation to Gaffken & Barriger Fund, LLC, Attention: Lloyd V. Barriger, Textron Financial

Corporation, in addition to other things, declared:

> "Events of default have occurred and currently exist
> under the Agreement as a result of the Borrower's
> failure to comply with the maximum delinquent loan
> covenant set forth in Section 7.6(d) of the Agreement
> for the month ended March 31, 2007 (the foregoing
> defaults are collectively referred to herein as, the
> "Current Defaults")."

8

**A-11**

35.     By reason of the premises, Textron Financial Corporation knew or should have known that any payments made to it to cure its defaults were generated in the course of the Ponzi Scheme or obtained by Gaffken & Barriger Fund, LLC in its course of defrauding new investors and third parties like Frank Owens.

36.     From review and audit of Gaffken & Barriger Fund, LLC financial and internal books and records, Textron Financial Corporation knew that any payments made on account to cure "Current Defaults" or other defaults were the result of and generated by a "Ponzi Scheme" engaged in by Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger, individually, as President, and as Chief Executive Officer of Gaffken & Barriger Fund, LLC or generated through some other illegal or criminal activity or manipulative and deceptive device and contrivance.

37.     Textron Financial Corporation knew that any payments made to it on account by Gaffken & Barriger Fund, LLC could not come from earned income and profit of existing investment and that Gaffken & Barriger Fund, LLC was concealing its illegal business activities by accounting records intended to conceal and not kept in accordance with generally acceptable accounting principles.

38.     Textron Financial Corporation knew that any of the payments made to it from Gaffken & Barriger Fund, LLC to cure "Current Defaults" or any other defaults could not be made from current earned income and existing investment.

39.     Textron Financial Corporation knew that any payment made by Gaffken & Barriger Fund, LLC to cure "Current Defaults" or any other defaults had to come from monies received by Gaffken & Barriger Fund, LLC from new investors or lenders or other third parties such as Frank Owens.

40.      Textron Financial Corporation knew that Gaffken & Barriger Fund, LLC was unable to borrow from other factors and lenders because of its insolvent financial position and that applications for such borrowing from other factors or lenders had been denied.

41.      Knowing that Gaffken & Barriger Fund, LLC was insolvent, unable to pay investors from earned income, unable to pay investors from profits, unable to timely pay creditors, unable to timely pay Textron Financial Corporation, and unable to borrow, it did not declare a default which would have had the effect of closing down the Gaffken & Barriger Fund, LLC operations; and instead entered into forbearance agreements so that Gaffken & Barriger Fund, LLC would not be required to fully disclose its financial distress, could continue its illegal activities and fraudulently induce innocent third parties to lend, invest, and give it money, thereby aiding and abetting the criminal activities of Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger.

42.      Based upon obtaining money by false pretenses in violation of federal and state criminal statutes, Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger, as perpetrators, stole Two Million ($2,000,000.00) Dollars from Frank Owens, as victim, and the money was immediately wired to Textron Financial Corporation.

43.      The Two Million ($2,000,000.00) Dollars wired to Textron Financial Corporation constitutes proceeds of crime or crimes committed by Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger.

44.      The movement of the Two Million ($2,000,000.00) Dollars was orchestrated and carried out by Lloyd Vernon Barriger and another executive of Gaffken & Barriger Fund, LLC, Andrew McKean, on September 27, 2007 by intra-bank transfer at Catskill Hudson Bank, Monticello, New York 12701 from an attorney's escrow account held for the benefit of Frank Owens

to an account held for benefit of Gaffken & Barriger Fund, LLC and immediately wired by Gaffken & Barriger Fund, LLC to Textron Financial Corporation.

    45.    On September 27, 2007, Gaffken & Barriger Fund, LLC was insolvent and unable to meet its obligations as they became due.

    46.    Textron Financial Corporation is unjustly enriched by the receipt of Two Million ($2,000,000.00) Dollars proceeds of crime.

    47.    Frank Owens is entitled to return of the Two Million ($2,000,000.00) Dollars proceeds of crime together with interest from September 27, 2007 and disgorge by Textron Financial Corporation.

    48.    With regard to crimes alleged herein applicable to victim Frank Owens and other crimes applicable to old and new investors of Gaffken & Barriger Fund, LLC, by Grand Jury Indictment filed in the United State District Court, Southern District of New York on May 12, 2011, Lloyd Vernon Barriger was charged with conspiracy to commit mail fraud in violation of Title 18 United States Code Section 1341, Title 18 United States Code Section 1349, Title 15 United States Code, Sections 78(j)(b) and 78(ff), securities fraud in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18 United States Code, Section 2 and by Superseding Indictment dated February 26, 2013 as follows:

**COUNT ONE**
**(Conspiracy to Commit Mail Fraud)**

**COUNT TWO**
**(Mail Fraud)**

11

**COUNT THREE**
**(Conspiracy to Commit Securities Fraud)**

**COUNT FOUR**
**(Securities Fraud)**

49.    On July 26, 2013, Lloyd Vernon Barriger pleaded guilty to the charges listed

below:

| Number of Charges | Description of Charge(s) | Disposition |
|---|---|---|
| 1 | Conspiracy to commit offense or to defraud US | Guilty |
| 1 | Securities Violations | Guilty |
| 1 | Mail Fraud - Frauds and swindles | Guilty |
| 1 | Attempt and conspiracy fraud | Guilty |

and is awaiting sentencing presently scheduled for November 15, 2013 before Judge Cathy

Seibel of the United States District Court, Southern District of New York.

50.    The Two Million ($2,000,000.00) Dollars stolen from Frank Owens by Lloyd Vernon

Barriger and Gaffken & Barriger Fund, LLC was never commingled with other monies or funds of

Gaffken & Barriger Fund, LLC and is immediately traceable through the intra bank transfer and

immediate wire from the Catskill Hudson Bank to Textron Financial Corporation on September 27,

2007.

51.    At the close of banking business on September 26, 2007, the day before the transfer

of the Two Million ($2,000,000.00) Dollars to Textron Financial Corporation, the Gaffken &

Barriger Fund, LLC Catskill Hudson Bank Account Number: 1101012 had a balance of $116,667.12.

52.    On September 27, 2007, Baum Law Offices, LLP completed an intra-bank transfer

of Two Million ($2,000,000.00) Dollars, from its Catskill Hudson Bank special escrow Account

Number: 14103451 for Frank Owens, to Gaffken & Barriger Fund, LLC Catskill Hudson Bank Account Number: 1101012.

53.     On September 27, 2007, Gaffken & Barriger Fund, LLC wired Textron Financial Corporation $2,115,647.12, incurred a wire fee of $20.00, and on the close of business on that day, Account Number: 1101012 had a balance of $1,000.00. There were no intervening entries.

54.     The stolen Two Million ($2,000,000.00) Dollars is traceable from the time and point of theft directly into the Textron Financial Corporation account.

55.     The payment of Two Million ($2,000,000.00) Dollars was not made in the ordinary course of business.

56.     Textron Financial Corporation is not an innocent transferee without knowledge of the Gaffken & Barriger Fund, LLC criminal activity.

WHEREFORE, Plaintiff Frank Owens demands judgment against Defendant Textron Financial Corporation for compensatory damages in the amount of Two Million ($2,000,000.00) Dollars with interest from September 27, 2007, punitive damages in an amount to be determined, and legal fees in an amount to be determined, together with the costs and disbursements of the action.

Dated: October 18, 2013

BAUM LAW OFFICES, LLP

By:     Morton I. Baum, Esq. (MB 1674)
        *Attorneys for Plaintiff*
        428 Broadway
        P.O. Box 1260
        Monticello, New York 12701
        baumlawoffices@verizon.net
        (845) 791-1000

13

**A-16**

To:    GIBSON, DUNN & CRUTCHER, LLP
       Mitchell A. Karlan, Esq.
       *Attorneys for Defendant*
       200 Park Avenue
       New York, New York 10166-0193
       Telephone: (212) 351-4000
       Facsimile: (212) 351-4035
       mkarlan@gibsondunn.com


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a Jury Trial in accordance with Rule 38.

Dated: October 18, 2013

                                        BAUM LAW OFFICES, LLP


                              By:       Morton I. Baum, Esq. (MB 1674)
                                        *Attorneys for Plaintiff*
                                        428 Broadway
                                        P.O. Box 1260
                                        Monticello, New York 12701
                                        baumlawoffices@verizon.net
                                        (845) 791-1000



To:    GIBSON, DUNN & CRUTCHER, LLP
       Mitchell A. Karlan, Esq.
       *Attorneys for Defendant*
       200 Park Avenue
       New York, New York 10166-0193
       Telephone: (212) 351-4000
       Facsimile: (212) 351-4035
       mkarlan@gibsondunn.com

United States District Court
for the
Southern District of New York

FRANK OWENS,                            )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Civil Action No: 7:13-cv-5948 (VB)
                                        )
TEXTRON FINANCIAL CORPORATION,          )
                                        )
                    Defendant.          )

**CERTIFICATE OF SERVICE**

Morton I. Baum, a member of the firm Baum Law Offices, LLP, attorneys for Plaintiff

Frank Owens hereby certifies that he has served a copy of the within AMENDED COMPLAINT

dated October 18, 2013 with Demand For Jury Trial on:

> GIBSON, DUNN & CRUTCHER, LLP
> Mitchell A. Karlan, Esq.
> *Attorneys for Defendant*
> 200 Park Avenue
> New York, New York 10166-0193
> mkarlan@gibsondunn.com

by e-mail on October 18, 2013.

BAUM LAW OFFICES, LLP

By:    Morton I. Baum, Esq. (MB 1674)
       *Attorneys for Plaintiff*
       428 Broadway
       P.O. Box 1260
       Monticello, New York 12701
       baumlawoffices@verizon.net
       (845) 791-1000

1

To:    GIBSON, DUNN & CRUTCHER, LLP
       Mitchell A. Karlan, Esq.
       *Attorneys for Defendant*
       200 Park Avenue
       New York, New York 10166-0193
       Telephone: (212) 351-4000
       Facsimile: (212) 351-4035
       mkarlan@gibsondunn.com

2

**A-19**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
:
FRANK OWENS,                                       :
:
                    Plaintiff,                     :
:
     -against-                                     :     No. 13-cv-5948 (VLB)
:
TEXTRON FINANCIAL CORPORATION,                     :
:
                    Defendant.                     :
:
--------------------------------------------------------------x

### NOTICE OF DEFENDANT TEXTRON FINANCIAL CORPORATION'S MOTION TO DISMISS

PLEASE TAKE NOTICE that Defendant Textron Financial Corporation ("TFC") will

serve its Memorandum of Law in support of TFC's Motion to Dismiss the Amended Complaint,

together with the accompanying Declaration of Mitchell A. Karlan, dated December 13, 2013,

upon Plaintiff Frank Owens on December 13, 2013.  Upon receipt of Plaintiff Owens' opposition

to its motion, if any, and the service of its reply in further support of the motion, TFC will move

this Court, before the Honorable Vincent L. Briccetti, United States District Judge, at a time and

date to be determined by the Court, at the United States Courthouse, 500 Pearl Street, New York,

NY 10007, for an Order dismissing the Amended Complaint with prejudice, and granting such

other and further relief as the Court deems just and proper.

Dated:  New York, New York
        December 13, 2013

GIBSON, DUNN & CRUTCHER LLP

By: _____
Mitchell A. Karlan (MK-4413)
Nancy E. Hart (NH-1789)

200 Park Avenue
New York, NY 10166-0193

1

**A-20**

Telephone: 212.351.4000
Facsimile:  212.351.4035
mkarlan@gibsondunn.com

*Attorneys for Textron Financial Corporation*

**A-21**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :
FRANK OWENS,                                      :
                                                  :
                        Plaintiff,                :
                                                  :
        -against-                                 :     No. 13-cv-5948 (VLB)
                                                  :
TEXTRON FINANCIAL CORPORATION,                    :
                                                  :
                        Defendant.                :
                                                  :
-------------------------------------------------------------x

### DECLARATION OF MITCHELL A. KARLAN

        MITCHELL A. KARLAN, hereby declares, pursuant to 28 U.S.C. § 1746, that the

following is true and correct to the best of his knowledge:

        1.      I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, counsel for

Textron Financial Corporation ("TFC" or "Defendant") in this action.  I make this declaration to

present the Court with the attached documents in connection with the Defendant's Motion to

Dismiss the Amended Complaint, dated December 13, 2013.

        2.      Attached hereto as **Exhibit A** is a true and correct copy of the Amended

Complaint filed on October 18, 2013, entitled *Owens v. Textron Financial Corporation*, Index

No. 7:13-cv-5948, in the United States District Court in the Southern District of New York.

        3.      Attached hereto as **Exhibit B** is a true and correct copy of the Superseding

Indictment filed on February 26, 2013, entitled *United States of America v. Lloyd Barriger*,

Index No. 7:11-cr-00416, in the United States District Court in the Southern District of New

York.

        4.      Attached hereto as **Exhibit C** is a true and correct copy of the Corrected

Judgment filed on February 2, 2012, entitled *Frank Owens v. Lloyd Vernon Barriger, Gaffken &*

1

**A-22**

*Barriger Fund LLC, et al.*, Index No. 08-cv-8414, in the United States District Court in the

Southern District of New York.

     5.     Attached hereto as **Exhibit D** is a true and correct copy of the Loan and Security

Agreement between Textron Financial Corporation, as Lender, and Gaffken & Barriger Fund,

LLC, dated as of January 25, 2006.

     I declare that the foregoing is true and correct to the best of my knowledge.

Dated:  New York, New York
        December 13, 2013

                                  MITCHELL A. KARLAN

# EXHIBIT A

United States District Court
for the
Southern District of New York

FRANK OWENS,                              )
                                         )
                          Plaintiff,     )
                                         )
v.                                       )     Civil Action No: 7:13-cv-5948 (VB)
                                         )
TEXTRON FINANCIAL CORPORATION,           )
                                         )
                          Defendant.     )

**AMENDED COMPLAINT**

Plaintiff for his amended complaint alleges:

1.      On August 13, 2013, Plaintiff commenced an action, Index No. 2013-1993, in the

Supreme Court of the State of New York, County of Sullivan.  The action was removed by

Notice of Removal dated August 22, 2013 and filed on August 22, 2013 pursuant to 28 U.S.C.

§1446(b).

2.      This Court has original jurisdiction over this civil action: (1) Plaintiff and

Defendant are "citizens of different States," and (2) the amount in controversy "exceeds the sum

or value of $75,000.00, exclusive of interest and costs."  28 U.S.C. §1332(a).  This Court is the

district court "for the district and division embracing the place where such action is pending,"

and defendant is not a citizen of the State in which this action was brought.  28 U.S.C. §1441.

3.      Frank Owens resides at 4585 State Route 97, Narrowsburg, New York, 12764.

4.      Textron Financial Corporation is a Delaware corporation with principal place of

business at 40 Westminster Street, Providence, Rhode Island 02903 and with an additional office for

the conduct of business at 11575 Great Oaks Way, Suite 210, Alpharetta, GA 30022.

1

A-25

5.      Textron Financial Corporation is a highly sophisticated money lender skilled in the business of making high interest loans to high risk borrowers, a business usually not engaged in by conventional national and state banks.

6.      Gaffken & Barriger Fund, LLC is a New York limited liability company with principal place of business at 198 Bridgeville Road, Monticello, New York  12701.

7.      Lloyd Vernon Barriger presently resides at 73 Clover Hill Road, Damascus, Pennsylvania 18415-3534, previously had a principal place of business at 198 Bridgeville Road, Monticello, New York 12701, and is about to go to jail.

8.      Lloyd Vernon Barriger was an unregistered investment advisor, conducting business at 198 Bridgeville Road, Monticello, New York 12701 and was the President and Chief Executive Officer of Gaffken & Barriger Fund, LLC.

9.      This is an action by a crime victim to recover the proceeds of the crime from the beneficiary and recipient of the proceeds of that crime.

10.     Lloyd Vernon Barriger and Gaffken & Barriger Fund, LLC perpetrated the crime.

11.     Frank Owens was the victim of the crime.

12.     Textron Financial Corporation is the direct beneficiary of the crime and received the proceeds.

13.     The sole purpose of the crime was specifically to obtain money to give to Textron Financial Corporation.

14.     The crime proceeds were reserved to Textron Financial Corporation and not used or absorbed in the Ponzi Scheme hereinafter referred to.

15.    Gaffken & Barriger Fund, LLC had brief possession of the proceeds of the crime by virtue of a wire pass-through occurring simultaneously with or minutes after the commission of the crime itself.

16.    A criminal who profits by and has possession of the proceeds of his or her crime does not obtain title to those proceeds of the crime.

17.    By the commission of the crime, Lloyd Vernon Barriger and Gaffken & Barriger Fund, LLC stole Two Million ($2,000,000.00) Dollars from Frank Owens and immediately handed it over to Textron Financial Corporation through intra-bank transfer and wire transfer as hereinafter alleged.

18.    Gaffken & Barriger Fund, LLC is now in the hands of a receiver appointed by Supreme Court, Sullivan County, by order dated August 10, 2011 and entered on August 12, 2011.

19.    Textron Financial Corporation and Gaffken & Barriger Fund, LLC are parties to a Loan and Security Agreement dated as of January 25, 2006 (as amended, restated or otherwise modified from time to time) pursuant to which Textron Financial Corporation has made certain loans and other financial accommodations to Gaffken & Barriger Fund, LLC.

20.    The loans made by Textron Financial Corporation to Gaffken & Barriger Fund, LLC are high interest loans with high interest rates and high penalties for default.

21.    Prior to receivership, Gaffken & Barriger Fund, LLC was generally engaged in a business of holding primarily real estate collateralized commercial mortgage loans, other mortgages, real estate related and non-real estate assets, and making loans at high interest rates to high risk borrowers.

22.    Gaffken & Barriger Fund, LLC raised capital for its operation through sales of securities to public investors and private borrowing.

23.    Under provisions contained in the Loan and Security Agreement dated as of January 25, 2006 as alleged in paragraph "19", supra, Textron Financial Corporation had the right to review and audit and did review and audit the financial records and books maintained by Gaffken & Barriger Fund, LLC.

24.    The underlying Loan and Security Agreement gave Textron Financial Corporation all of the tools with which it could thoroughly understand the financial and illegal activities of the Gaffken & Barriger Fund, LLC and its President Lloyd Vernon Barriger and it did employ those tools.

25.    The Loan and Security Agreement between Textron Financial Corporation and Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

> "6.1    Financial Statements.    Borrower shall deliver to Lender, within one hundred twenty (120) days following the close of each Fiscal Year thereafter, Borrower's audited financial statements, certified by a recognized firm of independent certified public accountants acceptable to Lender as having been prepared in accordance with GAAP and as presenting fairly the financial condition of Borrower as of the date thereof and for the period then ended, and including a management letter to Borrower from such accounts.  Borrower shall deliver to Lender such other financial information as Lender shall reasonably request, including, (i) within thirty (30) days after the close of each month, reasonably detailed monthly and fiscal year-to-date financial statements, including income statement, balance sheet, and statement of cash flow, prepared in accordance with GAAP (subject to the absence of notes and to annual audit adjustment), certified by the chief executive officer or chief financial officer or other authorized individual of Borrower as presenting fairly the financial condition of Borrower, which, for the end of each month, shall also include a Covenant Compliance Certificate, setting forth a calculation of the financial covenants

4

described in Section 7.6 below, and the status of all other monetary covenants set forth in this Agreement, and (ii) at least sixty (60) days prior to the end of Borrower's Fiscal Year thereafter, an annual operating budget, prepared in accordance with GAAP, showing a projected income statement, balance sheet and cash flows as of each Fiscal Quarter end of the forthcoming Fiscal Year."

26.     The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.2     Books and Records.     Borrower shall keep accurate and complete records, including accurate and complete books and records of the Collateral, maintained in accordance with GAAP as acknowledged by Lender, including without limitation observing reasonable practices for monitoring and managing Borrower's loans to Clients, and shall permit Lender to: (a) visit Borrower's business locations during normal business hours upon two (2) days' prior notice, but without notice at any time during the existence of an Event of Default; (b) inspect, audit and make extracts from or copies of Borrower's books, records, journals, receipts, computer tapes and disks; (c) to accompany Borrower on its field examinations with respect to any Client; (d) to inspect all records available to Borrower including without limitation field examination reports, borrowing base certificates, appraisals, credit reports, credit approvals, and financial statements with respect to any Client and to examine and make copies of any such records; (e) to inspect all records available to Borrower from any credit reporting service, bureau or similar service with respect to any Client and to examine and make copies of any such records; provided that Borrower makes no representation to Lender regarding the accuracy or veracity of such reports; and (f) to attend, for the purpose of monitoring only and not for participating in, any and all meetings of Borrower the purpose of which, in whole or part, is to discuss the status of any and all Client Loans that are or may be delinquent or otherwise in default.     All governmental authorities are authorized to furnish Lender with copies of reports of examinations of Borrower made by such parties. Banks, Clients and other third parties (without waiving any attorney-client privilege) with whom Borrower has contractual relationships pertaining to the Collateral or the Loan Documents, are authorized to furnish Lender with copies of such contracts and related materials.     Lender is authorized, in its own name or any other name, to communicate with Clients in order to verify the existence, amount and terms of any

5

Receivable. Lender may exhibit a copy of this Agreement to any party with whom Lender contacts pursuant to this Section 6.2 and such party shall be entitled to rely on the provisions hereof in providing access or information to Lender as Provided herein."

27.  The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.3   Additional Documentation.   Borrower shall execute and deliver to Lender all additional documents that Lender may, from time to time, reasonably determine are necessary or appropriate to evidence the Loans or to continue or perfect Lender's Security Interest in the Collateral."

28.  The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.7   Reporting as to Revenues and Receivables.

(a)   With such frequency as Lender shall direct, Borrower shall shall deliver to Lender such information as Lender shall request with respect to the Revenues, Receivables and Inventory, including, but not limited to:

(i)   no later than 1:00 p.m., East Coast time on the first to occur of (A) the day on which Borrower requests a Revolving Loan Advance or (B) Wednesday of each week, a weekly Borrowing Base Certificate based on the Receivables as of the end of the preceding day, together with a detailed summary of sources of all of the Revenues and credits and collections associated with Receivables.

(ii)   no later than the fifteenth (15th) day of each month, a monthly Borrowing Base Certificate based on the Receivables as of the end of the preceding month, and detailed reports and schedules showing the aging of Receivables and Borrower's accounts payable as of the end of the preceding month;

(iii)   no later than 1:00 p.m., East Coat time on Wednesday of each week (or more often as the Lender may request) daily sales and collections reporting as of the end of the preceding day, in form and substances acceptable to Lender; and

(iv)    no later than ten (10) days following Lender's request therefor, complete and updated list of Borrower's Clients, including the name, address and telephone number of each customer.

(h) [sic]   Borrower shall notify Lender promptly if:

(i)    Borrower or any Client enters into a long-term contract with the United States of America, and, if requested by Lender, Borrower shall execute and shall cause such Client to execute all instruments and take all steps necessary to insure that all amounts due and to become due under such long-term contract are property assigned to Lender pursuant to the Assignment of Claims Act of 1940 or otherwise;

(ii)    Borrower receives information with regard to any type or item of Collateral which might have in any way a Materially Adverse Effect on the value of the Collateral as a whole or the rights and remedies of Lender with respect thereto; and

(iii)    any accounts due and owing in which amounts in excess of $20,000 are in dispute by any single Client on an Eligible Receivable, and Borrower shall explain in detail the reason for the dispute, all claims related to the dispute, and the amount in controversy."

29.    The Loan and Security Agreement between Textron Financial Corporation and

Gaffken & Barriger Fund, LLC, dated January 25, 2006, required:

"6.13   Disclosure.   Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, Borrower shall (i) notify Lender if any written information, exhibit, or report furnished to Lender contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and (ii) correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgment, filing or recordation thereof."

30.    Textron Financial Corporation did, prior to April 18, 2007, and from time to time

thereafter, conduct a review and audit of the financial records and books maintained by Gaffken &

Barriger Fund, LLC, thereby becoming fully familiar with the financial condition of Gaffken &

Barriger Fund, LLC , the condition of its distressed collateralized commercial mortgage loans and

other mortgages, as well as making payments to existing investors from funds obtained from new

investors, and the manner in which it was conducting business.

31.     Textron Financial Corporation knew or should have known that Gaffken & Barriger

Fund, LLC was a criminal enterprise engaged in the operation of a Ponzi Scheme, making payments

to existing investors from funds obtained from new investors and attracting new investors by

manipulative and deceptive device.

32.     Textron Financial Corporation was aware of the nature of the business conducted

by Gaffken & Barriger Fund, LLC, that it was insolvent at least as of April 18, 2007 or earlier,

and that it continued its business while insolvent.

33.     Textron Financial Corporation knew that Gaffken & Barriger Fund, LLC

guarantied a return of eight (8%) percent on investment for anyone investing in Gaffken &

Barriger Fund, LLC and that any investment was returnable on demand.

34.     By reservation of rights letter dated April 18, 2007 from Textron Financial

Corporation to Gaffken & Barriger Fund, LLC, Attention: Lloyd V. Barriger, Textron Financial

Corporation, in addition to other things, declared:

> "Events of default have occurred and currently exist
> under the Agreement as a result of the Borrower's
> failure to comply with the maximum delinquent loan
> covenant set forth in Section 7.6(d) of the Agreement
> for the month ended March 31, 2007 (the foregoing
> defaults are collectively referred to herein as, the
> "Current Defaults")."

8

A-32

35.    By reason of the premises, Textron Financial Corporation knew or should have known that any payments made to it to cure its defaults were generated in the course of the Ponzi Scheme or obtained by Gaffken & Barriger Fund, LLC in its course of defrauding new investors and third parties like Frank Owens.

36.    From review and audit of Gaffken & Barriger Fund, LLC financial and internal books and records, Textron Financial Corporation knew that any payments made on account to cure "Current Defaults" or other defaults were the result of and generated by a "Ponzi Scheme" engaged in by Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger, individually, as President, and as Chief Executive Officer of Gaffken & Barriger Fund, LLC or generated through some other illegal or criminal activity or manipulative and deceptive device and contrivance.

37.    Textron Financial Corporation knew that any payments made to it on account by Gaffken & Barriger Fund, LLC could not come from earned income and profit of existing investment and that Gaffken & Barriger Fund, LLC was concealing its illegal business activities by accounting records intended to conceal and not kept in accordance with generally acceptable accounting principles.

38.    Textron Financial Corporation knew that any of the payments made to it from Gaffken & Barriger Fund, LLC to cure "Current Defaults" or any other defaults could not be made from current earned income and existing investment.

39.    Textron Financial Corporation knew that any payment made by Gaffken & Barriger Fund, LLC to cure "Current Defaults" or any other defaults had to come from monies received by Gaffken & Barriger Fund, LLC from new investors or lenders or other third parties such as Frank Owens.

9

**A-33**

40.    Textron Financial Corporation knew that Gaffken & Barriger Fund, LLC was unable to borrow from other factors and lenders because of its insolvent financial position and that applications for such borrowing from other factors or lenders had been denied.

41.    Knowing that Gaffken & Barriger Fund, LLC was insolvent, unable to pay investors from earned income, unable to pay investors from profits, unable to timely pay creditors, unable to timely pay Textron Financial Corporation, and unable to borrow, it did not declare a default which would have had the effect of closing down the Gaffken & Barriger Fund, LLC operations; and instead entered into forbearance agreements so that Gaffken & Barriger Fund, LLC would not be required to fully disclose its financial distress, could continue its illegal activities and fraudulently induce innocent third parties to lend, invest, and give it money, thereby aiding and abetting the criminal activities of Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger.

42.    Based upon obtaining money by false pretenses in violation of federal and state criminal statutes, Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger, as perpetrators, stole Two Million ($2,000,000.00) Dollars from Frank Owens, as victim, and the money was immediately wired to Textron Financial Corporation.

43.    The Two Million ($2,000,000.00) Dollars wired to Textron Financial Corporation constitutes proceeds of crime or crimes committed by Gaffken & Barriger Fund, LLC and Lloyd Vernon Barriger.

44.    The movement of the Two Million ($2,000,000.00) Dollars was orchestrated and carried out by Lloyd Vernon Barriger and another executive of Gaffken & Barriger Fund, LLC, Andrew McKean, on September 27, 2007 by intra-bank transfer at Catskill Hudson Bank, Monticello, New York 12701 from an attorney's escrow account held for the benefit of Frank Owens

10

**A-34**

to an account held for benefit of Gaffken & Barriger Fund, LLC and immediately wired by Gaffken & Barriger Fund, LLC to Textron Financial Corporation.

45.     On September 27, 2007, Gaffken & Barriger Fund, LLC was insolvent and unable to meet its obligations as they became due.

46.     Textron Financial Corporation is unjustly enriched by the receipt of Two Million ($2,000,000.00) Dollars proceeds of crime.

47.     Frank Owens is entitled to return of the Two Million ($2,000,000.00) Dollars proceeds of crime together with interest from September 27, 2007 and disgorge by Textron Financial Corporation.

48.     With regard to crimes alleged herein applicable to victim Frank Owens and other crimes applicable to old and new investors of Gaffken & Barriger Fund, LLC, by Grand Jury Indictment filed in the United State District Court, Southern District of New York on May 12, 2011, Lloyd Vernon Barriger was charged with conspiracy to commit mail fraud in violation of Title 18 United States Code Section 1341, Title 18 United States Code Section 1349, Title 15 United States Code, Sections 78(j)(b) and 78(ff), securities fraud in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18 United States Code, Section 2 and by Superseding Indictment dated February 26, 2013 as follows:

**COUNT ONE**
**(Conspiracy to Commit Mail Fraud)**

**COUNT TWO**
**(Mail Fraud)**

11

A-35

**COUNT THREE**
**(Conspiracy to Commit Securities Fraud)**

**COUNT FOUR**
**(Securities Fraud)**

49.    On July 26, 2013, Lloyd Vernon Barriger pleaded guilty to the charges listed

below:

| Number of Charges | Description of Charge(s) | Disposition |
|---|---|---|
| 1 | Conspiracy to commit offense or to defraud US | Guilty |
| 1 | Securities Violations | Guilty |
| 1 | Mail Fraud - Frauds and swindles | Guilty |
| 1 | Attempt and conspiracy fraud | Guilty |

and is awaiting sentencing presently scheduled for November 15, 2013 before Judge Cathy

Seibel of the United States District Court, Southern District of New York.

50.    The Two Million ($2,000,000.00) Dollars stolen from Frank Owens by Lloyd Vernon

Barriger and Gaffken & Barriger Fund, LLC was never commingled with other monies or funds of

Gaffken & Barriger Fund, LLC and is immediately traceable through the intra bank transfer and

immediate wire from the Catskill Hudson Bank to Textron Financial Corporation on September 27,

2007.

51.    At the close of banking business on September 26, 2007, the day before the transfer

of the Two Million ($2,000,000.00) Dollars to Textron Financial Corporation, the Gaffken &

Barriger Fund, LLC Catskill Hudson Bank Account Number: 1101012 had a balance of $116,667.12.

52.    On September 27, 2007, Baum Law Offices, LLP completed an intra-bank transfer

of Two Million ($2,000,000.00) Dollars, from its Catskill Hudson Bank special escrow Account

12

Number: 14103451 for Frank Owens, to Gaffken & Barriger Fund, LLC Catskill Hudson Bank Account Number: 1101012.

53.    On September 27, 2007, Gaffken & Barriger Fund, LLC wired Textron Financial Corporation $2,115,647.12, incurred a wire fee of $20.00, and on the close of business on that day, Account Number: 1101012 had a balance of $1,000.00. There were no intervening entries.

54.    The stolen Two Million ($2,000,000.00) Dollars is traceable from the time and point of theft directly into the Textron Financial Corporation account.

55.    The payment of Two Million ($2,000,000.00) Dollars was not made in the ordinary course of business.

56.    Textron Financial Corporation is not an innocent transferee without knowledge of the Gaffken & Barriger Fund, LLC criminal activity.

WHEREFORE, Plaintiff Frank Owens demands judgment against Defendant Textron Financial Corporation for compensatory damages in the amount of Two Million ($2,000,000.00) Dollars with interest from September 27, 2007, punitive damages in an amount to be determined, and legal fees in an amount to be determined, together with the costs and disbursements of the action.

Dated: October 18, 2013

BAUM LAW OFFICES, LLP

By:    Morton I. Baum, Esq. (MB 1674)
       *Attorneys for Plaintiff*
       428 Broadway
       P.O. Box 1260
       Monticello, New York 12701
       baumlawoffices@verizon.net
       (845) 791-1000

13

**A-37**

To:   GIBSON, DUNN & CRUTCHER, LLP
      Mitchell A. Karlan, Esq.
      *Attorneys for Defendant*
      200 Park Avenue
      New York, New York 10166-0193
      Telephone: (212) 351-4000
      Facsimile: (212) 351-4035
      mkarlan@gibsondunn.com


### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a Jury Trial in accordance with Rule 38.

Dated: October 18, 2013

                                        BAUM LAW OFFICES, LLP


                              By:       Morton I. Baum, Esq. (MB 1674)
                                        *Attorneys for Plaintiff*
                                        428 Broadway
                                        P.O. Box 1260
                                        Monticello, New York 12701
                                        baumlawoffices@verizon.net
                                        (845) 791-1000


To:   GIBSON, DUNN & CRUTCHER, LLP
      Mitchell A. Karlan, Esq.
      *Attorneys for Defendant*
      200 Park Avenue
      New York, New York 10166-0193
      Telephone: (212) 351-4000
      Facsimile: (212) 351-4035
      mkarlan@gibsondunn.com


14

**A-38**

United States District Court
for the
Southern District of New York

FRANK OWENS,                              )
                                          )
                          Plaintiff,      )
                                          )
v.                                        )        Civil Action No: 7:13-cv-5948 (VB)
                                          )
TEXTRON FINANCIAL CORPORATION,            )
                                          )
                          Defendant.      )

## CERTIFICATE OF SERVICE

Morton I. Baum, a member of the firm Baum Law Offices, LLP, attorneys for Plaintiff

Frank Owens hereby certifies that he has served a copy of the within AMENDED COMPLAINT

dated October 18, 2013 with Demand For Jury Trial on:

> GIBSON, DUNN & CRUTCHER, LLP
> Mitchell A. Karlan, Esq.
> *Attorneys for Defendant*
> 200 Park Avenue
> New York, New York 10166-0193
> mkarlan@gibsondunn.com

by e-mail on October 18, 2013.

                                    BAUM LAW OFFICES, LLP

                          By:       Morton I. Baum, Esq. (MB 1674)
                                    *Attorneys for Plaintiff*
                                    428 Broadway
                                    P.O. Box 1260
                                    Monticello, New York 12701
                                    baumlawoffices@verizon.net
                                    (845) 791-1000

1

**A-39**

To:    GIBSON, DUNN & CRUTCHER, LLP
       Mitchell A. Karlan, Esq.
       *Attorneys for Defendant*
       200 Park Avenue
       New York, New York 10166-0193
       Telephone: (212) 351-4000
       Facsimile: (212) 351-4035
       mkarlan@gibsondunn.com

**A-40**

# EXHIBIT B

Case: 14-2637    Document: 38    Page: 45    09/03/2014    1310409    212
Case 7:13-cv-05948-VB    Document 19-2    Filed 12/13/18    Page 9 of 29 30
Case 7:11-cr-00416-CS    Document 19    Filed 02/26/13    Page 9 of 29

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
                                  :
UNITED STATES OF AMERICA          :    **SUPERSEDING INDICTMENT**
                                  :
           - v. -                 :    S1 11 Cr. 416 (CS)
                                  :
LLOYD BARRIGER,                   :
                                  :
           Defendant.             :
                                  :
                                  :
- - - - - - - - - - - - - - - - - X

## COUNT ONE
### (Conspiracy to Commit Mail Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.     At all times relevant to this Indictment, Gaffken

& Barriger Fund LLC ("the Fund") was a limited liability company

organized under Delaware law with its principal place of business

in Monticello, New York.  The Fund purportedly invested primarily

in real estate collateralized commercial mortgage loans, other

mortgage and real estate related assets and a limited amount of

non-real-estate assets.  The Fund raised capital for its

purported operations through sales of securities to public

investors.  Such securities included Preferred Interests of the

Fund, which were referred to as Preferred Interests and/or

Preferred Units (the "Preferred Interests").

2.     At all times relevant to this Indictment, LLOYD

BARRIGER, the defendant, was the president of the Fund; the

Case: 14-2637    Document: 38    Page: 46    09/03/2014    1310409    212

Case 7:13-cv-05948-VB    Document 19-2    Filed 12/13/13    Page 2 of 30
Case 7:11-cr-00416-CS    Document 19    Filed 02/26/13    Page 2 of 29

principal shareholder, director and officer of G&B Partners, Inc., which was the Fund's managing member and sole common shareholder; and a 25% owner of the entity that underwrote and serviced the Fund's loans ("Entity 1").

    3.    From in or about April 2005 through in or about September 2008, a co-conspirator not named as a defendant herein ("CC-1"), was the vice president of the Fund, a principal of G&B Partners, Inc., and a 25% owner, the President and the Chief Executive Officer of Entity 1.

    4.    At all times relevant to this Indictment, the Fund was managed by G&B Partners, Inc. ("G&B Partners"), a New York limited liability company wholly owned and controlled by LLOYD BARRIGER, the defendant, with its principal place of business in Monticello, New York.  G&B Partners appointed Bridgeville Management, LLC to manage the Fund's investments.

    5.    At all times relevant to this Indictment, Bridgeville Management, LLC ("Bridgeville Management"), a New York limited liability company wholly owned and controlled by LLOYD BARRIGER, the defendant, managed the investment of the assets of the Fund.  Bridgeville Management's principal place of business was Monticello, New York.  Prior to January 1, 2007, Bridgeville Management received a monthly fee, from the Fund, equal to .0833% of the ending Net Asset Value of assets under management.  On January 1, 2007, Bridgeville Management increased

2

**A-43**

Case 7:11-cr-00416-CS   Document 19   Filed 02/28/13   Page 3 of 30

its monthly fee to .1250% of the ending Net Asset Value of assets under management.  From in or about January 2007 through on or about March 3, 2008, the Fund paid approximately $650,000 in management fees to Bridgeville Management.

6.   In January 2006, the Fund received a line of credit, initially in the amount of $15,000,000, from a commercial lender ("Lender 1"). Lender 1 was given a lien on all assets of the Fund, which were pledged to secure full and prompt repayment of all obligations incurred under the line of credit. Under the terms of the line of credit, if the Fund defaulted on the line of credit, Lender 1 had the right to seize all of the Fund's assets and dispose of them to recover Lender 1's advances under the line of credit and prohibit any distributions to investors holding the Preferred Interests while a default was ongoing.

7.   At all times relevant to this Indictment, Entity 1 acted as the servicer of the Fund's loans - collecting loan payments and remitting payments to Lender 1 to repay funds borrowed through the line of credit.  As of January 1, 2007, Entity 1 received a fixed monthly fee of $30,000 for performing these collection activities, regardless of the size of the loans or the total assets.  From January 2007 through in or about March 2008, the Fund paid Entity 1 approximately $420,000 in fees.

8.   At all times relevant to this Indictment, the Fund allocated net profits on a monthly basis to each investor in

3

Case: 14-2637     Document: 38     Page: 48     09/03/2014     1310409     212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 5 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 4 of 29

Preferred Interests in an amount equal to the current value of

the investor's Preferred Interests multiplied by an annualized

rate of 8 percent.  The Fund made monthly distributions and

permitted Preferred Interest holders to reinvest the

distributions instead of receiving them on a current basis. The

Fund allocated the net losses of the Fund to a Common Interests'

capital account (the "capital account") - an account of LLOYD

BARRIGER, the defendant.

THE SCHEME TO DEFRAUD

9.   As described more fully below, from in or about

July 2006 through on or about March 5, 2008, LLOYD BARRIGER, the

defendant, perpetrated a scheme to defraud investors by

soliciting millions of dollars in investments under false

pretenses and committed overt acts in furtherance of this scheme,

in the Southern District of New York, as set forth in paragraphs

12 through 51 below.  During this time period, the Fund raised

approximately $12.6 million from new and existing investors.

Specifically, from in or about July 2006 through on or about

March 5, 2008, the Fund obtained approximately $6.9 million in

additional investments from approximately 38 existing investors

and raised approximately $5.7 million from approximately 35 new

investors.

10.   LLOYD BARRIGER, the defendant, defrauded

prospective investors in the Fund by presenting the Fund as a

4

A-45

Case: 14-2637   Document: 38   Page: 49   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 6 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 8 of 29

relatively safe and liquid investment that paid a minimum return
of 8% per year - a return that was referred to as the "Preferred
Return," was reported to investors as income on periodic account
statements produced by the Fund and mailed to investors, and was
supposed to be funded by the Fund's net income and thus subject
to the Fund's actual performance - when Barriger knew that the
Fund's actual performance did not justify these performance
claims.

       11.  LLOYD BARRIGER, the defendant, fraudulently
induced victims to invest and reinvest their money.  As
summarized in the paragraphs below, among other things, BARRIGER
failed to inform investors that: (1) the Fund had incurred a loss
of $600,000 in 2005; (2) the Fund lacked sufficient income to
support the promised 8% return, and was continuing to pay the
promised return, when it actually paid the return rather than
simply credit it to investors' accounts, by funding payments with
investor capital, rather than income, and disguised the lack of
income by creating a large and growing deficit in BARRIGER's
capital account with the Fund; (3) as a result of the failure of
its borrowers to repay their loans, the Fund experienced a severe
liquidity crunch and could not meet any substantial amount of
withdrawal requests; (4) the Fund had defaulted on its $20
million line of credit with a third party lender - Lender 1 - in
March 2007 and remained in default for much of the period

thereafter, which entitled Lender 1 to prohibit distributions on

the Preferred Interests and to seize the Fund's assets; and (5)

delinquencies on the Fund's loan portfolio spiked to over

approximately 25% in July 2007 and increased to approximately 34%

in November 2007.

### Barriger Raises Funds by Misleading Investors About the Fund's Financial Performance

12. In a letter dated September 21, 2005 and mailed to

investors, LLOYD BARRIGER, the defendant, stated that investors

should have a "'floor' of a basic return on [their] money," which

would be accomplished by investors "receiv[ing] 8% per year paid

on a monthly basis." BARRIGER informed investors that if the Fund

earned less than 8%, then his capital account would absorb the

deficit.

13. In a letter dated January 31, 2006 and mailed to

investors, LLOYD BARRIGER, the defendant, informed investors that

Lender 1 had extended the Fund a $15 million line of credit.

14. LLOYD BARRIGER, the defendant, and CC-1 allocated

to investors Preferred Returns totaling approximately $1 million

during 2005, notwithstanding that the Fund actually had a loss

for that year of almost $600,000. In or about June 2006, during

their review of the Fund's financial statements, the Fund's

independent accountants, Accounting Firm 1 (hereinafter "the

auditors"), reversed the allocation of the 8% return to investors

for 2005 as part of their "Accountants' Review Report" for the

6

year ending December 31, 2005.  In light of the Fund's 2005 loss,
the auditors required that the allocation of the Preferred Return
to investors' equity be reversed, thereby reducing the value of
those investors' equity collectively by approximately $1 million.
In addition, the auditors advised that going forward, before any
returns could be allocated to investors, the Fund's income would
have to be sufficient to make up the loss.

          15.   On June 16, 2006, CC-1 forwarded to LLOYD
BARRIGER, the defendant, a copy of the "Gaffken & Barriger Fund,
LLC Financial Statements - December 31, 2005 and Accountants'
Review Report", which showed that the Fund had incurred a loss of
nearly $600,000 for 2005 and reflected the auditors' reversal of
the allocation for that year of $1 million in Preferred Returns.

          16.   In or about February 2007, the auditors advised
CC-1 that the returns allocated to investors in 2006 were not
supported by the Fund's income and were not allowed under
Generally Accepted Accounting Principles ("GAAP").  Although the
Fund earned a profit in 2006, the auditors determined that there
was a shortfall of approximately $775,000 in shareholders'
equity, meaning that the amount of "income" the Fund had
allocated to investors during 2006 was overstated by
approximately $775,000.  Accordingly, the auditors directed CC-1
to reduce the investors' preferred equity account by that amount
on the Fund's 2006 audited financial statements.  Such financial

7

**A-48**

Case: 14-2637  Document: 38  Page: 52  09/03/2014  1310409  212

Case 7:13-cv-05948-VB  Document 19-2  Filed 12/13/13  Page 9 of 30
Case 7:11-cr-00416-CS  Document 19  Filed 02/26/13  Page 8 of 29

statements were not provided to investors or prospective
investors, however, and investors were not otherwise informed
that the Preferred Return reflected on their account statements
did not reflect the actual return on their investment.

17.  Even after the auditors advised, in or about June
2006, that the allocation of the Preferred Return was not
supported by the Fund's financial condition, LLOYD BARRIGER, the
defendant, and CC-1 continued to send out periodic account
statements to investors reporting "income" on their investments
and failed to disclose that the reported "income" was not
supported by the Fund's financial condition and performance. For
example, BARRIGER's July 7, 2006 letter to investors accompanying
their quarterly account statements assured investors there were
no new developments and that all was well.  The letter stated: "I
am pleased to tell you that we have continued to make progress in
our ongoing efforts to improve our portfolio and operations.
There is not a great deal new or different to report to you,
except that [a newspaper] was kind enough to feature our business
in a very nice article, which gave us good publicity."

18.  In or about September 2006, the Fund produced a
brochure that was received by investors stating that the Fund's
returns – from 1998 to 2006 – "compared favorably" with those of
stock exchanges and a stock exchange index, the S&P 500.  The
document also stated that "management's policy has also been to

8

provide ready liquidity to any of the partners who may from time to time need to withdraw money." The document made no reference to the fact that the Fund had actually incurred a loss for 2005.

19.   In or about October 2006, the Fund produced a brochure that was received by investors that stated that its average annual return was over 9% and exceeded the returns of United States Treasury bonds and certificate of deposits. The brochure stated that the Fund "provides flexible investment options to investors looking for consistent returns . . . [and] pays a fixed rate of 8% annually." It also stated that "[a]lthough not required to do so, the managing partner maintains a policy of permitting investors to add or withdraw money from the fund at any time, allowing them to achieve a good return while keeping their assets liquid."

### The Fund's Financial Condition Deteriorates and the Fund is in Default on its Credit Agreement with Lender 1

20.   According to its January 1, 2007 private placement memorandum offering the sale of a maximum of $25,000,000 of Preferred Interests to investors who were willing to invest a minimum of $200,000, the Fund's stated purpose was "to hold primarily real estate collateralized commercial mortgage loans . . . and other mortgage and real estate related assets . . . and a limited amount of non-real estate assets." As disclosed in its private placement memorandum, the Fund's primary strategy was "hard money lending" - making short-term bridge

9

**A-50**

Case: 14-2637    Document: 38    Page: 54    09/03/2014    1310409    212
Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 10 of 29
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 11 of 30

loans at high interest rates to real estate developers (initially
in Sullivan County, New York, and ultimately nationwide) who
could not obtain traditional bank financing.  In accordance with
that strategy, the Fund primarily made short term loans
(typically for twelve months or less) to real estate developers,
collateralized by the underlying real estate, with a loan-to-
value ratio purportedly of at least 70%. Most of the projects
financed by the Fund were in the development stage and thus were
not generating income. As a result, the borrowers generally were
unable to make the periodic payments on their loans.  When the
loans were made, a portion of the loan proceeds was used to
establish a pre-funded "interest reserve" account from which
interest payments were drawn during an initial period of the loan
(ranging from three to twelve months) because there would not be
any income until the project was developed and completed.
Repayment of the loan principal at maturity required a successful
exit strategy for the borrower, specifically, the sale of the
property or finding replacement financing.

          21.  As the real estate market deteriorated in 2007,
the Fund's borrowers began to default in increasing numbers, and
the Fund began to experience significant liquidity problems which
were not fully disclosed to investors until after the Fund was
frozen on or about March 5, 2008. This liquidity crunch was
exacerbated by the terms of the Fund's credit agreement with

Case: 14-2637   Document: 38   Page: 55   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 02/26/13   Page 12 of 29 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 11 of 29

Lender 1. Under the agreement, whenever a loan pledged as
collateral became delinquent, the Fund was required to remove it
from the collateral pool (the "borrowing base"), and either repay
Lender 1 the amount it had borrowed against the loan, thereby
reducing the outstanding balance on the credit line, or
substitute a new, performing loan. Faced with a dearth of
eligible borrowers to whom it could make new loans in the
deteriorating real estate market, and lacking the cash to do so
even if it could have found qualified borrowers, the Fund
increasingly found itself in the position of having to raise new
cash with which to repay Lender 1. Moreover, when 10% or more of
the Fund's borrowing base became delinquent, the Fund was in
default under the credit agreement.

      22.   In an effort to stave off default and improve the
Fund's liquidity, in the first half of 2007, CC-1 engaged in
transactions pursuant to which the Fund purportedly "sold" loans
to other hard money lenders, but in fact agreed to guarantee
payment of principal and interest should the borrowers default,
and further agreed to repurchase the loans on demand at the
discretion of the purchaser.  Although they temporarily moved
these loans out of the Fund's borrowing base and raised immediate
cash, as a practical matter these transactions did not improve
the Fund's financial position because the Fund remained obligated
for the full amount of principal and interest on the loans.

Case: 14-2637    Document: 38    Page: 56    09/03/2014    1310409    212

Case 7:13-cv-05948-VB    Document 19-2    Filed 12/13/13    Page 13 of 30
Case 7:11-cr-00416-CS    Document 19    Filed 02/26/13    Page 12 of 29

Moreover, these transactions were costly to the Fund because it
was obligated to pay interest to the purchasers, at a rate of 12%
per annum. From January to May 2007, the Fund raised
approximately $3.7 million by "selling" four such loans, two of
which it subsequently repurchased at face value in late 2007 for
$2 million. During 2007, the Fund paid the purchasers of the
four loans interest of approximately $366,000, $207,000 of which
it paid on the two loans it repurchased.

    23.  On or about January 4, 2007, CC-1 emailed LLOYD
BARRIGER, the defendant, and others stating: "We have a very
small % of past due loans that [Lender 1] will permit us to have.
Once we exceed this percentage, we are in default of our line of
credit and it can be shut down. In theory [Lender 1] could work
with us if we ran into this problem, but I wouldn't count on it
based on their current frame of mind toward our type of
business."

    24.  On or about January 27, 2007, CC-1 emailed LLOYD
BARRIGER, the defendant, and others and stated: "[O]ur history
shows that when we take a very short interest reserve and it
comes time for the borrower to make payments we end up with a
past due loan. We can't afford this, a few of these loans and
[Lender 1] can pull the plug on us."

    25.  On or about March 23, 2007, in an email to LLOYD
BARRIGER, the defendant, and another individual, CC-1 stated,

after informing the recipients that the payments on one of the
Fund's outstanding loans had "bounced": "As of today we are
officially in default of our line of credit [with Lender 1]."

### Barriger Mails Letters Containing Positive Statements About the Fund's Financial Performance

    26.  Notwithstanding the March 23, 2007 email in which
CC-1 informed LLOYD BARRIGER, the defendant, that the Fund had
defaulted on its line of credit with Lender 1, in a letter dated
April 2, 2007 that was mailed to investors, BARRIGER stated that:
the events that were the subject of "the great deal of negative
news recently regarding sub-prime mortgages" had no impact on the
Fund, because "what is making headlines is residential mortgages
of lower quality, we are commercial property bridge lenders and
consequently are really in a different business." In that
letter, BARRIGER also informed investors that the Fund's line of
credit with Lender 1 was now $20 million and the Fund's total
assets exceeded $32 million. BARRIGER failed to disclose in this
letter that a substantial percentage of the Fund's bridge loans
went to developers of residential property. Barriger also failed
to disclose that the Fund was in default on its line of credit to
Lender 1.

    27.  On April 18, 2007, November 16, 2007 and July 28,
2008, Lender 1 sent LLOYD BARRIGER, the defendant, letters
advising BARRIGER that the Fund was in default on its line of

credit because the Fund had failed to comply with its obligation that the delinquency rate in the Fund's loan portfolio not exceed 10%. These letters advised BARRIGER that the Fund had been in default on the line of credit since March 2007.

28. On April 20, 2007, CC-1 copied LLOYD BARRIGER, the defendant, on an email to Lender 1 in which CC-1 explained why there was a difference between the Fund's audited financial statements and management's "internal figures": "In summary, the difference is simply due to the fact that we adjust the preferred equity accounts by the exact 8% return regardless of income or loss whereas [Generally Accepted Accounting Principles] limits the adjustment on any type of equity accounts to no more than the amount of income or loss for that fiscal year."

29. In a letter dated June 30, 2007 and mailed to investors, LLOYD BARRIGER, the defendant, stated: "There has been measurable progress in every one of the quantifiable areas by which we rate our Fund. I am very pleased with the way all the indicators point." BARRIGER also stated that the Fund had grown to over $40 million.

The Fund's Financial Condition Further Deteriorates Because of Rising Delinquencies in its Loan Portfolio

30. As of on or about July 16, 2007, the percentage of the Fund's loans past due had increased to approximately 26% of the loans outstanding.

14

**A-55**

31.   On August 11, 2007, in an email titled "Liquidity Crunch", from CC-1 to LLOYD BARRIGER, the defendant, and another individual, CC-1 stated that: "If we don't receive payments from [two individuals] by Tuesday we are going to have a tremendous problem with our line of credit. This will put us overline at the exact time [Lender 1's] participating bank is entertaining our request [for a larger line of credit]."

32.   On August 15, 2007, in an email titled "Issues," from CC-1 to LLOYD BARRIGER, the defendant, and another individual, CC-1 stated: "Just found out the lender that [Lender 1] was going to participate with turned us down due to our delinquencies . . . . When we get our delinquency level down we will make another attempt. In the interim we will attempt to collect on loans and raise capital."

33.   On August 22, 2007, LLOYD BARRIGER, the defendant, emailed CC-1 and another individual and stated: "Just so you are a little updated on our situation, as [CC-1] indicated we are struggling (as usual!) We have a high rate of slow-pays which makes it impossible for us to use leverage, since after x-many days past due we have to remove them from our borrowing base. We are in survival mode now just to weather the storm . . . ."

34.   On August 31, 2007, CC-1 emailed LLOYD BARRIGER, the defendant, and a loan broker ("Broker 1").  CC-1 informed Broker 1 that "We have to close [the loan] quickly. I have a

15

**A-56**

Case: 14-2637   Document: 38   Page: 60   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 17 of 29
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 16 of 30

strong feeling [Lender 1] is going to shut us down so I would
like to get the funds requested and your loan closed before we
end up looking bad."

35.   In late September 2007, LLOYD BARRIGER, the
defendant, and CC-1 met with a potential investor ("Investor 1")
at the Fund's offices in Monticello, New York.   BARRIGER told
Investor 1 that the Fund was, in sum and substance, a money
market fund that offered a minimum return of 8%. In addition,
BARRIGER told Investor 1 that BARRIGER would personally guarantee
the refund of Investor 1's principal.   On September 27, 2007,
Investor 1 invested $2,000,000 in the Fund.

36.   On September 27, 2007, after Investor 1 invested
$2,000,000 with the Fund, the Fund transferred approximately
$2,115,000 to Lender 1.

37.   As of on or about September 30, 2007, the deficit
in the capital account – the account of LLOYD BARRIGER, the
defendant, to which Fund allocated its net losses – according to
the Fund's method of accounting – was approximately $1,413,639.

38.   Notwithstanding the poor financial condition of
the Fund, on or about October 1, 2007, LLOYD BARRIGER, the
defendant, and CC-1 mailed a letter to investors announcing their
intention to "do a series of dinners for potential new
investors."   They also stated that: "We believe that positive
progress continues to be made in a number of key areas."

16

Case: 14-2637   Document: 38   Page: 61   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 18 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 17 of 29

39.   As of on or about October 31, 2007, the deficit in the capital account – according to the Fund's method of accounting – was approximately $1,509,465.

40.   As of on or about November 27, 2007, the percentage of the Fund's loans past due had increased to approximately 34% of the loans outstanding.

41.   As of on or about November 30, 2007, the deficit in the capital account – according to the Fund's method of accounting – was approximately $2,387,237.

42.   As of on or about December 31, 2007, the deficit in the capital account – according to the Fund's method of accounting – was approximately $2,656,497.  According to a later audit performed in 2008 by an external accounting firm, the deficit in the capital account, on December 31, 2007, was approximately $2,709,293.

43.   On or about December 31, 2007, LLOYD BARRIGER, the defendant, mailed a letter to investors stating: "the housing-asset bubble with related credit repercussions has begun to affect the entire real estate sector and the banking world, creating significant challenges. Whereas we were in an expansionary mode last year, now we are in a batten-down-the-hatches mode. Our immediate goal is to keep our balance sheet and liquidity as strong as possible during this storm . . . . Despite the difficult environment we have continued, as we promised you,

17

Case: 14-2637   Document: 38   Page: 62   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 19 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 18 of 29

to pay the "floor" of 8% on your money and to maintain your principal balances. Those two items remain our priorities."

Despite a Lack of Liquidity and an Over $3 Million Deficit in the Capital Account, Barriger Issues a Positive Report and a Special Distribution Bonus

44.   On January 21, 2008, LLOYD BARRIGER, the defendant, emailed CC-1 and employees of Lender 1.  BARRIGER stated to Lender 1's employees that: "It is unquestionably a difficult time for us . . . [O]ur most pressing problem is our illiquidity. We would be most appreciative if you would consider helping us over the next several months work our way out of this crisis . . . ."

45.   As of on or about January 31, 2008, the deficit in the capital account – according to the Fund's method of accounting – was approximately $3,073,311.

46.   On or about January 31, 2008, LLOYD BARRIGER, the defendant, and CC-1 mailed a letter to investors in which the Fund declared a "special [.25%] distribution bonus for all partners of the Gaffken & Barriger Fund, effective today . . . . This bonus represents a tangible expression of . . . (1) Our increasing CONFIDENCE in the Fund's future and profitability . . . . "

47.   In or about February 2008, the fund received approximately $34,000 in investments from three investors.

The Fund Collapses

18

**A-59**

48. On or about March 3, 2008, $20,000 was transferred from one of the Fund's accounts to Bridgeville Management's bank account. On or about March 4, 2008, $18,000 was transferred from Bridgeville Management's bank account to one of the personal bank accounts of LLOYD BARRIGER, the defendant.

49. On or about March 4, 2008, an investor invested $1,855 with the Fund.

50. In a letter dated March 5, 2008 that was mailed to investors, LLOYD BARRIGER, the defendant, stated: "The repayment speed on our commercial real estate loans (which comprise the bulk of our portfolio) has slowed and the value of some of our real estate collateral has dropped. Just in the last couple of weeks this trend has greatly intensified . . . . This forces me – I have no choice – to make a painful and disappointing decision: we must temporarily stop all partner withdrawals, including the monthly checks. Until we are able to work through this, we cannot continue to credit the 8% to your accounts."

51. In a letter dated May 30, 2008 that was mailed to investors, LLOYD BARRIGER, the defendant, stated that the Fund has been forced to write down the value of the portfolio by approximately 40% and that there was a total reduction in investors' capital accounts from $25,538,530 to $15,003,208.

19

Case: 14-2637   Document: 38   Page: 64   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 21 of 30
Case 7:11-cr-00416-CS   Document 19-2   Filed 02/26/13   Page 20 of 29

## STATUTORY ALLEGATION

52. From in or about July 2006 through on or about
March 5, 2008, in the Southern District of New York and
elsewhere, LLOYD BARRIGER, the defendant, and others known and
unknown, knowingly and willfully did combine, conspire,
confederate, and agree together and with each other, to commit an
offense against the United States, to wit, mail fraud, in
violation of Title 18, United States Code, Section 1341.

53. It was a part and an object of the conspiracy
that LLOYD BARRIGER, the defendant, and others known and unknown,
knowingly and willfully, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice, would and did place in a post office and
authorized depository for mail matter, a matter and thing to be
sent and delivered by the Postal Service, and deposit and cause
to be deposited a matter and thing to be sent and delivered by
private and commercial interstate carriers, and take and receive
therefrom, such matter and thing, and cause to be delivered by
mail and such carriers according to the direction thereon, and at
the place at which it was directed to be delivered by the person

20

to whom it was addressed, such matter and thing, in violation of
Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Mail Fraud)

The Grand Jury further charges:

54.   The allegations contained in paragraphs 1 through
51 above are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

55.   From in or about July 2006 through on or about
March 5, 2008, in the Southern District of New York and
elsewhere, LLOYD BARRIGER, the defendant, knowingly and
willfully, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, for the purpose of executing such scheme and artifice
and attempting so to do, placed in a post office and authorized
depository for mail matter, a matter and a thing to be sent and
delivered by the Postal Service, and deposited and caused to be
deposited a matter and thing to be sent and delivered by private
and commercial interstate carriers, and took and received
therefrom, such matter and thing, and caused to be delivered by
mail and such carriers according to the direction thereon, and at
the place at which it was directed to be delivered by the person

21

**A-62**

to whom it was addressed, such matter and thing, to wit, BARRIGER
sent and caused to be sent letters and other materials containing
false statements about the Fund's performance.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT THREE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

56.   The allegations contained in paragraphs 1 through
51 are hereby repeated, realleged and incorporated by reference
as if fully set forth herein.

57.   From in or about July 2006 up to and including
on or about March 5, 2008, in the Southern District of New York
and elsewhere, LLOYD BARRIGER, the defendant, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit an
offense against the United States, to wit, violations of Title
15, United States Code, Sections 78j(b) and 78ff and Title 17,
Code of Federal Regulations, Section 240.10b-5.

### Object of the Conspiracy

58.   It was a part and an object of the conspiracy
that LLOYD BARRIGER, the defendant, and others known and unknown,
willfully and knowingly would and did directly and indirectly, by
the use of means and instrumentalities of interstate commerce and
of the mails, and of a facility of a national securities

22

A-63

exchange, use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud, (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading, and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-

### Overt Acts

59.   In furtherance of the conspiracy and to effect its unlawful object, LLOYD BARRIGER, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about April 2, 2007, BARRIGER drafted and caused to have mailed to investors, a letter stating that: the events that were the subject of "the great deal of negative news recently regarding sub-prime mortgages" had no impact on the Fund, because "what is making headlines is residential mortgages of lower quality, we are commercial property bridge lenders and consequently are really in a different business."

23

**A-64**

Case: 14-2637   Document: 38   Page: 68   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 25 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 24 of 29

        b.    On or about June 30, 2007, BARRIGER drafted and caused to have mailed to investors, a letter stating: "There has been measurable progress in every one of the quantifiable areas by which we rate our Fund.  I am very pleased with the way all the indicators point."

        c.    In late September 2007, BARRIGER and CC-1 met with Investor 1 at the Fund's offices in Monticello, New York, and BARRIGER made statements to Investor 1, including that BARRIGER would personally guarantee the refund of Investor 1's principal.

        d.    on or about October 1, 2007, BARRIGER and CC-1 drafted and caused to have mailed to investors a letter announcing their intention to "do a series of dinners for potential new investors" and further stating, "[w]e believe that positive progress continues to be made in a number of key areas."

        e.    On or about December 31, 2007, BARRIGER drafted and caused to have mailed to investors a letter stating: "the housing-asset bubble with related credit repercussions has begun to affect the entire real estate sector and the banking world, creating significant challenges.  Whereas we were in an expansionary mode last year, now we are in a batten-down-the-hatches mode.  Our immediate goal is to keep our balance sheet and liquidity as strong as possible during this storm . . . . Despite the difficult environment we have continued, as we

24

**A-65**

Case: 14-2637    Document: 38    Page: 69    09/03/2014    1310409    212

Case 7:13-cv-05048-VB   Document 19-2   Filed 12/13/13   Page 26 of 30
Case 7:11-cr-00416-CS   Document 19-2   Filed 02/26/13   Page 25 of 29

promised you, to pay the "floor" of 8% on your money and to
maintain your principal balances.  Those two items remain our
priorities."

        f.   On or about January 31, 2008, BARRIGER and
CC-1  drafted and caused to have mailed to investors a letter
declaring a "special [.25%] distribution bonus for all partners
of the Gaffken & Barriger Fund, effective today . . . . This
bonus represents a tangible expression of . . . (1) Our
increasing CONFIDENCE in the Fund's future and
profitability . . . . "

        (Title 18, United States Code, Section 371.)

### COUNT FOUR
### (Securities Fraud)

    The Grand Jury further charges:

    60.   The allegations contained in paragraphs 1 through
51 above are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

    61.   From in or about July 2006 through on or about
March 5, 2008, in the Southern District of New York and
elsewhere, LLOYD BARRIGER, the defendant, willfully, and
knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce and of the mails, and of
a facility of a national securities exchange, did use and employ,
in connection with the purchase and sale of a security, a

Case: 14-2637   Document: 38   Page: 70   09/03/2014   1310409   212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 27 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 26 of 29

manipulative and deceptive device and contrivance in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud, (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading, and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, namely purchasers of the Preferred Interests.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

### FORFEITURE ALLEGATION

62. As the result of conspiring to violate Title 18, United States Code, Sections 1341 (mail fraud) as alleged in Count One of this Indictment; committing mail fraud, in violation of Title 18, United States Code, Section 1341 as alleged in Count Two of this Indictment; conspiring to violate Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud), as alleged in Count Three of this Indictment; committing securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, as alleged in Count Four of this Indictment,

LLOYD BARRIGER, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to the following:

       a.   At least $12,600,000 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the offenses charged in Counts One through Four of this Indictment.

### Substitute Assets Provision

      63.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

           a.   cannot be located upon the exercise of due diligence;

           b.   has been transferred or sold to, or deposited with, a third party;

           c.   has been placed beyond the jurisdiction of the court;

           d.   has been substantially diminished in value; or

           e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

27

**A-68**

Case: 14-2637    Document: 38    Page: 72    09/03/2014    1310409    212

Case 7:13-cv-05948-VB    Document 19-2    Filed 12/13/13    Page 29 of 30
Case 7:11-cr-00416-CS    Document 19    Filed 02/26/13    Page 28 of 29

United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property described above.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Sections 981(a)(1)(C) and 1349;
Title 21, United States Code, Section 853(p); and
Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
UNITED STATES ATTORNEY

28

**A-69**

Case: 14-2637    Document: 38    Page: 73    09/03/2014    1310409    212

Case 7:13-cv-05948-VB   Document 19-2   Filed 12/13/13   Page 30 of 30
Case 7:11-cr-00416-CS   Document 19   Filed 02/26/13   Page 29 of 29

**United States District Court**

**SOUTHERN DISTRICT OF NEW YORK**

## THE UNITED STATES OF AMERICA

vs.

**LLOYD BARRIGER,**
**Defendant.**

# INDICTMENT

**S1 11 Cr. 416**

( In Violation of Title 18,  United States Code, Sections 1341 and 1349)
( In Violation of Title 18,  United States Code, Sections 371)
( In Violation of Title 15,  United States Code, Sections 78j(b) and 78ff)
( In Violation of Title 17, Code of Federal Regulations , Sections 240.10b-5)

**PREET BHARARA**

United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT C

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-2-12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

FRANK OWENS,

                      Plaintiff,

          -against-

LLOYD VERNON BARRIGER, GAFFKEN &
BARRIGER FUND LLC, et al.,
                      Defendants.
------------------------------------------------------------X

08 **CIVIL** 8414 (PKC)

**CORRECTED JUDGMENT**

#12,018c

      A Jury Trial before the Honorable P. Kevin Castel, United States District Judge, having

begun on January 23, 2012, and at the conclusion of the trial, on January 25, 2012, the jury having

rendered a verdict in favor of plaintiff Frank Owens in the amount of $6,560,000.00, it is,

      **ORDERED, ADJUDGED AND DECREED:**  That plaintiff Frank Owen have

judgment in the sum of $6,560,000.00 as against the defendant Lloyd Vernon Barriger.

**DATED:**  New York, New York
          February 2, 2012

                                               **RUBY J. KRAJICK**

**So Ordered:**                                        **Clerk of Court**

                                    BY:

**U.S.D.J.**                                            **Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

# EXHIBIT D

# LOAN AND SECURITY AGREEMENT

Between

## TEXTRON FINANCIAL CORPORATION

As Lender

and

## GAFFKEN & BARRIGER FUND, LLC

As Borrower

Dated as of January  25 , 2006

atl-fs1\545023v09

## TABLE OF CONTENTS

Page

**ARTICLE I - LOANS, RENEWAL AND TERMINATION**................................................ 19

1.1    CREDIT FACILITY ................................................................................................. 19
1.2    BORROWING PROCEDURES ................................................................................... 19
1.3    INTEREST ............................................................................................................. 19
1.4    CHARGES TO LOAN ACCOUNT ............................................................................. 19
1.5    ALLOCATION OF PAYMENTS AND LIMIT OF INTEREST ......................................... 19
1.6    RENEWAL AND TERMINATION ............................................................................. 19

**ARTICLE II - FEES** ................................................................................................... 19

2.1    FACILITY FEE ....................................................................................................... 19
2.2    UNUSED LINE FEE ................................................................................................ 19
2.3    FIELD EXAMINATION FEE ..................................................................................... 19
2.4    WIRE TRANSFER FEE ............................................................................................ 19
2.5    EARLY TERMINATION FEE .................................................................................... 19
2.6    COLLATERAL MONITORING FEE ........................................................................... 19
2.7    COSTS AND EXPENSES .......................................................................................... 19

**ARTICLE III - GRANT OF SECURITY INTEREST** ................................................. 19

3.1    GRANT OF SECURITY INTEREST ............................................................................ 19
3.2    CONTINUED PRIORITY OF SECURITY INTEREST .................................................... 19

**ARTICLE IV - PROCEEDS OF COLLATERAL, RECEIVABLES AND COLLECTIONS** ........... 19

4.1    BORROWER'S PROCEEDS OF COLLATERAL ........................................................... 19
4.2    COLLECTION OF RECEIVABLES AND OTHER COLLATERAL ................................... 19

**ARTICLE V - REPRESENTATIONS AND WARRANTIES** ......................................... 19

5.1    EXISTENCE, POWER AND AUTHORITY; BORROWER AFFILIATES ........................... 19
5.2    COMPLIANCE WITH OTHER AGREEMENTS AND APPLICABLE LAW .......................... 19
5.3    ABSENCE OF LITIGATION ..................................................................................... 19
5.4    TAXES AND RETURNS ........................................................................................... 19
5.5    LIEN PRIORITY AND NATURE OF CERTAIN COLLATERAL ...................................... 19
5.6    PRINCIPAL PLACE OF BUSINESS ........................................................................... 19
5.7    ENVIRONMENTAL COMPLIANCE ........................................................................... 19
5.8    PROPRIETARY RIGHTS .......................................................................................... 19
5.9    TRADE NAMES ..................................................................................................... 19
5.10   EMPLOYEE RELATIONS ........................................................................................ 19
5.11   EMPLOYEE PENSION BENEFIT PLANS ................................................................... 19
5.12   BANK ACCOUNTS ................................................................................................ 19
5.13   ACCURACY AND COMPLETENESS OF INFORMATION ............................................. 19
5.14   SOFTWARE LICENSE COMPLIANCE ....................................................................... 19
5.15   SURVIVAL OF WARRANTIES; CUMULATIVE .......................................................... 19

**ARTICLE VI - AFFIRMATIVE COVENANTS** ......................................................... 19

6.1    FINANCIAL STATEMENTS ...................................................................................... 19
6.2    BOOKS AND RECORDS .......................................................................................... 19
6.3    ADDITIONAL DOCUMENTATION ............................................................................ 19
6.4    EXISTENCE, NAME, ORGANIZATION AND CHIEF EXECUTIVE OFFICE ..................... 19
6.5    COMPLIANCE WITH LAWS AND TAXES ................................................................. 19

6.6    PERFORMANCE OF OBLIGATIONS ............................................................................. 19
6.7    REPORTING AS TO REVENUES AND RECEIVABLES ................................................. 19
6.8    OVER-ADVANCE ...................................................................................................... 19
6.9    BREACH OR DEFAULT .............................................................................................. 19
6.10   MAINTENANCE OF ASSETS ...................................................................................... 19
6.11   INSURANCE ............................................................................................................. 19
6.12   USE OF PROCEEDS ................................................................................................... 19
6.13   DISCLOSURE ............................................................................................................ 19
6.14   FURTHER ASSURANCES ........................................................................................... 19
6.15   BROKERAGE COMMISSIONS ..................................................................................... 19
6.16   AFFIRMATIVE COVENANTS AS TO CLIENT LOAN DOCUMENTS ............................... 19
6.17   MONITORING OF CLIENT PRACTICES ....................................................................... 19
6.18   DELIVERY OF AUTHORITATIVE ORIGINALS; DELIVERY OF TITLE INSURANCE POLICY ..... 19

ARTICLE VII - BORROWER'S NEGATIVE COVENANTS ...................................... 19

7.1    BUSINESS, MANAGEMENT AND ORGANIZATION ...................................................... 19
7.2    DISPOSITION OF ASSETS........................................................................................... 19
7.3    LOANS AND GUARANTEES ....................................................................................... 19
7.4    INVESTMENTS .......................................................................................................... 19
7.5    DISTRIBUTIONS AND SALARIES ............................................................................... 19
7.6    FINANCIAL COVENANTS .......................................................................................... 19
7.7    CHANGE OF CONTROL .............................................................................................. 19
7.8    LIMITATION ON INDEBTEDNESS FOR MONEY BORROWED ...................................... 19
7.9    MERGERS; CONSOLIDATIONS; ACQUISITIONS ........................................................ 19
7.10   SUBSIDIARIES .......................................................................................................... 19
7.11   FISCAL YEAR ........................................................................................................... 19
7.12   AFFILIATE TRANSACTIONS ...................................................................................... 19
7.13   SUBORDINATED INDEBTEDNESS............................................................................... 19
7.14   ALTERATION TO CLIENT LOAN DOCUMENTS; MODIFICATION OF CREDIT POLICIES ..... 19
7.15   SETTLEMENT OR COMPROMISE AFTER DEFAULT ..................................................... 19

ARTICLE VIII - CONDITIONS PRECEDENT ........................................................... 19

8.1    INITIAL CREDIT........................................................................................................ 19
8.2    INITIAL AND SUBSEQUENT CREDIT .......................................................................... 19

ARTICLE IX - EVENTS OF DEFAULT; REM ........................................................... 19

9.1    EVENTS OF DEFAULT ............................................................................................... 19
9.2    LENDER'S REMEDIES ............................................................................................... 19

ARTICLE X - JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; AND
GOVERNING LAW .................................................................................................. 19

10.1   GOVERNING LAW; CHOICE OF FORUM; SERVICE OF PROCESS; JURY TRIAL WAIVER.......... 19
10.2   WAIVER OF CERTAIN CLAIMS AND COUNTERCLAIMS.............................................. 19
10.3   INDEMNIFICATION .................................................................................................... 19

ARTICLE XI - MISCELLANEOUS ............................................................................ 19

11.1   POWER OF ATTORNEY .............................................................................................. 19
11.2   OUTSTANDING LOAN BALANCE................................................................................ 19
11.3   MODIFICATIONS AND COURSE OF DEALING ............................................................. 19
11.4   ASSIGNMENT AND PARTICIPATION........................................................................... 19
11.5   DELEGATION OF DUTIES .......................................................................................... 19
11.6   NOTICES .................................................................................................................. 19

| 11.7 | EXPENSES | 19 |
| 11.8 | ASSIGNMENT OF RECEIVABLES | 19 |
| 11.9 | BINDING EFFECT; SEVERABILITY | 19 |
| 11.10 | FINAL AGREEMENT | 19 |
| 11.11 | COUNTERPARTS | 19 |
| 11.12 | CAPTIONS | 19 |
| 11.13 | BORROWER'S REPRESENTATIVE | 19 |

## LOAN AND SECURITY AGREEMENT

Dated as of January _____, 2006

GAFFKEN & BARRIGER FUND, LLC, a Delaware limited liability company ("Borrower"), and TEXTRON FINANCIAL CORPORATION, a Delaware corporation ("Lender"), agree as follows:

### DEFINITIONS

As used in this Agreement:

"Account" or "Accounts" means all now owned or hereafter acquired right, title and interest in all accounts, as such term is defined in the UCC, and any and all supporting obligations with respect to any of the foregoing.

"Additional Documents" has the meaning set forth in Section 3.2(d).

"Adjusted Tangible Net Worth" means, with respect to Borrower, the sum of (i) members' equity determined in accordance with GAAP and (ii) the outstanding principal balance of Subordinated Indebtedness, minus (a) Intangible Assets, (b) prepaid expenses, and (c) all loans or advances to Affiliates of Borrower or any third party other than Clients.

"Affiliate" means, with respect to a Person, (a) any partner, officer, shareholder or member (if holding more than 5% of the outstanding interest in such Person), director or managing agent of such Person, and (b) any other Person (other than a Subsidiary) that, (i) directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such given Person, (ii) directly or indirectly beneficially owns or holds 10% or more of any class of voting stock or partnership or other voting interest of such Person or any Subsidiary of such Person, or (iii) 5% or more of the voting stock or partnership or other voting interest of which is directly or indirectly beneficially owned or held by such Person or a Subsidiary of such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or partnership or other voting interest, by contract or otherwise.

"Agreement" means this Loan and Security Agreement, including all Schedules, exhibits and other attachments hereto, as the same may be amended, supplemented, extended or restated from time to time.

"Agreement Date" means the date as of which this Agreement is dated.

"Applicable Law" means all applicable provisions of constitutions, statutes, rules, regulations and orders of governmental bodies and orders and decrees of courts and arbitrators.

atl-fs1\545023v09

1

"Appraisal Report" means the written statement, dated no more than ninety (90) days prior to an anticipated Client Loan Closing Date, setting forth the appraiser's opinion of the fair market value of the Client Collateral to which such Client Loan relates. Such Appraisal Report shall reflect the appraiser's assumption that the repairs proposed by the Client will be performed in a diligent and workmanlike manner. The Appraisal Report shall be prepared by (i) a real estate appraiser certified and licensed in the jurisdiction where the Client Collateral is located to conduct appraisals of the type(s) of real property substantially similar to the Client Collateral or (ii) any other Person acceptable to Lender in Lender's discretion.

"Appraised Value" means the fair market value of the Client Collateral, as reflected in and supported by an Appraisal Report.

"Asset Disposition" means the disposition of any asset of Borrower or any of its Subsidiaries, other than sales of Inventory in the ordinary course of business.

"Authoritative Original" means the sole authoritative original, notwithstanding the existence of additional counterparts containing original signatures, of a Client Loan Document, that bears a legend on the face thereof identifying Lender as secured party or assignee and which identification cannot be changed except by the consent of Lender.

"Availability" means at any time (a) the amount of the Borrowing Base at such time minus (b) the aggregate principal amount of Revolving Loan Advances outstanding at such time.

"Availability Reserve" means a reserve based on the requirement that excess Availability under the Credit Facility as of the Agreement Date, and for a period of no less than thirty (30) days thereafter, shall not be less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), or such other amount as Lender may require in the exercise of its discretion.

"Bankruptcy Code" means the United States Bankruptcy Code, as in effect from time to time.

"Blocked Account" means each bank deposit account established for the collection and remittance to Lender of Receivables.

"Blocked Account Agreement" means the agreement between Borrower, Lender and a bank concerning the establishment, maintenance, and administration of a Blocked Account.

"Board" means the duly elected and serving members of the Board of Directors of Borrower.

"Borrower" means Borrower as defined in the preamble.

"Borrowing" means a borrowing of Revolving Loan Advances.

atl-fs1\545023v09                    2

**A-79**

"Borrowing Base" means, with respect to Borrower, an amount in Dollars equal to the lesser of (a) the Maximum Credit, or (b) the sum, without duplication, of: (i) eighty-five percent (85%) of the net amount of the Eligible Receivables consisting of Client Loans secured by improved real property; *plus* (ii) the lesser of seventy percent (70%) of the net amount of Eligible Receivables consisting of Client Loans secured by unimproved land and Three Million Dollars ($3,000,000.00); *plus* (iii) the lesser of 85% of the net amount of Eligible Receivables consisting of Second Priority Client Loans and Three Million and No/100 Dollars ($3,000,000.00);  *minus* (iv) the Availability Reserve; *minus* (v) other Reserves, if any.

"Borrowing Base Certificate" means the Borrowing Base Certificate referred to in Section 1.2(b) in the form attached hereto as Exhibit A and by this reference made a part hereof.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Providence, Rhode Island are authorized or required to close.

"Capital Expenditures" means the aggregate of all expenditures made and liabilities incurred that, in accordance with GAAP, are required to be included in or reflected by the property, plant, equipment or similar fixed assets accounts.

"Capitalized Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Change of Control" means the occurrence of any of the following events: (i) the sale or transfer of all or substantially all of the assets of Borrower as an entirety to any person or related group of persons other than an Affiliate or Affiliates of Borrower; (ii) Lloyd Barriger or Andrew McKean shall cease to manage the day-to-day operations of Borrower; (iii) G & B Partners, Inc. shall cease to own all of the managing membership interest of Borrower or cease to have voting control of Borrower, or (iv) Borrower is liquidated, dissolved, or adopts a plan of liquidation pursuant to the Bankruptcy Code or any other bankruptcy law.

"Client" means a Person to whom Borrower or Thom Forest, LLC extends credit, loans, or other financial accommodations or provides goods or services in the ordinary course of business, which Client is obligated to Borrower or Thom Forest, LLC under one or more Client Loan Documents.

"Client Collateral" means all real and personal property collateral pledged by a Client to Borrower pursuant to Client Loan Documents.

"Client Credit Documentation" shall mean the background documentation for each Client Loan prepared by Borrower for its own internal purposes, including term sheets, reports and credit committee write-ups, with all exhibits and schedules thereto, all as prepared and maintained in accordance with Borrower's Credit Policies.

atf-fs1\545023v09                                         3

**A-80**

"Client Loan" shall mean any loan, extension of credit, or financial accommodation made by Borrower, to or for the benefit of a Client, the purpose of which Client Loan is the purchase, refinance, repair, renovation, and/or restoration of real estate and improvements thereto secured thereby, subject to the limitations set forth herein.

"Client Loan Document(s)" means any and all agreements, contracts, documents, and instruments, including without limitation any and all debt instruments, promissory notes, loan agreements, chattel paper, agreements of guaranty, and all assignment agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, general or specific security agreements, certificates, financing statements and amendments thereto, policies of title insurance, and all other like or similar agreements, contracts, documents and instruments evidencing, pertaining or otherwise securing at any time any Client Loan, Thom Forest Client Loan, or Borrower's interest therein. For purposes of illustration, a list of documents used by the Borrower in documenting a typical Client Loan is set forth on Exhibit C attached hereto and made a part hereof by this reference.

"Client Loan Closing Date" means the date of the Borrower's funding of a Client Loan.

"Collateral" means all of Borrower's assets, including, without limitation, all of the following property and interests in property of Borrower, wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising: (i) all Receivables, including without limitation all Receivables due or to become due by a Client to Borrower, by virtue of a Client Loan or otherwise; (ii) all Client Loan Documents and all right, title, and interest of Borrower therein and thereunder (including all rights to take remedial action against any Client, any Client Collateral, or any other Person); (iii) all Inventory; (iv) all Equipment; (v) all Contract Rights; (vi) all General Intangibles; (vii) all Investment Property; (viii) each Deposit Account and all certificates of deposit maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit that is an instrument under the UCC; (ix) all machinery; (x) all Proprietary Rights; (xi) all Instruments; (xii) all securities; (xiii) all goods and other property, whether or not delivered, (a) the sale or lease of which gives or purports to give rise to any Receivable, including, but not limited to, all merchandise returned or rejected by or repossessed from customers, or (b) securing any Receivable, including, without limitation, all rights as an unpaid vendor or lienor (including, without limitation, stoppage in transit, replevin and reclamation) with respect to such goods and other property; (xiv) all mortgages, deeds to secure debt and deeds of trust on real or personal property, guaranties, leases, security agreements, security instruments, and other agreements and property which secure or relate to any Receivable or other Collateral, or are acquired for the purpose of securing and enforcing any item thereof, and all of Borrower's right, title and interest in and to the foregoing, including without limitation all collateral described therein upon repossession, foreclosure or any other disposition thereof, and all proceeds issuing or resulting therefrom; (xv) all documents of title, policies and certificates of insurance, securities, chattel paper (including electronic chattel paper and tangible chattel paper) and other documents and instruments; (xvi) all other goods and personal property, whether tangible

atl-fs1\545023v09                    4

**A-81**

or intangible, wherever located, including money, supporting obligations, letters of credit, and each letter-of-credit right; (xvii) all books and records, files, correspondence, computer programs, tapes, discs and related data processing software which contain information identifying or pertaining to any of the foregoing, or any Client, or showing the amounts thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof; (xviii) any "commercial tort claims" as that term is defined in the UCC, as set forth on Schedule 1 attached hereto; (xix) all of Debtor's membership interest in and to Thom Forest, LLC, a Delaware limited liability company; and (xx) any and all products and proceeds of the foregoing (including, but not limited to, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the Collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements and other documents.

"Collateral Assignment" means a conveyance, assignment, pledge, security instrument, and/or encumbrance in the form attached hereto as Exhibit F and by this reference made a part hereof and any and all agreements, instruments, documents, notations, delivery or other transfer of possession or control, or other evidence or indicia of assignment, in form and substance acceptable to Lender in Lender's sole discretion, the purpose of which is to convey, assign, pledge, secure, and/or encumber Borrower's rights in any asset of any Client pledged to Borrower in favor of Lender to secure the payment and performance of the Obligations. Without limiting the foregoing, and for the purpose of clarity, the term "Collateral Assignment" shall include without limitation the following methods: (i) with respect to any instrument, i.e. promissory notes, an endorsement (by allonge); (ii) with respect to any chattel paper, a notation of Lender's Lien thereon conspicuously placed on the face of such chattel paper; (iii) with respect to any UCC financing statement, an assignment thereof favoring Lender in a form suitable for filing of public record; (iv) with respect to any deed of trust, deed to secure debt, mortgage or similar instrument, an assignment thereof favoring Lender in a form suitable for filing of public record in the jurisdiction where the Client Collateral is located, where any of the Client Loan Documents are filed of record, or in any other jurisdiction of Lender's choosing; (v) with respect to cash on deposit, an account control agreement favoring Lender.

"Contract Rights" means any rights under contracts not yet earned by performance and not evidenced by an instrument or chattel paper.

"Covenant Compliance Certificate" means the Covenant Compliance Certificate referred to in Section 6.1.

"Credit Facility" means the total credit facility established under this Agreement in the amount of the Maximum Credit.

**A-82**

"Credit Policies" means the Standard Credit Policies and Procedures set forth in Exhibit B attached hereto and by this reference made a part hereof, and as modified by Borrower from time to time with the express written consent of Lender, for the making of Client Loans, including without limitation those which shall at all times incorporate at a minimum financial, asset valuation, and eligibility requirements that are standard in the sector of the lending industry of which Borrower is a part.

"Credit Support Document" means each Guaranty, letter of credit or other undertaking of any Guarantor or other party given for the benefit of Lender relating to the Obligations.

"Custodial Agreement" means, if any, that certain Custodial Agreement by and among Lender, Borrower, Thom Forest, LLC and the Custodian, or other like or similar document.

"Custodial Certification" has the meaning ascribed to such term in the Custodial Agreement.

"Custodial Deliverables" has the meaning ascribed to such term in the Custodial Agreement.

"Custodian" means, if any, Branch Banking and Trust Company, a North Carolina banking corporation, or such other entity as Lender may select as Custodian pursuant to any Custodial Agreement.

"Default" shall mean an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

"Deposit Account" has the meaning given to it in the UCC.

"Deposit Account Control Agreement" means the Deposit Account Control Agreement among Borrower, Lender and the bank named therein, pursuant to which Lender shall have been granted a first priority lien and security interest in the deposit account more particularly described therein.

"Dollar" and "$" mean freely transferable United States dollars.

"Early Termination Fee" means the fee referred to in Section 2.5.

"East Coast Time" means the time in Providence, Rhode Island.

"EBITDA" means, for any period with respect to Borrower, the sum of the amounts for such period of (a) Net Income, (b) Interest Expense, (c) taxes imposed on or measured by income or excess profits, including without limitation dividends, distributions or payments to members in cash for the purposes of paying certain federal and state income taxes pursuant to Section 7.5(a) (for such period and without regard to

any prior periods), and (d) the amount of all depreciation and amortization allowances and other non-cash expenses of Borrower.

"Eligible Client Loan Document(s)" mean those certain Client Loan Documents approved in advance by Lender in writing as to a particular Client, which without limitation (a) evidence the extension of credit to a Client approved by Borrower in strict accordance with Borrower's Credit Policies; (b) convey to Borrower a valid and enforceable first-priority or second-priority security interest in and to the Client Collateral described thereby as security therefor, properly perfected in accordance with applicable law; (c) are subject to Lender's valid and perfected first-priority security interest; (d) are accompanied by evidence of insurance coverage of such types and coverage amounts as Borrower and Lender may require, including at a minimum builder's risk insurance coverage for construction loans, in an amount of not less than the original principal amount of the Client Loan related thereto; (e) are guaranteed by the unconditional guaranty of all principals of the Client to which such Client Loan is made; (f) bear a legend indicating that they are the Authoritative Original thereof; (g) have been sent to Lender for review as to eligibility not less than ten (10) days prior to inclusion in the Borrowing Base; (h) with respect to each Client Loan, not later than five (5) Business Days after the actual closing date thereof, the Authoritative Originals and duly executed original Collateral Assignments as to the Client Loan Documents pertaining thereto have been delivered to Lender; and (i) with respect to each Thom Forest Client Loan, such original, duly executed Custodial Deliverables with respect thereto have been delivered to the Custodian and the Custodian has delivered to Lender a Custodial Certification, all in accordance with the terms and conditions of the Custodial Agreement. Eligible Client Loan Documents shall not include those Client Loan Documents: (q) which evidence a Client Loan that on its face matures beyond the earlier to occur of (1) one year after the date on which the first installment becomes due and payable and (2) thirteen months after the corresponding Client Loan Closing Date; (r) which evidence a Client Loan regarding residential or commercial real property in an amount exceeding seventy-five percent (75%) of the Appraised Value of such Client Collateral, or other higher or lower percentage as may be approved in writing by Lender from time to time; (s) which evidence a Client Loan regarding Client Collateral consisting of unimproved real property, unless such Client Loan is approved by Lender in writing and in advance of said Client Loan; and in any case in an amount exceeding seventy percent (70%) of the Appraised Value of such Client Collateral, or other higher or lower percentage as may approved in writing by Lender from time to time, (t) which evidence a Second Priority Client Loan, unless such Client Loan is approved by Lender in writing and in advance of said Client Loan; and in any case which after taking into account the outstanding balance of all prior liens encumbering the Client Collateral subject to such Second Priority Client Loan, would cause the total aggregate amount of all liens encumbering said Client Collateral to exceed seventy percent of the Appraised Value of such Client Collateral, or other higher or lower percentage as may be approved in writing by Lender from time to time, (u) which represent any Client Loan with respect to which such Client's actual cash investment represents less than fifteen percent (15%) of the Appraised Value of the Client Collateral related thereto, (v) which represent any Client Loan that constitutes in whole or part the restructuring of a troubled debt, (w) which are not substantially in the

form of the Client Loan Documents set forth in Exhibit C, unless otherwise agreed by Lender in writing; (x) which purport to encumber any Client's real property lying and being in a state other than the state to which the particular Client Loan Documents relate; (y) which evidence a single Client Loan in excess of One Million and No/100 Dollars ($1,000,000.00), or a Second Priority Client Loan in excess of Five Hundred Thousand and No/100 Dollars ($500,000.00), unless approved in writing by Lender which approval Lender shall give or withhold in its sole discretion and without recourse to Borrower or any other entity; (z) with respect to which Borrower does not have, or will not have promptly after the applicable Client Loan Closing Date, a valid and perfected first priority security interest in and to the Client Collateral as security therefor, provided, however, Lender may from time to time, in its sole discretion, give Borrower written permission to make Client Loans regarding Second Liens in which cases the related Client Loan Documents would be Eligible Client Loan Documents; (aa) that are not, or do not continue to be, acceptable to Lender in Lender's sole and absolute discretion based upon one or more change after the corresponding Client Loan Closing Date in such factors as credit policies, market conditions, Borrower's business and other criteria, or for which Lender is not or does not continue to be, in Lender's sole and absolute discretion, satisfied with the credit standing of the Client or the value of the Client Collateral in relation to the amount of credit extended; (bb) that are not, or any collateral with respect to which is not, wholly and validly collaterally assigned to Lender via such Collateral Assignments as may be required or requested by Lender in Lender's sole and absolute discretion; (cc) with respect to which a representation or warranty has been breached to the dissatisfaction of Lender in Lender's sole and absolute discretion; or (dd) which represent any Thorn Forest Client Loan with respect to which the Custodial Deliverables have not been delivered to the Custodian and with respect to which the Custodian has not issued a Custodial Certification pursuant to the Custodial Agreement.

"Eligible Receivable" means any and all presently existing or hereafter arising Receivable(s) of Borrower with respect to credit, loans, or other financial accommodations extended and funds advanced or goods or services provided to, for, or for the benefit of, a Client in the ordinary course of Borrower's business that Lender determines in its sole good faith discretion, based on credit policies, market conditions, Borrower's business and other criteria, is eligible. A Receivable shall not be an Eligible Receivable unless such Receivable (i) arises under Eligible Client Loan Documents, (ii) is unconditionally payable in Dollars, and (iii) conforms to all applicable representations and warranties contained in this Agreement. Eligible Receivables shall not include any of the following:

(a)   a Receivable arising under any Client Loan Documents, with respect to which two (2) or more scheduled monthly payments or installments are in arrears after the expiration of any applicable cure periods;

(b)   a Receivable owing from a Client with respect to which fifty percent (50%) or more of all Receivables owing from such Client or an affiliated group of Clients (in dollar value) are not Eligible Receivables pursuant to clause (a) above;

(c)     a Receivable with respect to a Client Loan that remains outstanding after maturity, whether by acceleration or otherwise; provided, however, that Borrower may extend the maturity date of any Client Loan for a period of up to six (6) months beyond the original maturity date thereof so long as no default exists under such Client Loan Documents as of the date of such extension and Borrower has collected all accrued interest under such Client Loan Documents as of the original maturity date thereof;

(d)     a Receivable arising under any Client Loan with respect to which the required insurance coverage, including without limitation builder's risk insurance coverage for construction loans, has for any reason lapsed or fails to be in force or effect;

(e)     a Receivable with respect to which the Client is either (i) the United States or any department, agency, or instrumentality of the United States (other than Receivables with respect to which Borrower has complied, to the satisfaction of Lender, (i) with the Assignment of Claims Act of 1940, as amended), or (ii) any state of the United States (other than (y) Receivables owed by any state that does not have a statutory counterpart to the Assignment of Claims Act or (z) Receivables owed by any state that has a state statutory counterpart to the Assignment of Claims Act, as to which Borrower has complied to Lender's satisfaction);

(f)     a Receivable that arises from a Client that is (i) a creditor of Borrower, (ii) has or has asserted a right of setoff, (iii) has disputed its liability or (iv) has made any claim with respect to its obligation to pay, or is a Receivable that is subject to a levy, prior assignment, claim, Lien, subrogation right or security interest which is not a Permitted Lien;

(g)     a Receivable that is subject to any credit, offset or contra; provided, however, that if the amount of such Receivable exceeds the amount of such credit or contra, such excess may be considered for eligibility;

(h)     a Receivable owed by a Client to Borrower respecting one or more Client Loans, the aggregate unpaid balance of which exceeds fifteen percent (15%) (unless otherwise agreed to in writing by Lender) of the aggregate unpaid balance of all Client Loans owed to Borrower at such time by all Clients, but only to the extent of such excess;

(i)     a Receivable that arises from an Affiliate of Borrower or an Interested Party;

(j)     a Receivable, to the extent thereof, which represents a "holdback" or other arrangement by which Borrower holds in trust sums lent to a Client for future disbursement upon satisfaction or performance of a specified condition or set of conditions;

(k)     a Receivable that is not supported by the unlimited personal guaranty of at least one (1) principal owner of such Client;

(l)    a Receivable that arises from a Client (i) that is subject to an Insolvency Proceeding, is not solvent or has gone out of business; or (ii) as to which Lender or Borrower is aware of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Client;

(m)    a Receivable with respect to which the Client is located in a state that requires a creditor to file a business activity report or similar document in order to bring suit or enforce its remedies against such Client, unless the Borrower or Client has qualified to do business in such state or is exempt from such filing requirement;

(n)    a Receivable owing by a Client whose chief executive office or place of organization is outside the United States or any of the following provinces of Canada: Ontario, Alberta, Manitoba, Saskatchewan, British Columbia, Prince Edward Island and the Yukon Territory, unless (i) the payment for such Receivable is assured by an irrevocable letter of credit payable in United States dollars satisfactory to Lender (as to form, substance, issuer and domestic confirming bank), the proceeds of which have been assigned to Lender and the original letter of credit has been delivered to Lender and directly drawable by Lender, or (ii) the payment for such Receivable is insured by foreign credit insurance acceptable to Lender, such credit insurance has been collaterally assigned to Lender in form satisfactory to Lender, and Lender has been named beneficiary with respect thereto;

(o)    a Receivable secured in whole or part, directly or indirectly, by Client Collateral that is located outside the states of New York, Pennsylvania, California, Florida, or such other states as Lender may approve in writing in advance from time to time;

(p)    all Receivables, to the extent the Client Loans respective thereto cause the aggregate amount of all Client Loans to exceed seventy-five percent (75%) of the Appraised Value of all Client Collateral;

(q)    a Receivable arising from a Second Priority Client Loan, that, after accounting for all loans prior to Borrower, exceeds seventy (70%) of the Appraised Value of the Client Collateral relating to such Second Priority Client Loan, to the extent thereof;

(r)    a Receivable arising from a Second Priority Client Loan with respect to which the aggregate outstanding balance of all loans prior to Borrower exceed three hundred percent (300%) of said Second Priority Client Loan;

(s)    a Receivable with respect to a Client Loan in which Borrower is a participant with another Person, and further with respect to which Borrower is not the originating or "lead" lender.

(t)    a Receivable with respect to which Borrower has extended the time or modified the terms for payment in favor of such Client without written notification to Lender; provided, however, that nothing contained herein shall permit the Borrower, without the prior express written consent of Lender, to extend the maturity date of any

atl-fs1\545023v09                        10

**A-87**

Client Loan for a period of more than three (3) months in any single extension or modification, nor in any event beyond the eighteenth (18th) month after the Client Loan Closing Date relative thereto;

(u)     a Receivable which arises out of finance or similar charges, expense reimbursement or other fees or service charges, to the extent thereof;

(v)     a Receivable arising from a Client that has not duly executed such Client Loan Documents as may be required or advised under the circumstances, or for whom Borrower cannot or does not certify, prior to the inclusion of any Receivables related to such Client in the Borrowing Base, that it has followed all of its Credit Policies with respect to such Client; or

(w)     a Receivable for which Lender has notified Borrower that the Receivable, the Client, the Client Collateral, and/or any related Client Loan Document(s) is unsatisfactory or unacceptable (which Lender reserves the right to do at any time in its sole good faith discretion based upon factors including without limitation a change after the corresponding Client Loan Closing Date in credit policies, market conditions, Borrower's business and other criteria).

For purposes of this definition, any Receivable that at any time is or becomes an Eligible Receivable, but which subsequently fails to meet any of the requirements of this definition, shall cease to be an Eligible Receivable (but shall continue to be part of the Collateral) for so long as the same fails to meets such requirements.

"Environmental Laws" means all federal, state, local and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, ambient air, surface water, ground water, or land), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes, and all regulations, notices or demand letters issued, entered, promulgated or approved thereunder.

"Equipment" has the same meaning given to it in the UCC.

"ERISA" means the Employee Retirement Income Security Act of 1974, as in effect from time to time.

"Event of Default" means an event described in Section 9.1 of the Agreement.

"Existing Lender" means First National Bank of Jeffersonville.

"Facility Fee" means the fee referred to in Section 2.1.

"Financing Statements" has the same meaning given to it in the UCC.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of Borrower that ends on the last day of December of each year.

"Fixed Charge Coverage Ratio" means, for any period, the ratio of (i) Borrower's EBITDA minus Unfinanced Capital Expenditures minus taxes actually paid by Borrower in cash, to (ii) Borrower's Interest Expense paid in cash plus the principal portion of any and all scheduled amortization payments on Indebtedness for Money Borrowed made by Borrower, in each case for such period.

"GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and, when used with reference to Borrower or any Subsidiary of Borrower, consistent with the prior financial practices of Borrower.

"General Intangibles" has the same meaning given to it in the UCC.

"Governmental Approvals" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all governmental bodies, whether federal, state, local or foreign national or provincial and all agencies thereof.

"Guarantor" or "Guarantors" means Lloyd V. Barriger, Andrew E. McKean and each other Person guaranteeing to Lender all or part of the Obligations.

"Guaranty" or "Guaranties" means (a) that certain Guaranty of Guarantor dated of even date herewith and (b) any other guaranty executed and delivered by a Guarantor in favor of Lender, in each case in form and substance satisfactory to Lender.

"Indebtedness" of any Person means, without duplication, all Liabilities of such Person, and to the extent not otherwise included in Liabilities, the following: (a) all obligations for Money Borrowed or for the deferred purchase price of property or services, (b) all obligations (including, during the noncancellable term of any lease in the nature of a title retention agreement, all future payment obligations under such lease discounted to their present value in accordance with GAAP) secured by any Lien to which any property or asset owned or held by such Person is subject, whether or not the obligation secured thereby shall have been assumed by such Person, (c) all obligations of other Persons which such Person has guaranteed, including, but not limited to, all obligations of such Person consisting of recourse liability with respect to accounts receivable sold or otherwise disposed of by such Person, and (d) in the case of Borrower (without duplication) all Obligations under the Loan Documents.

"Initial Term" means the three (3) year period commencing on the Agreement Date.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal

bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Instrument" has the meaning given to it in the UCC.

"Intangible Assets" means, with respect to any Person, that portion of the book value of all of such Person's assets that would be treated as intangibles under GAAP, including without limitation all leasehold improvements, goodwill, receivables from affiliates, members, and stockholders, and any and all other like or similar assets.

"Interest Expense" means for any period as determined in conformity with GAAP, total interest expense, whether paid or accrued or due (including without limitation, in respect of the Loans and subordinated debt, if any) and payable, including without limitation, the interest component of Capitalized Lease obligations for such period, all bank fees, and net costs under interest rate contracts.

"Interest Rate" means a variable rate, adjusted daily, equal to the Prime Rate plus one and one-half of one percent (1.5%).

"Interested Party" means any employee, agent, owner, partner, member, or shareholder in Borrower.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as in effect from time to time.

"Inventory" has the same meaning given to it in the UCC.

"Investment" means, with respect to any Person; (a) the acquisition or ownership by such Person of any share of capital stock, evidence of Indebtedness (which shall not include funds on deposit in demand deposit accounts) or other security issued by any other Person, (b) any loan, advance or extension of credit to, or contribution to the capital of, any other Person, excluding advances to employees in the ordinary course of business for business expenses, (c) the obligations of any other Person that are guaranteed by such Person, (d) any other investment in any other Person, and (e) any commitment or option to make any of the investments listed in clauses (a) through (d) above.

"Investment Property" has the meaning given to it in the UCC.

"Lender" shall mean Textron Financial Corporation, a Delaware corporation.

"Letter-of-credit right" has the same meaning given to it in the UCC.

"Leverage Ratio" shall mean, at any time, the ratio of (i) total Liabilities less the aggregate outstanding principal balance of Subordinated Indebtedness to (ii) Borrower's Adjusted Tangible Net Worth.

atl-fs1\545023v09                    13

**A-90**

"Liabilities" of any Person means all items (except for items of capital stock or membership interest, additional paid-in capital or retained earnings, or of general contingency or deferred tax reserves) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet of such Person as at the date as of which Liabilities are to be determined.

"Lien" as applied to the property of Borrower or any Person means: (a) any mortgage, deed to secure debt, deed of trust, lien, pledge, charge, lease constituting a Capitalized Lease Obligation, conditional sale or other title retention agreement, or other security interest, security title or encumbrance of any kind in respect of any property of such Person, or upon the income or profits therefrom, (b) any arrangement, express or implied, under which any property of such Person is transferred, sequestered or otherwise identified for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to the payment of the general, unsecured creditors of such Person, and (c) the filing of, or any agreement to give, any financing statement under the Uniform Commercial Code or its equivalent in any jurisdiction, excluding informational financing statements relating to property leased by such Person.

"Loan Documents" means collectively this Agreement, the Security Documents, the Credit Support Documents, and each other instrument, agreement or document executed by Borrower, a Guarantor, or any other Person in connection with this Agreement, whether prior to, on or after the Agreement Date.

"Loans" means, individually and collectively, each and every Revolving Loan Advance.

"Materially Adverse Effect" means a material adverse effect on (a) the business, assets, properties, financial condition or prospects, contingent liabilities or material agreements of Borrower and its Subsidiaries taken as a whole, (b) the value of the Collateral, (c) the Security Interest or the priority of the Security Interest, (d) the respective ability of Borrower or any other obligor to perform any material obligations under this Agreement or any other Loan Document, or (e) the rights of or benefits available to Lender under, or the validity or enforceability of, any Loan Document.

"Maximum Credit" means the amount of Fifteen Million and No/100 Dollars ($15,000,000), or such lesser or greater amount as shall be agreed upon from time to time in writing by Lender and Borrower.

"Membership Interest Pledge Agreement" or "Membership Interest Pledge Agreements" means (a) that certain pledge agreement dated as of even date herewith executed and delivered by G & B Partners, Inc. in favor of Lender as security for the Obligations, pursuant to which all of the membership interests of Borrower have been pledged to Lender as Collateral, and (b) that certain pledge agreement dated as of even date herewith executed and delivered by Borrower in favor of Lender as security for the Obligations, pursuant to which all of Borrower's membership interests of Thorn Forest, LLC have been pledged to Lender as Collateral.

atl-fs1\545023v09                    14

**A-91**

"Money Borrowed" means, as applied to Indebtedness, (a) Indebtedness for money borrowed, (b) Indebtedness, whether or not in any such case the same was for money borrowed, (i) represented by notes payable, and drafts accepted, that represent extensions of credit, (ii) constituting obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) upon which interest charges are customarily paid or that was issued or assumed as full or partial payment for property (other than trade credit that is incurred in the ordinary course of business), (c) Indebtedness that constitutes a Capitalized Lease Obligation, and (d) Indebtedness that is such by virtue of clause (c) of the definition thereof, but only to the extent that the obligations guaranteed are obligations that would constitute Indebtedness for Money Borrowed.

"Net Income" means, as applied to any Person, the net income (or net loss) of such Person for the period in question after giving effect to deduction of or provision for all operating expenses, all taxes and reserves (including reserves for deferred taxes) and all other proper deductions, all determined in accordance with GAAP, provided that there shall be excluded: (a) the net income (or net loss) of any Person accrued prior to the date it becomes a Subsidiary of, or is merged into or consolidated with, the Person whose Net Income is being determined or a Subsidiary of such Person, (b) the net income (or net loss) of any Person in which the Person whose Net Income is being determined or any Subsidiary of such Person has an ownership interest, except, in the case of net income, to the extent that any such income has actually been received by such Person or such Subsidiary in the form of cash dividends or similar distributions, (c) any restoration of any contingency reserve, except to the extent that provision for such reserve was made out of income during such period, (d) any net gains or losses on the sale or other disposition, not in the ordinary course of business, of Investments, business units and other capital assets, provided that there shall also be excluded any related charges for taxes thereon, (e) any net gain arising from the collection of the proceeds of any insurance policy, (f) any write-up of any asset, and (g) any other extraordinary item.

"Net Proceeds" means proceeds received by Borrower or any of its Subsidiaries in cash from any Asset Disposition (including, without limitation, payments under notes or other debt securities received in connection with any Asset Disposition), net of: (a) the transaction costs of such sale, lease, transfer or other disposition; (b) any tax liability arising from such transaction; and (c) amounts applied to repayment of Indebtedness (other than the Obligations) secured by a Lien on the asset or property disposed.

"Notice of Borrowing" means a telephonic or electronic notice followed by a confirming same-day written notice requesting a Borrowing, which is given by telex or facsimile transmission in accordance with the applicable provisions of this Agreement and which specifies (i) the amount of the requested Borrowing, and (ii) the date of the requested Borrowing.

"Obligations" means, in each case whether now in existence or hereafter arising, (a) the principal of, and interest and premium, if any, on, the Loans, and (b) all indebtedness, liabilities, obligations, covenants and duties of Borrower to Lender of every kind, nature and description arising under this Agreement, or any of the other Loan

Documents, or in connection with the Credit Facility, whether direct or indirect, absolute or contingent, due or not due, contractual or tortious, liquidated or unliquidated, and whether or not evidenced by any note, and whether or not for the payment of money, including without limitation, fees and expenses required to be paid or reimbursed pursuant to this Agreement.

"Obligor" means Borrower and any Person who may now or in the future guaranty the payment and performance of the whole or any part of the Obligations.

"OREO Properties" means other real estate owned by the Borrower including real property on which the Borrower has foreclosed.

"PBGC" means the Pension Benefit Guaranty Corporation and any successor agency.

"Permitted Investments" means Investments of Borrower in: (a) negotiable certificates of deposit or time deposits issued by a state bank or by any United States bank or trust company having capital, surplus and undivided profits in excess of $500,000,000; (b) any direct obligation of the United States of America or any agency or instrumentality thereof which has a remaining maturity at the time of purchase of not more than one year and repurchase agreements relating to the same; and (c) other than in the ordinary course of Borrower's business, advances or extensions of credit made by Borrower not to exceed $100,000 in the aggregate outstanding at any time.

"Permitted Liens" means: (a) Liens securing taxes, assessments and other governmental charges or levies (excluding any Lien imposed pursuant to any of the provisions of ERISA) or the claims of materialmen, mechanics, carriers, warehousemen or landlords for labor, materials, supplies or rentals incurred in the ordinary course of business, but (i) in all cases only if payment shall not at the time be required to be made, and (ii) in the case of warehousemen or landlords, only if such liens are junior to the Security Interest in any of the Collateral, (b) Liens consisting of deposits or pledges made in the ordinary course of business in connection with, or to secure payment of, obligations under workers' compensation, unemployment insurance or similar legislation or under payment or performance bonds, (c) other Liens on real property owned by Borrower in the nature of zoning restrictions, easements, and rights or restrictions of record on the use of real property, which do not materially detract from the value of such property or impair the use thereof in the business of Borrower, (d) purchase money Liens, (e) Liens shown on Schedule 1, and (f) Liens of Lender arising under this Agreement and the other Loan Documents.

"Person" means any individual, limited liability company, corporation, partnership, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"Plan" means any employee benefit plan as defined in Section 3(3) of ERISA in respect of which Borrower or any Affiliate of Borrower is, or within the immediately preceding six years was, an "employer" as defined in Section 3(5) of ERISA.

"Prime Rate" means the rate of interest per annum announced or quoted by JPMorgan Chase Bank from time to time as its prime rate for commercial loans, whether or not such rate is the lowest rate charged by JPMorgan Chase Bank to its most preferred borrower, and, if such prime rate for commercial loans is discontinued by JPMorgan Chase Bank as a standard, a comparable reference rate designated by Lender as a substitute therefor shall be the Prime Rate.

"Proprietary Rights" means all of Borrower's now owned and hereafter arising or acquired patents, patents pending, patent applications, inventions and improvements, copyrights, copyright applications, literary rights, trademarks, trademark applications, trade names, trade secrets, service marks, data bases, computer software and software systems, including the source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, licenses, and other intangible property, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, all income, royalties, damages, claims and payments now or hereafter due and/or payable under or with respect thereto, including without limitation, damages and payments for past and future infringement thereof, and all rights to sue for past, present and future infringement of any of the foregoing.

"Receivable" means and includes (a) any and all rights to the payment of money or other forms of consideration of any kind (whether classified under the UCC as Accounts, contract rights, chattel paper, general intangibles, or otherwise) including without limitation all rights to payment arising under Accounts, letter-of-credit rights, chattel paper, tax refunds, insurance proceeds, Contract Rights, notes, drafts, instruments, documents, acceptances, and all other debts, obligations and liabilities in whatever form from any Person, (b) all guarantees, security and Liens for payment thereof, (c) all goods, whether now owned or hereafter acquired, and whether sold, delivered, undelivered, in transit or returned, which may be represented by, or the sale or lease of which may have given rise to, any such right to payment or other debt, obligation or liability, and (d) all proceeds of any of the foregoing.

"Renewal Term" means the extension of this Agreement beyond the Initial Term, as provided for in Section 1.6.

"Reportable Event" has the meaning set forth in Section 4043(b) of ERISA, but shall not include a Reportable Event as to which the provision for thirty (30) days notice to the PBGC is waived under applicable regulations.

"Reserves" means reserves established against the amount of the Borrowing Base, which Lender in the exercise of its credit judgment and discretion deems necessary to ensure payment of the Obligations.

atl-fs1\545023v09                    17

**A-94**

"Revenues" shall mean all money, funds, cash, proceeds, or payments of any kind received by Borrower from all sources, including without limitation the entire principal and interest portions of all such payments from any Client on any Client Loan, all proceeds of Collateral, including Net Proceeds, insurance proceeds, and all proceeds from the sale of Collateral, whether received in cash, by check, by other instrument, or otherwise.

"Revolving Loan Advance" means a revolving loan made to Borrower pursuant to this Agreement, and "Revolving Loan Advances" means more than one Revolving Loan Advance and, collectively, all Revolving Loan Advances.

"Second Priority Client Loan" means a Client Loan secured by a lien in favor of Borrower on improved real property which security interest is subject to the security interest of only one other person.

"Security" shall have the same meaning as in Section 2(1) of the Securities Act of 1933, as amended.

"Security Documents" means each of the following: (a) the Financing Statements, (b) the Membership Interest Pledge Agreements, (c) the Collateral Assignments, (d) the Blocked Account Agreement, and (e) each other writing executed and delivered by Borrower or any other Obligor securing the Obligations or any part thereof.

"Security Interest" means the Liens of Lender on and in the Collateral created or effected hereby or by any of the Security Documents or pursuant to the terms hereof or thereof.

"Subordinated Indebtedness" means any Indebtedness for Money Borrowed of Borrower that is expressly subordinated to the Obligations on terms and conditions acceptable to Lender in its discretion.

"Subsidiary" means, (a) when used to determine the relationship of a Person to another Person, a Person of which an aggregate of fifty percent (50%) or more of the stock of any class or classes or fifty percent (50%) or more of other ownership interests is owned of record or beneficially by such other Person, or by one or more Subsidiaries of such other Person, or by such other Person and one or more Subsidiaries of such Person, (i) if the holders of such stock, or other ownership interests, (A) are ordinarily, in the absence of contingencies, entitled to vote for the election of a majority of the directors (or other individuals performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency, or (B) are entitled, as such holders, to vote for the election of a majority of the directors (or individuals performing similar functions) of such Person, whether or not the right so to vote exists by reason of the happening of a contingency, or (ii) in the case of such other ownership interests, if such ownership interests constitute a majority voting interest, and (b) when used with respect to a Plan, ERISA or a provision of the Internal Revenue Code pertaining to employee benefit plans, any other corporation, trade or business (whether or

not incorporated) which is under common control with Borrower and is treated as a single employer with Borrower under Section 414(b) or (c) of the Internal Revenue Code and the regulations thereunder.

"Termination Date" means the earliest to occur of: (a) the end of the Initial Term, or such later date as to which the same may be extended pursuant to the provisions of Section 1.6, (b) such date as the Obligations shall have been accelerated pursuant to the provisions of Section 9.2, or (c) such date as all Obligations shall have been irrevocably paid in full and the Credit Facility shall have been terminated.

"Termination Event" means (a) a Reportable Event, or (b) the filing of a notice of intent to terminate a Plan, or the treatment of a Plan amendment as a termination, under Section 4041(c) of ERISA, or (c) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or the appointment of a trustee to administer any Plan.

"Thom Forest" shall mean Thom Forest, LLC, a Delaware limited liability company, owned and held in whole or part by Borrower.

"Thom Forest Agreement" means, if any, that certain Agreement by and among Lender, Thom Forest, Borrower, GAB Holding, LLC, and Campus Capital Corp., or other like or similar document.

"Thom Forest Client Loan" shall mean any loan, extension of credit, or financial accommodation made by Thom Forest, LLC which includes any funds contributed by Borrower, to or for the benefit of a Client of Thom Forest.

"Title Insurance Policy" means one or more policies of title insurance in favor of Lender, issued by a national title insurance company, containing, at a minimum and without exception thereto, coverage for loss or damage incurred by the insured (and its successors and assigns, as their interests may appear) by reason of the invalidity or unenforceability of the lien of the insured mortgage upon the title, as to the Client Collateral referenced therein.

"UCC" means the Uniform Commercial Code as in effect from time to time in the state of Rhode Island.

General. Unless otherwise defined, all terms used in this Agreement that are defined in the UCC shall have the meaning given them in the UCC. All terms of an accounting nature not specifically defined in this Agreement shall have the meaning ascribed them by GAAP. References to any legislation or statute or code, or to any provision thereof, shall include any modification or reenactment of, or any legislative, statutory or code provision substituted for, such legislation, statute or code or provision thereof. References to any Person include its successor or permitted substitutes and assigns.

atl-fs1\545023v09                    19

**A-96**

## ARTICLE I - LOANS, RENEWAL AND TERMINATION

1.1     Credit Facility.   Lender agrees, for so long as no Default or Event of Default exists and subject to the terms of this Agreement, to make Loans to Borrower in an aggregate amount outstanding not to exceed the Borrowing Base at any time.

1.2     Borrowing Procedures.

(a)     Until but not including the Termination Date, subject to the provisions of Article VIII of this Agreement, and provided that there does not then exist a Default or an Event of Default, Borrower may, from time to time, request that Lender make Revolving Loan Advances to Borrower in accordance with the terms of this Agreement.  Lender shall fund Borrower's request for Revolving Loan Advances as follows: (i) by the close of business on the day such request is received if the request is received prior to 1:00 p.m. East Coast time; and (ii) by the close of the next Business Day if the request is received after that time.

(b)     Each request for a Revolving Loan Advance shall be made by transmission to Lender of a Notice of Borrowing and shall be accompanied by a complete and accurate Borrowing Base Certificate, and shall be confirmed by Borrower with Lender by telephone; provided, that Lender shall at any time have the right to review and adjust, in the exercise of its reasonable discretion, any calculation set forth in the Borrowing Base Certificate or the Notice of Borrowing (i) to reflect Lender's reasonable estimate of declines in value of any of the Collateral described in such Borrowing Base Certificate, and (ii) to the extent such calculation is not in accordance with this Agreement.

(c)     Borrower shall reimburse Lender and hold Lender harmless from any loss or expense that Lender may sustain or incur as a consequence of the failure of Borrower to borrow additional Loans after Borrower has requested (or is deemed to have requested) such additional Loans, including any such loss or expense arising from the liquidation or re-employment of funds obtained by Lender to maintain the Loans or from fees payable to terminate the deposits from which such funds were obtained.

(d)     It is expressly understood and agreed that Lender intends to use the Borrowing Base as a maximum ceiling on Revolving Loan Advances to Borrower; provided, however, that it is agreed that should the Revolving Loan Advances ever exceed the ceiling so determined or any other limitation set forth in this Agreement, such Revolving Loan Advances shall nevertheless constitute Obligations secured by the Security Interest of Lender and, as such, shall be entitled to all benefits thereof and security therefor.  Under the Credit Facility, Borrower from time to time may borrow, repay, prepay and reborrow the Revolving Loan Advances pursuant to the terms of this Agreement.

1.3     Interest.

atl-fs1\545023v09                                  20

**A-97**

(a)     Interest shall accrue on the outstanding principal balance of the Loans at the Interest Rate. All interest accrued on the outstanding principal balance of the Loans shall be calculated on the basis of a year of three hundred sixty (360) days and the actual number of days elapsed in each month. Accrued interest shall be added to the outstanding principal balance of the Loans on the first calendar day of each calendar month following the month in which such interest accrues.

(b)     Upon the occurrence and during the continuation of an Event of Default, which Event of Default is not cured to the satisfaction of Lender within ten (10) days from the date such Event of Default first occurred, the unpaid principal balance of the Revolving Loan Advances shall bear interest at a per annum rate equal to the Interest Rate plus two hundred (200) basis points effective as of and from the date such Event of Default first occurred, as determined by Lender.

1.4     Charges to Loan Account. At Lender's option, exercised in Lender's sole discretion, Lender may (a) deduct the aggregate amount of principal, interest, fees, costs, expenses, and other charges and amounts provided for in this Agreement or in any other Loan Documents from any Revolving Loan Advance on the due date thereof, (b) treat such amounts as a Revolving Loan Advance or (c) disburse such amount by way of direct payment, which such disbursement shall be deemed to be a Revolving Loan Advance.

1.5     Allocation of Payments and Limit of Interest. Prior to the occurrence of an Event of Default, all Revenues received by Lender from Borrower shall be applied pro tanto to the Obligations as follows: first to pay any fees and expenses then due to Lender under the Loan Documents, until paid in full, and second, to repay the principal amount of all outstanding Obligations until paid in full. Upon the occurrence and during the continuance of an Event of Default, all Revenues received by Lender from Borrower shall be applied pro tanto to the Obligations in such manner as Lender shall determine in its sole discretion. Lender does not intend to charge interest at a rate in excess of the highest rate permitted by Applicable Law. Interest on any outstanding principal balance shall be spread over the entire period that such principal balance is outstanding. Any excess interest charges paid by Borrower to Lender shall be applied to reduce the outstanding principal balance of the Obligations.

1.6     Renewal and Termination.

(a)     This Agreement shall expire on the Termination Date. This Agreement shall be automatically renewed for additional one (1) year periods upon expiration of the Initial Term unless terminated by Lender or Borrower as provided in this Section 1.6. Borrower may terminate this Agreement at the expiration of the Initial Term or at the end of each Renewal by giving written notice of such termination to Lender at least sixty (60) days prior to the effective date of such termination, and, if such termination date is on a date other than the end of the Initial Term or a Renewal Term, by payment to Lender of the Early Termination Fee as provided in Section 2.5 hereof. Lender may terminate this Agreement (i) at the expiration of the Initial Term or at the end of each Renewal by giving written notice of such termination to Borrower at least ninety

**A-98**

(90) days prior to the effective date of such termination, and (ii) at any time during the existence of an Event of Default.

(b)  Upon the termination of this Agreement for any reason as herein provided, Borrower shall be required to pay, discharge and satisfy, no later than the effective date of such termination, the Loans, all accrued and unpaid interest and fees, any Early Termination Fee, and all other non-contingent Obligations outstanding.

(c)  All undertakings, agreements, covenants, warranties and representations of Borrower contained in this Agreement and the other Loan Documents shall survive any such termination, and Lender shall retain each and every Security Interest, and all other rights and remedies of Lender under this Agreement and the other Loan Documents, notwithstanding such termination until Borrower has paid the amounts described in Section 1.6(b).

(d)  Notwithstanding the payment in full of the Loans, all accrued and unpaid interest and fees, any Early Termination Fee, and all other non-contingent Obligations outstanding, Lender shall not be required to terminate its Security Interests unless, with respect to any loss or damage Lender may incur as a result of dishonored checks or other items of payment received by Lender from Borrower or any Client and applied to the Obligations, Lender shall (i) have received a written agreement, executed by Borrower and by any Person whose loans or other advances to Borrower are used in whole or in part to satisfy the Obligations, indemnifying Lender from any such loss or damage; or (ii) have retained such monetary reserves and its Security Interest for such period of time as Lender, in its reasonable discretion, may deem necessary to protect Lender from any such loss or damage.

## ARTICLE II - FEES

2.1  Facility Fee. In order to induce Lender to enter into this Agreement and to make the Loans, Borrower agrees to pay to Lender a Facility Fee in an amount equal to One Hundred Twelve Thousand Five Hundred and no/100 Dollars ($112,500.00), which Facility Fee shall be due and payable on the Agreement Date and shall be fully earned by Lender on the date thereof. Borrower shall pay to Lender Forty Five Thousand and No/100 Dollars ($45,000.00) of the Facility Fee on the Agreement Date, and Borrower shall pay the remainder of the Facility Fee in equal monthly payments of Five Thousand Six Hundred Twenty Five and No/100 Dollars ($5,625.00) on the first (1st) day of each full month thereafter until paid in full.

2.2  Unused Line Fee  Commencing on the one hundred twenty-first (121st) day after the Agreement Date, Borrower shall pay to Lender a fee at the end of each month for the unused portion of the Credit Facility, such fee to be determined by multiplying the difference between (i) the Maximum Credit, and (ii) for said month, the average daily balance of the amount of the outstanding loan balance, by 35/100 one percent (0.35%) per annum for the number of days in said month.

2.3    Field Examination Fee.  For each field examination of the books, records and other assets of Borrower performed by one or more employees or agents of Lender, Borrower shall pay to Lender a field examination fee in an amount equal to $1,000 (or such other amount as Lender shall establish from time to time on notice to Borrower) for each day spent by each such employee or agent in performing and/or summarizing the results of such examination (including all necessary travel time) plus all reasonable "out-of-pocket" expenses. Field examinations may be performed by Lender no less frequently than four (4) times annually and, if Borrower is in default, as often as the Lender shall require in its discretion, and each field examination fee shall be payable by Borrower to Lender on the date on which such field examination is performed.

2.4    Wire Transfer Fee.  For each wire transfer initiated by Lender to or for the benefit of Borrower, Borrower shall pay to Lender a fee of $25 or such higher amount as Lender shall reasonably establish from time to time.

2.5    Early Termination Fee.  If for any reason this Agreement is terminated by Borrower prior to the end of the Initial Term or any Renewal Term of this Agreement, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of lost profits of Lender as a result thereof, Borrower agrees to pay to Lender, upon the effective date of such termination, an Early Termination Fee in an amount equal to the following percentage of the amount of the Credit Facility corresponding to the period in which the termination date occurs:

| Percentage of Credit Facility | Period |
|---|---|
| 3% | From the Agreement Date to and including the first anniversary of the Agreement Date |
| 2% | After the first anniversary of the Agreement Date but prior to the second anniversary of the Agreement Date |
| 1% | After the second anniversary of the Agreement Date but prior to the Termination Date |

The Early Termination Fee shall be presumed to be the amount of damages sustained by Lender as a result of such early termination, and Borrower agrees that it is reasonable under the circumstances currently existing.  In addition, Lender shall be entitled to the Early Termination Fee upon the termination of this Agreement by Lender on account of any Event of Default as provided in Section 9.2 or the occurrence of an Event of Default described in Section 9.1(h).  The Early Termination Fee shall be deemed included in the Obligations.  Notwithstanding the foregoing, Lender agrees that no Early Termination Fee shall be due if this Agreement is terminated at the election of Borrower and the Obligations are indefeasibly paid in full on or after November 1, 2006 but on or prior to December 31, 2006.

2.6    Collateral Monitoring Fee.    Borrower shall pay Lender a monthly collateral monitoring fee in an amount equal to One Thousand Five Hundred and No/100 Dollars ($1,500.00).  This fee shall be due and payable monthly, in advance, on the Agreement Date and on the first day of each month thereafter.  Notwithstanding the foregoing, Borrower shall not be required to pay Lender a monthly collateral monitoring fee for the first (1st) three (3) months following the Agreement Date.

2.7    Costs and Expenses.    Borrower agrees to reimburse Lender for all reasonable out-of-pocket expenses incurred by Lender in connection with the Loans, including, but not limited to, filing fees, tax, lien and judgment search fees, fees of outside auditors, bank fees, outside attorneys' fees, and any other reasonable fees or expenses.

### ARTICLE III - GRANT OF SECURITY INTEREST

3.1    Grant of Security Interest.    To secure the payment, performance and observance of the Obligations, Borrower grants, and hereby assigns, mortgages, and pledges, to Lender all of the Collateral, and grants to Lender a continuing security interest in, and a Lien upon, and a right of set off against, all of the Collateral.

3.2    Continued Priority of Security Interest.

(a)    The Security Interest granted by Borrower shall at all times be valid, perfected and enforceable against Borrower and all third parties in accordance with the terms of this Agreement, as security for the Obligations, and the Collateral shall not be at any time subject to any Liens that are prior to, or on parity with or junior to the Security Interest, other than Permitted Liens.  Borrower represents and warrants to Lender that none of the lenders holding a Permitted Lien has a security interest in the Collateral superior in priority to the Lien of Lender granted under this Agreement.

(b)    Borrower shall, at its sole cost and expense, take all action that may be necessary or desirable, or that Lender may reasonably request, so as at all times to maintain the validity, perfection, enforceability and rank of the Security Interest in the Collateral in conformity with the requirements of Section 3.2 (a), or to enable Lender to exercise or enforce its rights hereunder.  Lender may, in Lender's sole discretion, at any time, file for record any Assignment of Security Instrument relating to any Client Loan that remains outstanding as of such date, in order to evidence the assignment contained therein.

(c)    Borrower covenants and agrees with Lender that from and after the Agreement Date and until the Termination Date:

(i)    In addition to Borrower's obligation to deliver all Client Loan Documents in accordance with the terms set forth in this Agreement with respect thereto, in the event that any Collateral, including proceeds, is evidenced by or consists of negotiable collateral (including without limitation letters of credit, letter-of-credit rights, instruments, promissory notes, draft documents or chattel

atl-fs1\545023v09                                24

**A-101**

paper (including electronic and tangible chattel paper)), and if and to the extent that perfection or priority of Lender's security interest is dependent on or enhanced by possession, Borrower, not later than five (5) Business Days after the execution and delivery thereof to Borrower, shall endorse and deliver physical possession of such negotiable collateral or chattel paper to Lender.

(ii)     Borrower, not later than five (5) Business Days after the date of same, shall take all steps reasonably necessary to grant Lender control of all electronic chattel paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transaction Act and the Electronic Signatures in Global and National Commerce Act; and

(iii)     Irrespective of whether Borrower retains possession of any chattel paper or instruments with or without Lender's consent, Borrower, not later than five (5) Business Days after the date of such Client Loan Documents, shall mark or cause each and every copy of such Client Loan Documents to be marked with the following legend: "This writing and the obligations evidenced or secured thereby are subject to the security interest of Textron Financial Corporation" and the Authoritative Original of each Client Loan Documents to be marked also with the following legend: "This is the Authoritative Original with respect to such security interest."

(iv)     Not later than forty-five (45) Business Days after the date of such Client Loan Documents, Borrower shall deliver to Lender or cause to be delivered to Lender an original of each Title Insurance Policy as to the Client Collateral encumbered by the Client Loan relating thereto.

(d)     At any time upon the request of Lender, Borrower shall authorize or execute (or cause to be executed) and deliver to Lender, any and all financing statements, original financing statements in lieu of continuation statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, and all other documents (the "Additional Documents") upon which Borrower's signature or authorization may be required that Lender may request in its discretion, in form and substance satisfactory to Lender, to perfect and continue the perfection of or better perfect Lender's Liens in the Collateral (whether now owned or hereafter arising or acquired), and in order to consummate fully all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by Applicable Law, Borrower authorizes Lender to execute any such Additional Documents in Borrower's name and authorizes Lender to file such executed Additional Documents in any appropriate filing office. In addition, on such periodic basis as Lender shall require, Borrower shall (a) provide Lender with a report of all new patent able, copyrightable, or trademark able materials acquired or generated by Borrower during the prior period, (b) cause all patents, copyrights, and trademarks acquired or generated by Borrower that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of Borrower's ownership

atl-fs1\545023v09                    25

thereof, and (c) cause to be prepared, executed, and delivered to Lender supplemental schedules to the applicable Loan Documents to identify such patents, copyrights, and trademarks as being subject to the security interests created thereunder. Borrower authorizes Lender to transmit, communicate or, as applicable, file any financing statement under the UCC, record, in-lieu financing statement, amendment, correction statement, continuation statement, termination statement or other instrument describing the Collateral defined herein as "all personal property of Debtor" or "all assets of Debtor" or words of similar effect in such jurisdictions and in such filing offices as Lender may deem necessary or desirable in order to perfect any security interest granted by Borrower under this Agreement and the other Loan Documents without signature. Borrower hereby ratifies, to the extent necessary, Lender's authorization to file a financing statement, if such financing statement has been pre-filed by Lender prior to the Agreement Date. Prior to repayment in full and final discharge of the Obligations, Borrower shall not terminate, amend or file a correction statement with respect to any financing statement filed pursuant to this Section 3.2(d) without Lender's prior written consent.

(e)  Borrower shall promptly notify Lender in writing upon incurring or otherwise obtaining a commercial tort claim, as that term is defined in the UCC, after the date hereof against any third party and, upon request of Lender, promptly amend Schedule I to this Agreement, authorize the filing of additional or amendments to existing financing statements and do such other acts or things deemed necessary or desirable by Lender to give Lender a security interest in any such commercial tort claim.

(f)  Borrower shall mark its books and records as directed by Lender and as may be necessary or appropriate to evidence, protect and perfect the Security Interest and shall cause its financial statements to reflect the Security Interest.

## ARTICLE IV - PROCEEDS OF COLLATERAL, RECEIVABLES AND COLLECTIONS

4.1  Borrower's Proceeds of Collateral.  Borrower shall pay to Lender all proceeds of Collateral, including Net Proceeds, immediately upon Borrower's receipt thereof. The receipt of any payment item by Lender (whether from transfers to Lender pursuant to the Blocked Account Agreement or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Lender's account or unless and until such payment item is honored when presented for payment. Anything to the contrary contained in this Agreement notwithstanding, any payment item shall be deemed received by Lender only if it is received into Lender's account on a Business Day on or before 11:00 a.m. (East Coast Time).

4.2  Collection of Receivables and other Collateral.

(a)  Borrower shall establish and maintain, at its expense, one or more Blocked Accounts, in the sole discretion of Lender, with such banks as are acceptable to Lender pursuant to documentation satisfactory to Lender, in its discretion, into which

atl-fs1\545023v09                    26

**A-103**

Borrower shall promptly deposit or cause to be deposited all Revenues. Borrower shall direct and instruct all of its Clients and all other Persons, including without limitation all closing attorneys, title agents, and other parties responsible for handling the sale or refinancing of any Client Collateral, to remit directly to such Blocked Account all payments on Receivables and all other payments constituting Revenues, via wire funds transfer or other like or similar manner of payment. If, notwithstanding such instructions, Borrower receives any Revenues, and upon receipt by Borrower of any such Revenues, Borrower shall receive such payments as Lender's trustee, and Borrower within one (1) Business Day deliver such payments to Lender in their original form duly endorsed in blank. Borrower agrees that all payments made to the Blocked Account or other funds received and collected by Lender, whether in respect of the Receivables, as other Revenues, or otherwise, shall be subject to Lender's sole control and shall be treated as payments to Lender in respect of the Obligations and therefore shall constitute the property of Lender to the extent of the amount of the outstanding Obligations.

(g)    Lender or its designee may, in Lender's sole discretion, at any time during which an Event of Default exists, notify Clients of the Security Interest and collect Receivables directly from Clients and charge the collection costs and expenses to Borrower as additional Loans. Whether or not a Default or an Event of Default has occurred, any of Lender's officers, employees or agents shall have the right, at any time or times hereafter, in the name of Lender, any designee of Lender, or Borrower, to verify the validity, amount or any other matter relating to any Receivables by mail, telephone, electronic communication or otherwise. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.

## ARTICLE V - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender, as of the date of this Agreement and at all times that Lender makes Loans to Borrower, as follows:

5.1    Existence, Power and Authority; Borrower Affiliates.

(a)    Organization; Qualification.    Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, as identified in Schedule 1, having the power and authority to own its properties and to carry on its business as now being and hereafter proposed to be conducted, and Borrower is duly qualified and authorized to do business in the jurisdictions listed on Schedule 1 and in each jurisdiction in which the nature of its business or the ownership and characteristics of its property requires such qualification and authorization, except where the failure to be so qualified would not have a Materially Adverse Effect. The jurisdictions in which Borrower is qualified to do business as a foreign entity are listed on Schedule 1.

(b)    Power.    Borrower has the right and power, and has taken all necessary action to authorize it, to execute, deliver and perform the Loan Documents in accordance with their respective terms. Each of the Loan Documents has been duly

**A-104**

)                                                              )

executed and delivered by the duly authorized officers of Borrower and each is, or each when executed and delivered in accordance with this Agreement will be, a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms. All of the transactions contemplated under the Loan Documents are within Borrower's powers and are not in contravention of law or the terms of Borrower's certificate of formation, articles of organization, operating agreement, or other organizational documentation, or any material agreement or undertaking to which Borrower is a party or by which Borrower or its property is bound, and does not result in the creation or imposition of any lien, charge or encumbrance upon any assets of Borrower, other than the Lien of Lender.

(c)     Borrower Affiliates.  Borrower has no Affiliates or Subsidiaries except as set forth on Schedule 1.

(d)     Capitalization.  The outstanding shares of capital stock or membership interests of Borrower have been duly and validly issued and are fully paid and nonassessable, and the number and owners of such stock or membership interests of Borrower are set forth on Schedule 1. Except as set forth on Schedule 1, there are no existing warrants, options, or commitments of any kind or nature convertible into capital stock or membership interests of any class of Borrower.

(e)     Business.  Borrower is engaged principally in the business(es) described on Schedule 1.

5.2     Compliance with Other Agreements and Applicable Law.  Except as set forth on Schedule 1, Borrower is not in default under, or in violation in any respect of, any material agreement, contract, instrument or other commitment to which Borrower is a party or by which Borrower or its property is bound, and Borrower is in compliance in all material respects with all Governmental Approvals applicable to or required in connection with the conduct of Borrower's business and affairs, and Borrower is otherwise in compliance in all material respects with all Applicable Laws.

5.3     Absence of Litigation.  Except as set forth on Schedule 1, there are no actions, proceedings or investigations pending or threatened against Borrower, or any of its assets, which, if adversely determined against Borrower can reasonably be expected to have a Materially Adverse Effect on the assets, financial condition or business prospects of Borrower.

5.4     Taxes and Returns.  Except as set forth on Schedule 1, Borrower has timely filed all tax returns which Borrower is required by law to file or has obtained valid extensions, and all taxes and other sums related to the payment of taxes owing by Borrower to any governmental authority have been fully paid and Borrower maintains adequate reserves to pay such tax liabilities as they accrue.

5.5     Lien Priority and Nature of Certain Collateral.

atl-fs1\545023v09                          28

**A-105**

)                                                    _)

(a)     Liens. Lender has a perfected first priority security interest in the Collateral and, except for the Liens described on Schedule 1 and the other Permitted Liens, none of the properties and assets of Borrower is subject to any Lien. Other than the Financing Statements of Lender pursuant to this Agreement, no financing statement under the Uniform Commercial Code of any state or other instrument evidencing a Lien that names Borrower as debtor has been filed (and has not been terminated) in any state or other jurisdiction, and Borrower has not signed any such financing statement or other instrument or any security agreement authorizing any secured party thereunder to file any such financing statement or instrument, except to perfect the Liens listed on Schedule 1 and the other Permitted Liens.

(b)     Title. Except as set forth on Schedule 1, Borrower has valid and legal title to or leasehold interest in all personal property, real property, and other assets used in its business.

(c)     Receivables.

(i)     Each Eligible Receivable has arisen from the extension of credit, loans, or other financial accommodations or provision of goods or services rendered by Borrower, is genuine, complete and, in all other respects, what it purports to be, and is not otherwise ineligible under the standards set forth in this Agreement;

(ii)    Borrower has a perfected, first-priority or second-priority security interest in the assets of Clients described in the Client Loan Documents, including without limitation the Client Collateral, and all of each Client's Accounts, Inventory, goods, Instruments, contract rights, chattel paper, documents, and General Intangibles, together with all proceeds thereof and all security and guarantees therefor, whether now existing or hereafter arising, together with all returned, reclaimed or repossessed goods, and all books and records pertaining to the foregoing;

(iii)   The Client Loans are and will be bona fide existing obligations created by the extension of credit, loans, or other financial accommodations or provision of goods or services rendered by Borrower to Clients in the ordinary and usual course of Borrower's business and will be owed to Borrower without defenses, disputes, offsets or counterclaims; Borrower shall have received no notice of actual or imminent bankruptcy or insolvency of any Client and each Client, respectively, shall be able to timely discharge all of its indebtedness to Borrower and Client, respectively;

(iv)    Neither any Client Loan Document nor any transaction entered into in connection therewith contravenes any applicable statute, law or regulation;

**A-106**

)                                          _)

(v)      The Client Collateral is covered by appropriate, duly executed Client Loan Documents, duly authorized, executed and delivered by the parties thereto and enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally, or by principles of equity, and all amounts due to Borrower under any Client Loan Document(s) are payable without defense, offset, claim or counterclaim;

(vi)     No default or event of default has occurred under the Client Loan Documents unless Lender has received written notice thereof;

(vii)    Each Client Loan Document, in the aggregate with respect to a Client, correctly sets forth the terms of Borrower's extension of credit, loans, or other financial accommodations or provision of goods or services by Borrower to such Client;

(viii)   Borrower acknowledges and agrees that Lender is not undertaking any authority or responsibility with respect to any of the Client Loan Documents entered into by Borrower including without limitation any obligation to extend credit, loans or other financial accommodations to any Client, nor is Lender assuming any collection or credit risk with respect to any Client Collateral owned by or pledged to Borrower, nor is Lender in any way involved in Borrower's pricing, underwriting or credit decisions with respect to any Client Loan Documents;

(ix)     Borrower has provided Lender with true, correct and substantially complete copies of all Client Loan Documents with respect to each Client Loan outstanding as of the Agreement Date;

(x)      Attached hereto as Exhibit B are the Credit Policies used by Borrower in connection with all Client Loans and Client Collateral;

(xi)     Attached hereto as Exhibit C are the forms of Client Loan Documents used by Borrower in connection with all Client Loans and Client Collateral;

(xii)    Borrower shall at all times maintain and administer its relationship with each of its Clients in accordance with the terms set forth in the Client Loan Documents for such Client;

(xiii)   Borrower is not extending or otherwise making available to any Client any Client Loan on any Client Collateral that is ineligible under applicable Client Loan Documents;

(xiv)    Borrower has complied with its Credit Policies for each Client.

atl-fs1\545023v09                    30

**A-107**

(d)    Real Estate.  Borrower owns or leases no real property other than that described on Schedule 1.

(e)    Corporate and Fictitious Names.  Except as otherwise disclosed on Schedule 1, during the five-year (5) period preceding the Agreement Date, neither Borrower nor any predecessor of Borrower has been known as or used any corporate or fictitious name other than the name of Borrower as first set forth in this Agreement.

5.6    Principal Place of Business.  Borrower's principal places of business or, if Borrower has more than one principal place of business, Borrower's chief executive office, is located at the address set forth on the signature page of this Agreement.  All books and records pertaining to the Collateral are kept by Borrower at its principal place of business or, if Borrower has one, its chief executive office.

5.7    Environmental Compliance.  Except as set forth on Schedule 1, to the best of Borrower's knowledge, (i) none of Borrower's properties or assets nor any Client Collateral has ever been used by Borrower or by any previous owner or operator of such properties or assets, in violation of any Environmental Laws; (ii) none of Borrower's properties or assets nor any Client Collateral has ever been designated or identified in any manner pursuant to any Environmental Laws as a hazardous substance or materials disposal site, or a candidate for closure pursuant to any Environmental Laws; (iii) no liens arising under any Environmental Laws has attached to any Revenues or to any real or personal property owned or operated by Borrower nor to any Client Collateral; (iv) Borrower has not received a summons, citation, notice or directive from any federal or state governmental agency concerning any action or omission by Borrower resulting from the violation of any Environmental Laws; (v) Borrower is now in compliance with all Environmental Laws; and (vi) all material Governmental Approvals or similar authorizations required to be obtained or filed in connection with the operations of Borrower under any Environmental Laws have been obtained, and all Governmental Approvals and similar authorizations are valid and in full force and effect in all respects.

5.8    Proprietary Rights.  A correct and complete schedule of all of Borrower's Proprietary Rights is set forth in Schedule 1 and none of the Proprietary Rights is subject to any licensing agreement or similar arrangement, except as set forth on Schedule 1 or as entered into in the ordinary course of Borrower's business.  To the best knowledge of Borrower none of the Proprietary Rights infringes on the valid trademark, trade name, copyright, or patent right of any other person or entity, and no other person's or entity's property infringes on the Proprietary Rights, in any material respect.  The Proprietary Rights described on Schedule 1 constitute all of the property of such type necessary to the current and anticipated future conduct of the business of Borrower.

5.9    Trade Names.  All trade names or styles under which Borrower does business or creates Accounts, or to which instruments in payment of Accounts are made payable, are listed on Schedule 1.

atl-fs1\545023v09                    31

**A-108**

5.10    Employee Relations.  Borrower is not, except as disclosed on Schedule 1, party to any collective bargaining agreement nor has any labor union been recognized as the representative of Borrower's employees, and Borrower knows of no pending, threatened, or contemplated strikes, work stoppage or other labor disputes involving any of Borrower's employees.

5.11    Employee Pension Benefit Plans.    Each  Plan  meets  the  minimum funding standards of Section 302 of ERISA, if applicable, and no Termination Event has occurred with respect to any Plan of Borrower.

5.12    Bank Accounts.  The information on Schedule 1 is a complete and correct list of all checking accounts, deposit accounts, and other bank accounts maintained by Borrower.

5.13    Accuracy and Completeness of Information.    All representations and warranties set forth in this Article V, and all statements and other information furnished by or on behalf of Borrower in connection with this Agreement or any of the Loan Documents are true and correct in all material respects and do not omit any material fact. Each financial statement furnished by or on behalf of Borrower presents fairly the financial condition of Borrower as of the date of such statement and for the relevant period(s) then ended.

5.14    Software License Compliance.  Borrower warrants and represents that all software used by Borrower on any of Borrower's computers is either Borrower's proprietary software or is duly licensed, maintained and operated in compliance with the software owner's license terms and conditions.

5.15    Survival of Warranties; Cumulative.  All representations and warranties contained in this Agreement or any of the other Loan Documents shall survive the execution and delivery of this Agreement, any investigation made by or on behalf of Lender, or any Borrowing hereunder, and shall be deemed to have been made again to Lender on the date of each additional Borrowing or other credit accommodation under this Agreement, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date), and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender.  The representations and warranties set forth in this Agreement and in the other Loan Documents shall be cumulative and shall be in addition to any other representations or warranties which Borrower shall now or hereafter give, or cause to be given, to Lender.

## ARTICLE VI - AFFIRMATIVE COVENANTS

Until this Agreement has been terminated and all Obligations have been paid in full, Borrower covenants and agrees with Lender as follows:

6.1     Financial Statements.     Borrower shall deliver to Lender, within one hundred twenty (120) days following the close of each Fiscal Year thereafter, Borrower's audited financial statements, certified by a recognized firm of independent certified public accountants acceptable to Lender as having been prepared in accordance with GAAP and as presenting fairly the financial condition of Borrower as of the date thereof and for the period then ended, and including a management letter to Borrower from such accountants. Borrower shall deliver to Lender such other financial information as Lender shall reasonably request, including, (i) within thirty (30) days after the close of each month, reasonably detailed monthly and fiscal year-to-date financial statements, including income statement, balance sheet, and statement of cash flow, prepared in accordance with GAAP (subject to the absence of notes and to annual audit adjustment), certified by the chief executive officer or chief financial officer or other authorized individual of Borrower as presenting fairly the financial condition of Borrower, which, for the end of each month, shall also include a Covenant Compliance Certificate, setting forth a calculation of the financial covenants described in Section 7.6 below, and the status of all other monetary covenants set forth in this Agreement, and (ii) at least sixty (60) days prior to the end of Borrower's Fiscal Year thereafter, an annual operating budget, prepared in accordance with GAAP, showing a projected income statement, balance sheet and cash flows as of each Fiscal Quarter end for the forthcoming Fiscal Year.

6.2     Books and Records. Borrower shall keep accurate and complete records, including accurate and complete books and records of the Collateral, maintained in accordance with GAAP as acknowledged by Lender, including without limitation observing reasonable practices for monitoring and managing Borrower's loans to Clients, and shall permit Lender to:  (a) visit Borrower's business locations during normal business hours upon two (2) days' prior notice, but without notice at any time during the existence of an Event of Default; (b) inspect, audit and make extracts from or copies of Borrower's books, records, journals, receipts, computer tapes and disks; (c) to accompany Borrower on its field examinations with respect to any Client; (d) to inspect all records available to Borrower including without limitation field examination reports, borrowing base certificates, appraisals, credit reports, credit approvals, and financial statements with respect to any Client and to examine and make copies of any such records; (e) to inspect all records available to Borrower from any credit reporting service, bureau or similar service with respect to any Client and to examine and make copies of any such records; provided that Borrower makes no representation to Lender regarding the accuracy or veracity of such reports; and (f) to attend, for the purpose of monitoring only and not for participating in, any and all meetings of Borrower the purpose of which, in whole or part, is to discuss the status of any and all Client Loans that are or may be delinquent or otherwise in default. All governmental authorities are authorized to furnish Lender with copies of reports of examinations of Borrower made by such parties. Banks,

**A-110**

Clients and other third parties (without waiving any attorney-client privilege) with whom Borrower has contractual relationships pertaining to the Collateral or the Loan Documents, are authorized to furnish Lender with copies of such contracts and related materials. Lender is authorized, in its own name or any other name, to communicate with Clients in order to verify the existence, amount and terms of any Receivable. Lender may exhibit a copy of this Agreement to any party with whom Lender contacts pursuant to this Section 6.2 and such party shall be entitled to rely on the provisions hereof in providing access or information to Lender as provided herein.

　　　　6.3　　Additional Documentation. Borrower shall execute and deliver to Lender all additional documents that Lender may, from time to time, reasonably determine are necessary or appropriate to evidence the Loans or to continue or perfect Lender's Security Interest in the Collateral.

　　　　6.4　　Existence, Name, Organization and Chief Executive Office. Borrower shall maintain its existence in good standing and shall deliver to Lender written notice, at least sixty (60) days in advance, of any proposed change in Borrower's state of formation, a change in Borrower's name or organizational identification number, a change in the use of any trade name, new trade names, fictitious name or new fictitious names, Borrower's business locations, the location of Borrower's principal place of business or chief executive office, the mailing address of Borrower, the location of any Inventory or Equipment, or the location of Borrower's books and records, and shall execute or cause to be executed any and all documents that Lender reasonably requests in connection therewith.

　　　　6.5　　Compliance with Laws and Taxes. Borrower shall comply in all material respects with all Applicable Laws, including without limitation all Environmental Laws. Borrower shall pay all real and personal property taxes, assessments and charges, and all franchise, income, unemployment, social security, withholding, sales and all other taxes assessed against Borrower or the Collateral, at such times and in such manner so as to avoid any penalty from accruing against Borrower or any Lien or charge from attaching to the Collateral. Borrower shall promptly deliver to Lender, upon request, receipted bills evidencing payment of such taxes and assessments. Borrower shall notify Lender promptly hereafter if, with respect to any of Borrower's properties or assets or any Client Collateral, Borrower becomes aware of any lien, action or notice resulting from violation or alleged violation of, or action pursuant to, any Environmental Laws, or the institution of any investigation, inquiry or proceeding concerning any of Borrower's properties or assets or any Client Collateral pursuant to any Environmental Laws.

　　　　6.6　　Performance of Obligations. Borrower shall perform, in a timely manner, all of its obligations pursuant to all leases, mortgages, deeds of trust or other agreements to which Borrower is a party, and shall pay when due all debt owed by Borrower and all claims of mechanics, materialmen, carriers, landlords, warehousemen and other like persons, except only, and to the extent that, the amount of any such debt and claims is being contested by Borrower in good faith by appropriate proceedings and Borrower maintains on its books reasonable reserves therefor in accordance with GAAP.

6.7   Reporting as to Revenues and Receivables.

(a)   With such frequency as Lender shall direct, Borrower shall deliver to Lender such information as Lender shall request with respect to the Revenues, Receivables and Inventory, including, but not limited to:

(i)   no later than 1:00 p.m., East Coast time on the first to occur of (A) the day on which Borrower requests a Revolving Loan Advance or (B) Wednesday of each week, a weekly Borrowing Base Certificate based on the Receivables as of the end of the preceding day, together with a detailed summary of sources of all of the Revenues and credits and collections associated with Receivables.

(ii)   no later than the fifteenth (15th) day of each month, a monthly Borrowing Base Certificate based on the Receivables as of the end of the preceding month, and detailed reports and schedules showing the aging of Receivables and Borrower's accounts payable as of the end of the preceding month;

(iii)   no later than 1:00 p.m., East Coast time on Wednesday of each week (or more often as the Lender may request), daily sales and collections reporting as of the end of the preceding day, in form and substance acceptable to Lender; and

(iv)   no later than ten (10) days following Lender's request therefor, a complete and updated list of Borrower's Clients, including the name, address and telephone number of each customer.

(h)   Borrower shall notify Lender promptly if:

(i)   Borrower or any Client enters into a long-term contract with the United States of America, and, if requested by Lender, Borrower shall execute and shall cause such Client to execute all instruments and take all steps necessary to insure that all amounts due and to become due under such long-term contract are properly assigned to Lender pursuant to the Assignment of Claims Act of 1940 or otherwise;

(ii)   Borrower receives information with regard to any type or item of Collateral which might have in any way a Materially Adverse Effect on the value of the Collateral as a whole or the rights and remedies of Lender with respect thereto;  and

(iii)   any accounts due and owing in which amounts in excess of $20,000 are in dispute by any single Client on an Eligible Receivable, and Borrower shall explain in detail the reason for the dispute, all claims related to the dispute, and the amount in controversy;

**A-112**

6.8     Over-Advance. If, at any time, the aggregate unpaid principal amount of any of the Loans, including without limitation, all amounts deemed to be Revolving Loan Advances exceeds any applicable limit set forth in this Agreement, Borrower shall immediately pay to Lender the amount of any such excess and all accrued interest and other charges owing to Lender with respect thereto.

6.9     Breach or Default. Borrower shall notify Lender promptly upon the occurrence of any circumstance which: (a) makes any representation or warranty of Borrower contained in this Agreement or any other Loan Document incorrect or misleading in any material respect; or (b) constitutes an Event of Default.

6.10    Maintenance of Assets. Borrower shall maintain and shall cause all Clients to maintain all of its real and personal property in good repair, working order and condition, shall make all necessary replacements to such property so that the value and the operating efficiency of such property will be preserved, shall prevent any personal property from becoming a fixture to real estate (unless owned by Borrower and encumbered by a mortgage, deed of trust, security deed or similar agreement in favor of Lender), and will pay or cause to be paid all rental or mortgage payments due on its real property.

6.11    Insurance. Borrower shall procure and continuously maintain: (a) "All Risk Extended Coverage" property insurance covering Borrower's tangible personal property for the full replacement value thereof; (b) "All Risk Extended Coverage" business interruption insurance in an amount acceptable to Lender; (c) liability insurance in an amount acceptable to Lender; and (d) such other customary insurance coverages as are reasonably specified by Lender from time to time. Each property and business interruption insurance policy shall contain a standard Lender's Loss Payable Endorsement in favor of Lender, providing for, among other things, thirty (30) days prior written notice to Lender of any cancellation, non-renewal or modification of such coverage. Borrower shall deliver to Lender certified copies of such policies and all required endorsements, or other evidence of such insurance acceptable to Lender. All amounts received by Lender from any such insurance policies may be applied by Lender to the Obligations. If Borrower fails to procure required insurance or such insurance is canceled or otherwise lapses, Lender may procure such insurance and add the cost of such insurance to the principal balance of the Loans.

6.12    Use of Proceeds. Borrower shall use the proceeds of all Revolving Loan Advances and all other loans or accommodations made by Lender for Borrower for legal and proper business purposes, and only for those purposes described on Schedule 1, and not for any personal, family or household purposes or for any purpose prohibited by law or by the terms and conditions of this Agreement or any of the Loan Documents.

6.13    Disclosure. Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, Borrower shall (i) notify Lender if any written information, exhibit, or report furnished to Lender contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements

**A-113**

)                                                    )

contained therein not misleading in light of the circumstances in which made, and (ii) correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgment, filing, or recordation thereof.

6.14   Further Assurances.   Borrower will promptly cure, or cause to be cured, defects in the execution and delivery of the Loan Documents and the Client Loan Documents (including this Agreement), resulting from any act or failure to act by Borrower or any of the employees or officers thereof.  Borrower, at its expense, will promptly execute and deliver to Lender, or cause to be executed and delivered to Lender, all such other and further documents, agreements, and instruments in compliance with or accomplishment of the covenants and agreements of Borrower in the Loan Documents, including this Agreement, or to correct any technical omissions in the Loan Documents, or to obtain any consents that are necessary in connection with or in accomplishment of the covenants and agreements of Borrower, all as may be necessary or appropriate in connection therewith as may be requested by Lender.

6.15   Brokerage Commissions.   Borrower shall pay any and all brokerage commission or finders fees incurred in connection with or as a result of Borrower's obtaining financing from Lender under this Agreement.  Borrower agrees to indemnify, defend, and hold Lender harmless from and against any claim of any broker or finder arising out of Borrower's obtaining financing from Lender under this Agreement.

6.16   Affirmative Covenants as to Client Loan Documents.   Borrower shall provide Lender with prompt written notice of (a) any material breach of any Client Loan Documents, (b) any request for amendment thereto, (c) any termination thereof, (d) any change in the name, type of organization, state of organization, or business address(es) or location(s) of any Client; and (e) any other notices received from or sent to any Client with respect thereto.  Borrower also agrees that no Client Loan Documents shall be modified or amended without Lender's prior written consent.

6.17   Monitoring of Client Practices.   Borrower shall establish and maintain reasonable procedures to verify that Clients are using reasonable and prudent practices in the operation of their respective businesses, including without limitation on-site examinations of Client Collateral and the workmanship of repairs and other improvements thereto, where appropriate, the results and reports from which shall be certified to Borrower and to Lender.

6.18   Delivery of Authoritative Originals; Delivery of Title Insurance Policy. Promptly upon the closing of a Client Loan, but in any event not later than five (5) Business Days after a Client Loan Closing Date, Borrower shall (i) cause to be duly recorded in the official deed records of the jurisdiction in which the Client Collateral related thereto is located, the deed to secure debt, mortgage, deed of trust or other security instrument encumbering such Client Collateral (a "Client Security Deed"), and upon receipt of such recorded Client Security Deed by Borrower or by any other Person (including without limitation any closing attorney, title agent, or other party) responsible for recording such Client Security Deed, shall deliver the recorded original thereof to Lender; and shall (ii) deliver to Lender the Authoritative Originals of all Client Loan

Documents related to such Client Collateral (provided, however, that Borrower shall deliver to Lender a true and correct copy of the Client Security Deed, duly assigned to Lender pursuant to an original Assignment of Security Instrument in recordable form with respect to such Client Security Deed and delivered therewith, in lieu of the Authoritative Original thereof until such time as the duly recorded Client Security Deed is returned to Borrower), all duly assigned to Lender pursuant to an original Collateral Assignment with respect thereto and delivered therewith, together with certified copies of certificates of existence or good standing for such Client. In addition, promptly upon Borrower's receipt of the Title Insurance Policy as to the Client Collateral encumbered by the Client Loan relating thereto, Borrower shall deliver same to Lender.

## ARTICLE VII - BORROWER'S NEGATIVE COVENANTS

Borrower covenants and agrees with Lender as follows:

7.1     Business, Management and Organization. Borrower shall not: (a) make any material change in its management, which includes the following: the removal of Lloyd V. Barriger as Managing Director and chief executive officer of Borrower and a replacement Managing Director and chief executive officer acceptable to Lender, in its sole discretion, is not named by Borrower within fifteen (15) days from the date of such removal; (b) the removal of Lloyd G. Barriger as President of G & B Partners, Inc. and a replacement President acceptable to Lender, in its sole discretion, is not named by Borrower within fifteen (15) days from the date of such removal; (c) the removal of Andrew E. McKean as Vice President of G & B Partners, Inc. and a replacement Vice President acceptable to Lender, in its sole discretion, is not named by Borrower within fifteen (15) days from the date of such removal; (c) make any material change in the nature of the business that Borrower presently conducts as set forth on Schedule 1; (d) change its name except after first complying with Section 6.4 of this Agreement; (e) change its state of formation or its type of organization (that is, from a limited liability company); or (f) merge or consolidate with any Person or purchase any stock or assets of or ownership interest in any other Person, other than assets used by Borrower in the ordinary course of its business and other than Permitted Investments.

7.2     Disposition of Assets. Borrower shall not: (a) encumber the Collateral in favor of any Person other than Lender, whether voluntarily or involuntarily, other than the Permitted Liens; or (b) sell, consign, lease or remove from Borrower's business locations any of Borrower's assets except that, until Lender gives Borrower notice to the contrary during the existence of any Event of Default, Borrower may (i) sell Collateral consisting of Client Loans in the ordinary course of its business (any sale incident to a securitization of Client Loans shall be deemed a sale in the ordinary course of business); (ii) sell or dispose of obsolete assets that constitute Collateral which Borrower has determined, in good faith, not to be useful in the conduct of its business and which, in any Fiscal Year, do not have an aggregate fair market value in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00); and (iii) sell or dispose of obsolete assets

that do not constitute Collateral which Borrower has determined, in good faith, not to be useful in the conduct of its business.

7.3    Loans and Guarantees.   Borrower shall not make any loan or contribute money, goods or services to, or guaranty or agree to become liable for any obligation of, any other Person, including any Affiliates of Borrower or any Interested Party, other than:  (a) loans to employees of Borrower for reimbursable expenses incurred by such employees in the normal course of Borrower's business; (b) sales of Inventory in the ordinary course of business; (c) Permitted Investments; and (d) Client Loans made in the ordinary course of business.

7.4    Investments.   Borrower shall not make any Investment other than Permitted Investments.

7.5    Distributions and Salaries.   Borrower shall not, without Lender's written consent:

(a)    make any dividend, distribution or payment on or with respect to any membership interest, or purchase, redeem or otherwise acquire or retire any of its membership interests; provided, however, that Borrower may make dividends, distributions or payments to its members in cash pursuant to its limited liability company governance documents, so long as, both prior to and after giving effect to any such dividend, distribution or payment, (x) no Event of Default is outstanding or would exist, (y) Borrower is and remains a limited liability company (and is not itself a taxpayer), and (z) in the event Borrower shall have a net operating loss for any taxable year, Borrower shall cause each member to refund to Borrower immediately the amount of any tax refund in cash (as equity and not as subordinated indebtedness) in respect of previously paid federal or state income taxes actually received by each such member as a result of carrying back such net operating loss; or

(b)    increase in any Fiscal Year, whether by election, promotion or otherwise, the aggregate salaries and other compensation paid to existing officers of Borrower in the prior Fiscal Year by more than ten percent (10%) in the aggregate.

7.6    Financial Covenants.

(a)    Borrower shall not permit its Adjusted Tangible Net Worth to be less than Twelve Million Two Hundred Fifty Thousand and No/100 Dollars ($12,250,000.00) as of the Agreement Date, and Borrower's minimum Adjusted Tangible Net Worth thereafter shall increase by seventy-five percent (75%) of Borrower's positive net income as of Borrower's fiscal year end after distributions to members as permitted under Section 7.5 (a) of this Agreement tested as of as of the end of each calendar month thereafter.

(b)    Borrower shall not permit the Fixed Charge Coverage Ratio to be less than .90:1.0 as of the end of each calendar month commencing on the Agreement Date, nor less than 1.25:1.0 as of the end of each calendar month commencing on July 1,

2006, nor less than 1.50:1.0 as of the end of each calendar month commencing as of January 1, 2007 through the Termination Date.

(c)     Borrower shall not permit its Leverage Ratio to exceed 2.5:1.0 as of the end of each calendar month commencing as of the Agreement Date and continuing through the Termination Date.

(d)     Borrower shall not permit the aggregate of: (i) the aggregate balance of all outstanding Clients Loans funded after the Agreement Date with respect to which regularly schedule of payments or installments are two (2) or more payments in arrears, and (ii) aggregate Appraised Value of Client Collateral acquired by Borrower after the Agreement Date through foreclosure, repossession, or other similar means, to exceed ten percent (10%) of the aggregate balance of all outstanding Client Loans funded after the Agreement Date.

All amounts referenced in this Section 7.6 shall be determined in accordance with GAAP.

7.7     Change of Control. Borrower shall not cause, permit, or suffer, directly or indirectly, any Change of Control.

7.8     Limitation on Indebtedness for Money Borrowed. Borrower shall not create or suffer to exist any Indebtedness for Money Borrowed, including without limitation Indebtedness for Money Borrowed from any member or Affiliate, except: (i) the Indebtedness for Money Borrowed by Borrower to Lender under this Agreement and the Loan Documents; (ii) Indebtedness for Money Borrowed outstanding as of the Agreement Date and listed on Schedule 1; (iii) Indebtedness for Money Borrowed secured by Permitted Liens in an aggregate amount not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) at any time outstanding; and (iv) other Indebtedness for Money Borrowed in an aggregate amount not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) at any time outstanding.

7.9     Mergers; Consolidations; Acquisitions. Borrower shall not merge or consolidate, or permit any Subsidiary of Borrower to merge or consolidate, with any Person; nor acquire, or permit any of its Subsidiaries to acquire, all or any substantial part of the properties and assets or Securities of any Person.

7.10     Subsidiaries. After the Agreement Date, Borrower shall not create any Subsidiaries, or transfer any assets to any Subsidiary.

7.11     Fiscal Year. Borrower shall not change its Fiscal Year end for accounting purposes.

7.12     Affiliate Transactions. Borrower shall not enter into or be a party to any agreement or transaction with any Affiliate except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms that are no less favorable to Borrower than it would obtain in a comparable arms

length transaction with a Person not an Affiliate of Borrower, and on terms consistent with the business relationship of Borrower and such Affiliate prior to the Agreement Date, if any, and fully disclosed to Lender.

7.13    Subordinated Indebtedness.  Borrower shall not make any payment with respect to any Subordinated Indebtedness or amend any document relating to the Subordinated Indebtedness.

7.14    Alteration to Client Loan Documents; Modification of Credit Policies. Borrower shall not, without the prior written approval of Lender, which may be granted or withheld by Lender in Lender's sole and absolute discretion, alter, amend, or modify the form of Borrower's Client Loan Documents or Credit Policies.

7.15    Settlement or Compromise After Default.  After the occurrence of an Event of Default, Borrower shall not, without the prior consent of Lender, adjust, settle or compromise the amount or payment of any Receivable or Client Loan, or release wholly or partly any Client, Client Collateral, or obligor thereof, or allow any credit or discount thereon.

## ARTICLE VIII - CONDITIONS PRECEDENT

8.1    Initial Credit.  The obligation of Lender to extend any credit under this Agreement is subject to the fulfillment to Lender's satisfaction of all of the following conditions:

(a)    All legal matters incidental to the extension of credit by Lender shall be satisfactory to counsel of Lender.

(b)    Lender shall have received, in form and substance satisfactory to Lender, each of the following, duly executed:

(i)    This Agreement;

(ii)    Borrower's borrowing resolutions, together with a secretary's certificate;

(iii)    UCC-1 Financing Statements;

(iv)    Each Guaranty;

(v)    An opinion of Borrower's counsel;

(vi)    The Deposit Control Agreement;

(vii)    Blocked Account Agreement;

(viii)  A Landlord Waiver and Consent from each of Borrower's landlords;

(ix)  All releases, terminations, agreements and other documents as Lender may request to effect and evidence termination of the existing financing arrangements of Borrower and the interests of any other lender or lenders pursuant to any such financing arrangements in any assets and properties of Borrower;

(x)  The Membership Interest Pledge Agreements;

(xii)  A Borrowing Base Certificate dated as of the Agreement Date;

(xiii)  The payoff letter from the Existing Lender;

(xiv)  True, correct, and complete copies of the Authoritative Originals (or photocopies, as acceptable to Lender in Lender's sole discretion) of all Client Loan Documents existing as of the Agreement Date, certified as such by an officer of Borrower and duly collaterally assigned to Lender; and

(xv)  Such other documents as Lender may require under this Agreement.

(c)  Lender shall have received evidence of insurance and loss payee endorsements and/or certificates of insurance naming Lender as loss payee, as required under this Agreement, in form, substance, and limits of coverage satisfactory to Lender, at Borrower's cost and expense.

(d)  Lender shall have completed a field review of the records and other information with respect to the Collateral as Lender may require, the results of which (including evidence of segregation and identification of Collateral) shall be satisfactory to Lender in its discretion.

(e)  Lender shall have received and reviewed UCC search results for all jurisdictions in which assets of Borrower are located in the United States, in form and substance satisfactory to Lender.

(f)  Lender shall have received evidence, in form and substance satisfactory to Lender, that Lender has a valid perfected first security interest in all of the Collateral except as otherwise permitted under this Agreement.

(g)  The Availability Reserve, as of the Agreement Date, shall not be less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) after the payment of all fees and expenses to be paid by Borrower at Agreement Date under this Agreement and the application of the proceeds of the initial Loans funded under this Agreement, and provided that the accounts payable over sixty (60) days past due have been satisfied or accommodations for the payment thereof have been made by Borrower to the satisfaction of Lender, in its sole discretion.

atl-fs1\545023v09                    42

**A-119**

(h)     Lender shall have completed its business, legal and collateral due diligence, including a collateral audit and review of Borrower's books and records, contracts with Clients conducted by Lender and verification of Borrower's representations and warranties to the Lender, the results of which shall be satisfactory to Lender.

(i)     Lender shall have completed background checks with respect to certain principal owners and managers of Borrower and certain of their respective assets and investments, the results of which shall be satisfactory to Lender in its sole discretion.

(j)     Lender shall be satisfied in its sole discretion that there are no offset arrangements between the Borrower and Clients, including any related buy-back agreements.

(k)     No Default or Event of Default shall have occurred and be continuing.

(l)     All representations and warranties of Borrower set forth in this Agreement shall be true and correct in all material respects.

(m)     The Parties shall have completed or delivered, as applicable, all items on the checklist of closing items in connection with this Agreement, each to the satisfaction of Lender in its discretion.

8.2     Initial and Subsequent Credit. The obligation of Lender to make each extension of credit requested by Borrower under this Agreement, including without limitation, the initial Revolving Loan Advance and any subsequent Revolving Loan Advance, shall be subject to the fulfillment to Lender's satisfaction of all of the following conditions:

(a)     The representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Agreement and on the date of each extension of credit or the making of any Loans by Lender pursuant to this Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist.

(b)     Lender shall have received all additional documents that Lender may require in connection with such extension of credit, in form and substance satisfactory to Lender.

(c)     There shall be no material adverse change, as determined by Lender in its discretion, since September 30, 2005 in the financial condition or business of Borrower or any Guarantor, nor any material decline, as determined by Lender in its discretion, in the market value of any Collateral or a substantial or material portion of the assets of Borrower or any Guarantor.

atl-fs1\545023v09                                    43

(d)      For a period of thirty (30) days after the Agreement Date, the Availability Reserve shall not be less than Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00).

## ARTICLE IX - EVENTS OF DEFAULT; REMEDIES

9.1      Events of Default.  The occurrence or existence of any one or more of the following events or conditions, whether voluntary or involuntary, shall constitute an Event of Default.

(a)      Borrower fails to pay when due (whether due at stated maturity, on demand, upon acceleration or otherwise) any installment of principal, overadvance, interest, premium, if any, and fees on any of the Loans, or otherwise owing under this Agreement;

(b)      Borrower fails to pay any of the other Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) and such failure shall continue for a period of ten (10) days after Lender's giving Borrower written notice thereof;

(c)      Borrower or any other Obligor fails or neglects to perform, keep or observe any covenant contained in this Agreement or the other Loan Documents (other than a covenant which is dealt with specifically elsewhere in this Section 9.1) and the breach of such other covenant in this Agreement or the other Loan Documents is not cured within ten (10) days after the sooner to occur of Borrower's or such other Obligor's receipt of notice of such breach from Lender or the date on which such failure or neglect first becomes known to any officer of Borrower or such other Obligor;

(d)      Borrower or any other Obligor fails or neglects to perform, keep or observe any covenant contained in any Client Loan Document;

(e)      Any representation or warranty made by or on behalf of Borrower or any other Obligor, or other information provided by or on behalf of Borrower or any other Obligor to Lender, was incorrect or misleading in any material respect at the time it was made or provided;

(f)      Borrower or Borrower Affiliate defaults:   (i) as primary or secondary obligor, in the payment of any principal or interest on any Indebtedness for Money Borrowed (other than the Obligations) in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00), and such default continues beyond any applicable grace period or, if such Indebtedness is payable on demand, fails to pay such Indebtedness upon demand; or (ii) in the observance of any covenant, term or condition contained in any agreement evidencing, securing or relating to any Indebtedness for Money Borrowed (other than the Obligations) in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00), if the effect of such default is to cause, or to permit any other party to such

all-fs1\545023v09                              44

**A-121**

Indebtedness to cause, all or part of such Indebtedness to become due before its stated maturity;

(g)   A writ of attachment, garnishment execution, distraint or similar process in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00) is issued against Borrower, any Borrower Affiliate, or any of their respective properties except for any such writ of attachment, garnishment execution, distraint or similar process that is subject to a bonafide dispute by Borrower and is properly contested by appropriate proceedings promptly instituted and diligently conducted;

(h)   Lender determines, in its reasonable discretion, that a Materially Adverse Effect has occurred;

(i)   Borrower becomes insolvent or bankrupt; makes an assignment for the benefit of creditors or consents to the appointment of a trustee or receiver; a trustee or a receiver is appointed for Borrower or for a significant portion of Borrower's assets; bankruptcy, reorganization or insolvency proceedings are instituted by or against Borrower; or if any of the foregoing occurs with respect to any guarantor or other party liable for any of Borrower's obligations owing to Lender;

(j)   Any judgment or order for the payment of money in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00), or in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) in the aggregate for all such judgments or orders, is entered against Borrower, unless the same shall be (i) fully covered by insurance and the issuer of the applicable policy shall have acknowledged full coverage in writing within thirty (30) days of judgment, or (ii) vacated, stayed, bonded, paid or discharged within a period of thirty (30) days from the date of such judgment or order;

(k)   Any Loan Document is terminated other than as provided for in this Agreement or becomes void or unenforceable, or any Security Interest ceases to be a valid and perfected first priority security interest in any portion of the Collateral, other than as a result of the Permitted Liens;

(l)   Borrower conceals, removes, or permits to be concealed or removed, any of its assets with the intent to hinder, delay or defraud Lender or any of any Borrower's other creditors;

(m)   A Guarantor, surety or endorser for any of the Obligations revokes, terminates or fails to perform any of the terms of any Guaranty, endorsement or other agreement of such party in favor of Lender, or prospectively terminates or revokes such Guaranty or surety;

(n)   Any Guarantor or any general partner of any Guarantor dies and, such Guarantor or general partner has not been replaced within forty-five (45) days of the death of that person by another Person creditworthy in Lender's reasonable judgment as the original Guarantor or general partner;

)                                        )

(o)    Any loss, theft, damage or destruction of any item of Collateral or other property of Borrower which, after giving effect to insurance coverage, has a Materially Adverse Effect;

(p)    There is filed against Borrower or any guarantor or other party liable for any of Borrower's Obligations any civil or criminal action, suit or proceeding under any federal or state racketeering statute (including, without limitation, the Racketeer Influenced and Corrupt Organization Act of 1970), which action, suit or proceeding could result in the confiscation or forfeiture of any material portion of the Collateral;

(q)    Any Termination Event with respect to any Plan shall have occurred; or a decision shall have been made by Borrower or Borrower Affiliate, or any member of the "controlled group of corporations"(as defined in Section 1563(a)(4) of the Internal Revenue Code determined without regard to Sections 1563(a) and (e)(3)(c) of such Code) of which Borrower or Borrower Affiliate is a party, to terminate, file a notice of termination with respect to, or withdraw from, any Plan; and

(r)    Any default, event of default, or breach occurs with respect to Borrower's real property lease for the premises located at 198 Bridgeville Road, Monticello, New York 12701.

9.2    Lender's Remedies.  In addition to any other rights and remedies that Lender may have, upon the occurrence and during the continuance of an Event of Default, Lender may:

(s)    Without notice to, or demand upon, Borrower:

(i)    discontinue making any further Loans;

(ii)    terminate this Agreement;

(iii)    declare all Obligations to be immediately due and payable;

(iv)    take possession of all or any portion of the Collateral, wherever located, and enter on any of the premises where any of the Collateral may be and use, remove, repair and store any of the Collateral until it is sold or otherwise disposed of (Lender shall have the right to store, without charge, all or any portion of the Collateral at any of Borrower's business locations);

(v)    use, without charge, Borrower's Proprietary Rights, advertising materials, or any property of a similar nature, in advertising for sale and selling any of the Collateral; and

(vi)    exercise any rights and remedies available to Borrower with respect to any Receivable and any Client or Client Loan, including

atl-fs1\545023v09                    46

**A-123**

without limitation the right to renew, modify or extend any Receivable or Client Loan, grant waivers or indulgences with respect to any Receivable or Client Loan, accept partial payments on any Receivable or Client Loan, release, surrender or substitute any security for payment of any Receivable or Client Loan, enforce any Client Loan Documents, enforce the Thom Forest Agreement or any like or similar agreement, or compromise with, or release, any party liable on any Receivable or Client Loan in such a manner as Lender may, in its sole discretion deem advisable, all without affecting or diminishing Borrower's Obligations to Lender.

(t)    With notice to Borrower:

(i)    require Borrower, at Borrower's expense, to assemble the Collateral and make the Collateral available to Lender at locations reasonably convenient to Lender and Borrower; and

(ii)    sell or otherwise dispose of all or any portion of the Collateral at public or private sale for cash or credit, with such notice as may be required by law (in the absence of any contrary requirement, Borrower agrees that fifteen (15) days prior notice of a public or private sale of the Collateral is reasonable), in lots or in bulk, all as Lender, in its sole discretion, may deem advisable. Lender shall have the right to conduct any such sales, without charge, at Borrower's business locations. Lender may purchase all or any portion of the Collateral at public sale and, if permitted by law, at private sale and, in lieu of actual payment of the purchase price, may offset the amount of such price against the outstanding amount of the Loans and any other amounts owing from Borrower to Lender. Proceeds realized from the sale of any Collateral will be applied in the following order: (a) to the reasonable costs, expenses and attorneys' fees incurred by Lender in connection with the collection, acquisition, protection and sale of the Collateral; (b) to any accrued and unpaid interest owing from Borrower to Lender; and (c) to any other amounts owing from Borrower to Lender. Borrower agrees that Borrower will remain fully liable for any deficiency owing to Lender after the proceeds of the Collateral have been applied to the Loans and all other amounts owing from Borrower to Lender.

(u)    If any of the Collateral shall require repairing, maintenance, preparation, or the like, or is in process or other unfinished state, Lender shall have the right, but not the obligation, to repair or perform such maintenance, preparation, processing or completion of manufacturing to place the same in such saleable condition as Lender shall deem appropriate, but Lender shall have the right to sell or dispose of such Collateral with or without such processing.

## ARTICLE X - JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; AND GOVERNING LAW

atl-fs1\545023v09                    47

**A-124**

)                                    _)

10.1   Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)   The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island, without reference to applicable conflict of law principles.

(v)   Borrower and Lender irrevocably consent and submit to the non-exclusive jurisdiction of Rhode Island Courts in connection with the resolution of any disputes relating to this Agreement or the other Loan Documents. Borrower irrevocably waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents, or in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or otherwise enforce its rights against Borrower or its property, or any guarantor of the Obligations.

(w)   Borrower waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrower at the address set forth below and service so made shall be deemed to be completed five (5) Business Days after the same shall have been so deposited in the United States mails. Nothing contained in this Agreement shall affect the right of Lender to serve legal process by any other manner permitted by law.

(x)   BORROWER AND LENDER EACH HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES TO THIS AGREEMENT IN RESPECT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE RELATED TRANSACTIONS, INCLUDING WITHOUT LIMITATION, THE OBLIGATIONS OF BORROWER AND ANY GUARANTOR, THE COLLATERAL, OR ANY INSTRUMENT, DOCUMENT OR GUARANTY DELIVERED PURSUANT TO THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, ADMINISTRATION, COLLECTION OR ENFORCEMENT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, WHETHER NOW EXISTING OR HEREAFTER ARISING, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. BORROWER AND LENDER EACH HEREBY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWER OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF THIS AGREEMENT WITH ANY

COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO A TRIAL BY JURY.

(y)    Borrower hereby releases and exculpates Lender, its officers, employees and designees, and Lender shall not have any liability to Borrower (whether in contract, tort, equity or otherwise) for losses suffered by Borrower in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct. In any such litigation, Lender shall be entitled to the benefit of the rebuttable presumption that it acted at all times in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.

10.2    Waiver of Certain Claims and Counterclaims. In no event shall Lender have any liability to Borrower for lost profits or other special, consequential, incidental, exemplary or punitive damages in connection with this Agreement or any of the other Loan Documents or the transactions contemplated hereby or thereby, and Borrower expressly waives any and all right to assert any such claims. Borrower further waives all rights to interpose any claims, deductions, setoffs, recoupment, or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto. No officer of Lender has any authority to waive, condition, or modify the provisions of this section 10.2.

10.3    Indemnification. Borrower agrees to indemnify, save and hold harmless Lender and its directors, officers, agents, attorneys and employees from and against: (i) the use or contemplated use of the proceeds of any of the Loans, any transaction contemplated by this Agreement or the other Loan Documents, or any relationship with Borrower or any other party to this Agreement or the other Loan Documents; (ii) any administrative or investigative proceeding by any governmental agency arising out of or related to a claim, demand, action or cause of action described in clause (i) above; and (iii) any and all liabilities, losses, costs or expenses (including reasonable attorneys' fees and disbursements and other professional services) that any party indemnified hereunder suffers or incurs as a result of any foregoing claim, demand, action or cause of action; provided, however, that no such indemnitee shall be entitled to indemnification for any loss caused by its own gross negligence or willful misconduct. Any obligation or liability of Borrower to any such indemnitee under this section 10.3 shall survive the expiration or termination of this Agreement and the repayment of the Loans and performance of all Obligations.

## ARTICLE XI - MISCELLANEOUS

11.1    Power of Attorney. Borrower irrevocably appoints Lender, and any person designated by Lender, as Borrower's true and lawful attorney-in-fact to: (a) endorse for Borrower, in Lender's or Borrower's name, any draft or other order for the

atl-fs1\545023v09                    49

**A-126**

)                                        )

payment of money payable to Borrower; (b) execute and file or submit for recording, in Lender's or Borrower's name, Financing Statements describing the Collateral; and (c) communicate, negotiate, and otherwise deal with any Client with respect to any Client Loan and to renew, modify, or extend any Client Loan and any Client Loan Documents. Lender shall not be liable to Borrower for any action taken by Lender or its designee under this power of attorney, except to the extent that such action was taken by Lender in bad faith or with gross negligence or willful misconduct. Borrower agrees that a carbon, photographic or other reproduction of a Financing Statement or this Agreement may be filed by Lender as a Financing Statement.

11.2    Outstanding Loan Balance. The outstanding principal amount of, and accrued interest on, the Loans and the Interest Rate applicable to the Loans from time to time, shall be, at all times, ascertained from the records of Lender and shall be conclusive absent manifest error.

11.3    Modifications and Course of Dealing. This Agreement constitutes the entire agreement of Borrower and Lender relative to the subject matter hereof. No modification of or supplement to this Agreement shall bind Lender unless in writing and signed by an authorized officer of Lender. The enumeration in this Agreement of Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Lender may have under the Uniform Commercial Code or other Applicable Law. No course of dealing and no delay or failure of Lender to exercise any right, power or privilege under any of the Loan Documents will affect any other or future exercise of such right, power or privilege. The exercise of any one right, power or privilege shall not preclude the exercise of any others, all of which shall be cumulative.

11.4    Assignment and Participation. Borrower may not assign or transfer any of its rights or delegate any of its obligations under this Agreement or any of the other Loan Documents. Lender shall have the right, from time to time, without notice to Borrower, to sell, assign or otherwise transfer all or any part of its interest in this Agreement, the other Loan Documents, and the Loans to any other party, or enter into participation arrangements with any other party. Borrower authorizes Lender to deliver to potential assignees or participants Borrower's financial information and all other information delivered to Lender in furtherance of or pursuant to the terms of this Agreement.

11.5    Delegation of Duties. Lender may execute any of its duties under this Agreement or the other Loan Document by or through agents, employees or attorneys-in-fact. Lender shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact selected by Lender as long as such selection was made without gross negligence or willful misconduct.

11.6    Notices. Except as otherwise provided herein, whenever any notice, demand, request or other communication shall or may be given to or served upon any party by any other party, or whenever any party desires to give or serve upon any other party any communication with respect to this Agreement, each such communication shall

atl-fs1\545023v09                          50

**A-127**

be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and five (5) Business Days after deposit in the United States mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States mail as otherwise provided in this Section 11.6), (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid or (d) when hand-delivered, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in the signature page to this Agreement or to such other address (or facsimile number) as may be substituted by the giving of notice of such substitution. Delivery of a copy of any notice under this Section 11.6 to an individual designated on the signature page as "with a copy to" shall not be deemed notice to a party.

11.7    Expenses.  Borrower agrees to pay, and to hold Lender harmless from and against, all reasonable out-of-pocket expenses incurred by Lender (including allocated costs of staff counsel) in connection with any amendments, waivers or consents relating to this Agreement or any of the other Loan Documents. Borrower further agrees to pay any reasonable fees, costs, or expenses incurred by Lender arising in connection with Lender's enforcement or preservation of its rights under this Agreement or any other Loan Document, or in the collection of any of the Loans, including without limitation, attorneys' fees (including allocated costs of staff counsel), expert fees, and legal costs. Borrower also agrees to pay or reimburse Lender for the costs of conducting the appraisal of Borrower's Inventory.

11.8    Assignment of Receivables.  This Agreement may be supplemented by separate assignments of Receivables and, if such assignments are executed, the rights and interests given by Borrower pursuant to such assignments shall be in addition to, and not in limitation of, the rights and security interests given by Borrower under this Agreement. Lender will not be responsible for the safekeeping of any Collateral delivered to Lender, for the collection of proceeds of any of the Collateral, or for losses of collected proceeds held by Borrower in trust for Lender.

11.9    Binding Effect; Severability.  This Agreement shall not be deemed to create any right in any party except as provided herein and shall inure to the benefit of, and be binding upon, the successors and assigns of Borrower and Lender. All of Borrower's obligations under this Agreement are absolute and unconditional and shall not be subject to any offset or deduction whatsoever. The provisions of this Agreement are intended to be severable. If any provision of this Agreement is held invalid or unenforceable in whole or in part, such provision will be ineffective to the extent of such invalidity or unenforceability without in any manner effecting the validity or enforceability of the remaining provisions of this Agreement.

11.10    Final Agreement.  This Agreement and the other Loan Documents are intended by Borrower and Lender to be the final, complete, and exclusive expression of the agreement between them. This Agreement supersedes any and all prior oral or

atl-fs1\545023v09                    51

A-128

written agreements relating to the subject matter hereof. No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any provision of any of the other Loan Documents shall be made, except by a written agreement signed by Borrower and a duly authorized officer of Lender.

11.11 Counterparts. This Agreement may be executed in any number of counterparts, and by Lender and Borrower in separate counterparts, each of which shall be an original, but all of which shall taken together constitute one and the same agreement. The parties hereby acknowledge and agree that facsimile signatures of this Agreement shall have the same force and effect as original signatures.

11.12 Captions. The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and should not be construed to modify, enlarge, or restrict any provision.

11.13 Borrower's Representative. Borrower hereby appoints and authorizes Lloyd V. Barriger to act as its representative and agent hereunder to issue notices and other communications on its behalf (the "Borrower Representative"). Notwithstanding any provision herein to the contrary, Lender agrees that any notice or other communication issued by an authorized representative on behalf of Borrower Representative shall be acknowledged as a notice or other communication properly issued by Borrower and that it shall not recognize any notice or other communication that was not issued by Borrower Representative as a properly authorized notice or other communication from Borrower.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**A-129**

The undersigned, pursuant to due authority, have caused this Agreement to be executed as of the date set forth above.

BORROWER:

GAFFKEN & BARRIGER FUND, LLC

By:  G & B Partners, Inc., a New
York corporation, its Managing
Member

By:

Name: Lloyd V. Barriger
Title: President

198 Bridgeville Road
Monticello, New York 12701
Attention: Andrew McKean
Facsimile: (845) 796-4949

with a copy to:

Facsimile:

LENDER:

TEXTRON FINANCIAL CORPORATION

By: _____
Name: _____
Title: _____

11575 Great Oaks Way, Suite 210
Alpharetta, GA 30022
Attention: SVP - Director of Credit and
Operations
Facsimile: (770) 360-1672

with a copy to:   Textron Financial Corporation
11575 Great Oak Way, Suite 210
Alpharetta, GA  30022
Attention:  Division Legal Counsel,
Business Credit Division
Facsimile:  (770) 360-1458

**A-130**

The undersigned, pursuant to due authority, have caused this Agreement to be executed as of the date set forth above.

BORROWER:

GAFFKEN & BARRIGER FUND, LLC

By:  G & B Partners, Inc., a New York corporation, its Managing Member

By:

Name: Lloyd V. Barriger
Title:  President

198 Bridgeville Road
Monticello, New York 12701
Attention: Andrew McKean
Facsimile:

with a copy to:

Facsimile:

LENDER:

TEXTRON FINANCIAL CORPORATION

By: _____
Name: _John Thomas_____
Title: _Account Executive_

11575 Great Oaks Way, Suite 210
Alpharetta, GA 30022
Attention: SVP - Director of Credit and Operations
Facsimile:  (770) 360-1672

with a copy to:   Textron Financial Corporation
11575 Great Oak Way, Suite 210
Alpharetta, GA  30022
Attention:  Division Legal Counsel,
Business Credit Division
Facsimile:  (770) 360-1458

atl-fs1\545023v09                    53

A-131

ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     )    ss:
COUNTY OF Sullivan   )
                     )

Before me, a Notary Public in and for said County and State, on this day personally appeared LLOYD V. BARRIGER, known to me to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he executed said instrument as his free and voluntary act as President of G & B Partners, Inc., Managing Member of Gaffken & Barriger Fund, LLC, a Delaware limited liability company.

Given under my hand and Notarial Seal this 25th day of January, 2006.

Notary Public, State of _____

_____
Printed, typed or stamped name of Notary Public

My commission expires:

SUE SCHAUER-JAHN
Notary Public, State of New York
Sullivan County Clerk's # 2178
Commission Expires 12/02/2009

atl-fs1\545023v09                    1

**SCHEDULE 1**

A.    Commercial Tort Claims    Not Applicable

B.    Organization; Qualification    Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware, having the power and authority to own its properties and to carry on its business as now being and hereafter proposed to be conducted, and Borrower is duly qualified and authorized to do business in Delaware, California and Pennsylvania and in each jurisdiction in which the nature of its business or the ownership and characteristics of its property requires such qualification or authorization, except where the failure to be so qualified would not have a Materially Adverse Effect. The jurisdictions in which Borrower is qualified to do business as a foreign entity are California and Pennsylvania

C.    Borrower Affiliates    Borrower has no Affiliates or Subsidiaries except for Thom Forest LLC.

D.    Capitalization    The outstanding shares of capital stock or membership interests of Borrower have been duly and validly issued and are fully paid and nonassessable, and the number and owners of such stock or membership interests of Borrower are [_____] Except as set forth above, there are no existing warrants, options, or commitments of any kind or nature convertible into capital stock or membership interests of any class of Borrower.

E.    Business of Borrower    Borrower is engaged principally in the business(es) of (i) to serve as a fund through which the assets of its members may be utilized in investing, holding and trading in real estate related securities, other financial instruments and rights related thereto in a manner consistent with Section 3(c)(5) of the Investment Company Act of 1940 and (ii) to enter into any lawful transaction and engage in any lawful activities in furtherance of or incidental to the foregoing purposes.

F.    Compliance with Other Agreements    Borrower is not in default under, or in violation in any respect of, any material agreement, contract, instrument or other commitment to which Borrower is a party or by which Borrower or its property is bound, and Borrower is in compliance in all material respects with all Governmental Approvals applicable to or required in connection with the conduct of Borrower's business and affairs, and Borrower is otherwise in compliance in all material respects with all Applicable Laws.

F.    Litigation    There are no actions, proceedings or investigations pending or threatened against Borrower, or any of its assets, which, if adversely determined against Borrower can reasonably be expected to have a Materially Adverse Effect on the assets, financial condition or business prospects of Borrower.

H.    Taxes and Returns    Borrower has timely filed all tax returns which Borrower is required by law to file or has obtained valid extensions, and all taxes and other sums related to the payment of taxes owing by Borrower to any governmental authority have been fully paid and Borrower maintains adequate reserves to pay such tax liabilities as they accrue.

I.    Permitted Liens    Lender has a perfected first priority security interest in the Collateral and none of the properties and assets of Borrower is subject to any Lien.

J.    Title    Borrower has valid and legal title to or leasehold interest in all personal property, real property, and other assets used in its business.

K.    Inventory    Not Applicable

L.    Equipment    Not Applicable

M.    Real Property    Borrower owns or leases no real property other than 198 Bridgeville Road Monticello, New York 12701.

N.    Corporate and Fictitious Names    During the five-year (5) period preceding the Agreement Date, neither Borrower nor any predecessor of Borrower has been known as or used any corporate or fictitious name other than the name of Borrower as first set forth in this Agreement.

O.    Environmental Compliance    To the best of Borrower's knowledge, (i) none of Borrower's properties or assets nor any Client Collateral has ever been used by Borrower or by any previous owner or operator of such properties or assets, in violation of any Environmental Laws; (ii) none of Borrower's properties or assets nor any Client Collateral has ever been designated or identified in any manner pursuant to any Environmental Laws as a hazardous substance or materials disposal site, or a candidate for closure pursuant to any Environmental Laws; (iii) no liens arising under any Environmental Laws has attached to any Revenues or to any real or personal property owned or operated by Borrower nor to any Client Collateral; (iv) Borrower has not received a summons, citation, notice or directive from any federal or state governmental agency concerning any action or omission by Borrower resulting from the violation of any Environmental Laws; (v) Borrower is now in compliance with all Environmental Laws; and (vi) all material Governmental Approvals or similar authorizations required to be obtained or filed in connection with the operations of Borrower under any Environmental Laws have been obtained, and all Governmental Approvals and similar authorizations are valid and in full force and effect in all respects.

P.    Proprietary Rights    A correct and complete schedule of all of Borrower's Proprietary Rights is set below:  Not Applicable.

Q.    Trade Names    All trade names or styles under which Borrower does business or creates Accounts, or to which instruments in payment of Accounts are made payable, are listed below: Not Applicable

R.    Employee Relations    Borrower is not, party to any collective bargaining agreement nor has any labor union been recognized as the representative of Borrower's employees, and Borrower knows of no pending, threatened, or contemplated strikes, work stoppage or other labor disputes involving any of Borrower's employees.

S.   Bank Accounts.   The information below is a complete and correct list of all
checking accounts, deposit accounts, and other bank accounts maintained by Borrower:
1. Community Bank of Sullivan County – "Operating Account" no. 11005394; and
2. Community Bank of Sullivan County – "Blocked Account" no. 11010121.

T.   Use of Proceeds   Borrower shall use the proceeds of all Revolving Loan Advances
and all other loans or accommodations made by Lender for Borrower for legal and proper
business purposes and not for any personal, family or household purposes or for any purpose
prohibited by law or by the terms and conditions of this Agreement or any of the Loan
Documents.

U.   Permitted Indebtedness   Indebtedness for Money Borrowed outstanding as of the
Agreement Date is listed below:
(1) $1,000,000 line of credit with The First National Bank of Jeffersonville; and
(2) various existing unsecured debt to private individuals.

**EXHIBIT A**

**FORM OF**

**BORROWING BASE CERTIFICATE**

See Attached

atl-fs1\545023v09

Exhibit A

## Gaffken & Barriger
## Borrowing Base Certificate
XX/X/XX

Report Date:
Report Number:

| | | | | | |
|---|---|---|---|---|---|
| 1 | Beginning Notes as of: | XX/XX/XX | | $ | - |
| | First Lien Real Estate loans | | | $ | |
| | First lien Land loans | | | $ | |
| | Second Lien Real Estate loans | | | $ | |
| | Second Lien Land Loans | | | $ | |
| 2 | plus: Advances | | $ | - | - |
| 3 | less: | | | | |
| | Collections | | | - | |
| | Credits | | | - | |
| | Other Adjustments | | | | - |
| 4 | Ending Notes as of: | XX/XX/XX | | $ | - |
| 5 | Less Ineligibles: | | | | |
| 6 | 2 scheduled payments in arrears | | $ | - | |
| 7 | 50% cross age | | | | |
| 8 | Past maturity | | | | |
| 9 | no insurance | | | | |
| 10 | Government, affiliate, | | | | |
| 11 | contra, set-off | | | - | |
| 12 | 15% concentration limit | | | | |
| 13 | Insolvency, unapproved state, foreign, | | | | |
| 14 | Matures more than 12 months | | | | |
| 15 | insufficient client loan documents | | | | |
| 16 | all other | | | | |
| 17 | less: Total Ineligibles | | | $ | - |
| 18 | Total Eligible Notes | | | $ | - |
| 19 | Times Advance Rate | | | | X 85% |
| 20 | TOTAL NOTES AVAILABILITY | | | $ | - |
| 21 | Loan Balance Previous Report | xx/xx/xx | $ | - | |
| 22 | less: Cash Remitted to Textron | | | - | |
| 23 | plus: Advance Request | | | - | |
| 24 | Additional Fees and adjustments | | | | |
| 25 | Ending Loan Balance | | | $ | - |
| | less: | | | | |
| 26 | Other Reserves | | | - | |
| 27 | Total Reserves | | | | - |
| 28 | NET BORROWING AVAILABILITY | | | $ | - |

For value received, we do hereby pledge, assign, transfer and set over to Texas Capital Bank, National Association, as co-agent for the Lenders (as defined below) ("Co-Agent"), its successors, assigns and legal representatives, the claims and accounts set forth above, and all rights, title and interest therein. We do hereby covenant and guarantee that the said claims and accounts are true and correct statements of indebtedness incurred by the debtor therein named, upon the terms stated, now outstanding and owing to full amounts thereof, that the same have not heretofore been assigned or pledged; that undersigned are the sole owners thereof that there are no defenses, counter claims or offsets thereto. This assignment is given pursuant to the terms of that certain Loan and Security Agreement dated as of June 29, 2005 (the "Loan Agreement") among the undersigned, Co-Agent, Textron Financial Corporation, as agent for the Lenders ("Agent"), and the financial institutions party thereto as lenders (the "Lenders"), and all of the terms, covenants and conditions of such Loan Agreement are incorporated between the undersigned, Co-Agent, Agent and the Lenders and all the terms covenants and conditions of such Loan Agreement are incorporated herein by reference with the same force and effect as if said terms had been stated in their entirety herein.

Authorized Signature:

Exhibit A

Title:  Authorized Representative

**EXHIBIT B**

**STANDARD CREDIT POLICIES**

**AND PROCEDURES OF BORROWER**

See Attached

atl-fs1\545023v09

# GAFFKEN & BARRIGER FUND, LLC

**Organizational Functional Area:**          **Lending**

**Policy For:**          **Credit Risk**

**Date Approved:**          **May 11, 2005**
**Last Revision Date:**          **May 11, 2005**

**Department/Individual Responsible**
**For Maintaining/Updating Policy:**          **Andy McKean**
**Vice President**
**G&B Partners, Inc.**

## SECTION I – GENERAL POLICY

The purpose of this policy is to establish the basic guidelines to be followed and adhered to by the lending personnel of Gaffken & Barriger Fund, LLC. The general objective is to provide guidelines to management in extending credit to customers. These guidelines are structured to maintain quality assets and a systematic approval process and thus to enhance customer relations and safety to the partners.

This lending policy will govern all extensions of credit by authorized officers and will be founded on the basis of sound, safe and prudent lending practices.

The lending policy will be reviewed on an annual basis and may be revised at any time there are pertinent changes.

The Management of Gaffken & Barriger Fund, LLC will extend credit to its customers. Such credit will be extended on a sound basis and on an equal opportunity basis without regard to race, color, age, nationality, religion, sex or marital status. This policy will delegate the authority to extend loans under specific guidelines and underwriting standards.

## PORTFOLIO SIZE AND COMPOSITION

Total loan portfolio and composition will be determined by senior management. Total debt to assets may not exceed 80 percent: total loans may not exceed 5.0 times capital. The composition of loans will vary, depending on economic conditions and local demand.

## CONCENTRATIONS

Concentrations by size, industry, business, and individual will be monitored and limited. All concentrations in the portfolio by industry, individuals, or affiliates will be monitored for adverse financial or economic conditions.

Additionally, loans to any single entity as defined under lending approval guidelines cannot exceed 10 percent of the total assets of the fund.

## SPECIFIC GOALS

The specific goals of this credit policy are to:

A.  Extend credit to provide a rate of return consistent with asset/liability management objectives.

B.  Meet the legitimate needs of customers and partners consistent with G&B's strategic plan and management expertise.

C.  Maintain underwriting and documentation standards to minimize losses and to protect the partners' investments.

D.  Sustain a high quality of credit with internally criticized loans comprising less than 40 percent of total capital.

E.  Focus on the overall cash flow strategies of the fund.

F.  Extend credit that will be in compliance with this policy, laws, regulations and prudent lending practices.

## PRIMARY MARKET AREA

G&B's primary lending area will be Sullivan, Orange and Ulster County in New York. The fund also has strategic contacts in California, Florida, New Jersey and Pennsylvania and therefore will make loans outside of New York.

## ORGANIZATION OF THE LENDING FUNCTION

Lloyd Barriger and Andy McKean will supervise the lending functions including Commercial Real Estate, and Secured/Unsecured Commercial Notes.

## LOAN COMMITTEE

Each Tuesday a loan committee comprised of Lloyd Barriger, Andy McKean, Tim McCausland, Frank Sacco, Walter Garigliano, Hayley Frunzi & Karen McKean will meet. This committee will review new applications, the pipeline of existing requests, portfolio statistics and develop collection plans for problem obligations.

## EXCEPTIONS TO POLICY

Exceptions to this credit policy may be authorized by the loan committee on a case by case basis.

## LENDING AUTHORITY

Lloyd Barriger and Andy McKean have full authority to approve loans up to the maximum limit of the fund.

## UNDESIRABLE LOANS

It is the Management's wish to maintain a sound and safe loan portfolio while maximizing the partners' return and conforming to all laws and regulations. In this view, they have identified certain types of loans which they believe to have inherent risks and therefore, are not desirable loans for G&B.

Undesirable credits that will not be extended include:
> Loans for consumer purposes.
> Loans in which the officer (or loan committee) has legitimate doubts regarding the borrowers' willingness to pay.
> Loans lacking defined repayment programs or financial information that demonstrates inability to repay.
> Secured credit lacking sufficient collateral or inability to perfect collateral.
> Unsecured loans.
> Loans with irregular interest repayment.

## DESIRABLE LOANS

The following descriptions are provided to ensure that loan officers are aware of what credits should be considered acceptable whether for commercial, or mortgage loans:

- ♦ Well-structured profitable credit that meets a legitimate purpose of customers and partners.

- ♦ Loans to small or middle market businesses especially when located in our primary lending area.

A "well-structured" credit is defined as a credit with a defined exit strategy, an interest rate commensurate with risk, and collateral that can be reasonably expected to protect any remaining outstanding balance.

## LOAN PRICING

Lloyd Barriger and Andy McKean have authority to set pricing in individual transactions after prevailing economic and monetary conditions that could affect the Fund's cost of funds, overall profitability, and credit risk are considered. Pricing procedures also will conform to all applicable laws and regulations.

One of the primary goals of the asset and liability management is to focus attention on product pricing and repricing opportunities as well as to provide balance sheet management and liquidity maintenance.

**Distribution of Loans By Category:**

Gaffken & Barriger Fund, LLC will focus on commercial purpose loans that
are secured by a primary or subordinate lien on real estate. A small amount of
commercial notes that are secured by other business assets may also be
extended.

**Maximum Maturities of Types of Loans:**

The standard term of all obligations will be twelve months with interest paid
on a monthly basis.

**Documentation Requirements:**

Each loan product requires a unique set of documents to ensure the loan is
properly completed and in compliance with various Federal and State lending
regulations and the security interest (if applicable) is adequately protected.
The fund will work closely with its legal counsel in this area.

## SECTION II - COMMERCIAL LOANS

### GENERAL POLICY

Commercial credit will be extended primarily to small and middle market customers. Such credits will typically comprise working capital credits, loans for physical asset expansion, asset acquisition, and other legitimate business loans. Loans to closely held businesses will be guaranteed by their major stockholders and in compliance with Regulation B.

The extension of credit will be based on the following:

- ♦ Ability and stability of current management
- ♦ Financial strength of industry and business itself
- ♦ Value and marketability of collateral

### COMMERCIAL MORTGAGES

The fund will require a Security agreement and UCC-1 filing on all furniture, fixtures and equipment, now owned and hereafter acquired, located on the premises, unless waived with adequate documentation.

### CREDIT/LOAN FILES

Documentation requesting approval and supporting the extension of credit is the responsibility of the loan officer. Credit binders on each customer will be maintained in a timely and sufficient manner so that any lending officer may review the file and assess the status of the credit quickly.

Credit/loan binders for commercial loans will contain the following information:

- ♦ Completed application, signed and dated.

- ♦ Loan approval and presentation sheet with all essential elements in connection with the loan.

- ♦ Note and all collateral documents.

- ♦ Guarantees, co-signatures, correspondence and indication of exit strategy.

### LOAN TO VALUE

**A-145**

In general the maximum loan to value against any type of real estate collateral should not exceed 70% of an appraisal or acceptable valuation. Prior liens must be considered in this calculation.

## SERVICING

All aspects of servicing for all of the Fund's loans shall be handled by Barriger Capital, LLC.

## PARTICIPATION MORTGAGES

Gaffken & Barriger Fund, LLC will engage in participation mortgage and can act as either the lead or a participant.

## INTEREST RESERVE

When possible an interest reserve account will be established at CBSC for the monthly payment of interest on mortgages.

## CONSTRUCTION ADVANCES

Inspections for advances to be made in accordance with the advance schedule may be performed by in-house staff. A picture as well as a written verification that the construction has met the requirement stage for the disbursement will be placed in the file.

## SECTION III - APPRAISALS

### GENERAL POLICY

The quality of the Fund's real estate loan portfolio is dependent to a great extent upon the quality of appraisals supporting these loans. Because appraisals are one of the essential components of the Fund's underwriting process, Management has adopted appraisal guidelines which must be followed.

### B. APPRAISAL STANDARDS

Appraisals should be obtained on all loans secured by real estate.

    All appraisals must meet the following standards:

      a.    Conform to generally accepted appraisal standards as evidenced by the Uniform Standards of Professional Appraisal Practice (USPAP).

      b.    Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction.

      c.    Analyze and report appropriate deductions and discounts.

      d.    Present a clear definition of market value.

### SELECTION OF APPRAISERS

Since many of the loans will be from outside of our area the fund will accept appraisals from a variety of firms. The qualifications of the appraiser will be reviewed as will the appraisal itself. On local transactions the Fund will attempt to obtain appraisals from the following appraisers:

- ◆ Andrew Cinque, CA-R
- ◆ Roeder's Appraisal Service, Harold G. Roeder, Jr., CREA
- ◆ Countywide Appraisal Service, Robert G. Buckles
- ◆ 3 Day Appraisal, Brian Amiel

### ENVIRONMENTAL HAZARDS

It is the Fund's intention not to make loans secured by property on which environmental hazards exist nor on properties adjacent thereto. In the event a property being offered for collateral is suspected of a potential environmental contamination, a Phase I Environmental Site Assessment will be required to be submitted by the applicant.

## SECTION IV - OTHER REAL ESTATE OWNED

### PURPOSE

The Fund involuntarily may become the owner of real estate not used in its business as a result of a mortgage foreclosure or other settlement of a previously contracted debt. The Fund may also acquire real estate for future expansion purposes. Regardless of the reason for its acquisition, any real estate not used in the conduct of business is considered Other Real Estate Owned (OREO). The purpose of this policy is to define the rules and procedures used in the documentation and accounting of this type of real estate.

### DETERMINATION OF VALUE

In order to determine this fair value, a current independent appraisal is secured from a qualified appraiser to support the amount the bank has recorded as the value of foreclosed real estate. In any OREO transaction, if we have an existing appraisal, and it is determined to be valid, the Fund need not obtain a new appraisal. The determination that an appraisal remains valid should be made by an individual who has appropriate real estate expertise and market knowledge. The basis for determining whether an appraisal continues to be valid will vary depending upon the circumstances of the property and marketplace. Written documentation should be in the loan file to support the determination. No appraisal is needed, however, if the investment is under $100,000.

The carrying value of the OREO must be reduced to the appraised value less the cost of sale, if it is less then the current carrying value on the banks books. Revenues and expenses resulting from the operation of OREO are accounted for in the statement of income for the period in which they occur. Gross rentals should be included in other non-interest income and the expenses of operating the property including depreciation, when appropriate should be included in other non-interest expense.

Gaffken & Barriger Fund, LLC will require a 25% downpayment on the resale of any OREO property.

## SECTION V - PROBLEM LOANS

### NONACCRUAL

A loan becomes nonaccrual when collateral is impaired and the potential for loss is evident. Accruing loans 90+ days past due must be supported with documentation such as an appraisal well in excess of the current principal and interest balance and/or a clearly defined workout plan.

Nonaccrual obligations can be reclassified when they return to current status. Interest paid by the borrower during the nonaccrual period will be collected on a cash basis.

### LOAN CHARGE-OFFS

Gaffken & Barriger Fund, LLC recognizes that there is always risk of loss when extending credit. Loan losses must be recognized in a timely manner. The recognition of the loss of loans or portions of loans will occur as soon as there is a reasonable probability of loss. When the amount of loss can be readily calculated, that loss will be recognized. In cases where an amount cannot be calculated, specific reserves will be maintained.

#### Loans

Losses on all nonmortgage loans will be recognized in accordance with a uniform policy:

- Losses will be taken when the loan is 90 days delinquent, and
- Exceptions to this policy must be documented in the file and/or problem loan register reviewed at the weekly loan meetings.

#### Real Estate Mortgages

Loan amounts in excess of recent appraised values will be reduced or charged off when the property is transferred to OREO unless the property is sold quickly for an amount that covers loan balances. The exception would be when there is very clear evidence that the current payoff amount on the mortgage is in excess of what we could reasonably liquidate the collateral for and the obligation is past due.

## CREDIT RISK POLICY REVIEW

Management will continuously monitor the conditions in the Fund's real estate market and the portfolio composition to ensure that the lending policies are appropriate for the current market conditions.

## EXHIBIT C

### FORM OF CLIENT LOAN DOCUMENTS

C-1:    Client Loan Documents approved by Lender with regard to Client Collateral located in New York.

C-2:    Client Loan Documents approved by Lender with regard to Client Collateral located in Pennsylvania.

C-3:    Client Loan Documents approved by Lender with regard to Client Collateral located in California.

See Attached

atl-fs1\545023v09

*Gaffken & Barriger Fund, LLC*

$_____ *Loan*

*to*

_____

_____, *2005*

## Index

1. Loan Agreement
2. Mortgage Note
3. Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing
4. Guaranty of _____
5. Membership Interest Pledge Agreement
   a) Assignment of Membership Interest
   c) Durable Power of Attorney – Pledgor, _____ -
6. Closing Certificate of _____
   a) Exhibit A - Articles of Organization – **not included**
   b) Exhibit B - Operating Agreement – **not included**
   c) Exhibit C – Written Consent of Sole Member – **not included**
   d) Exhibit D - Certificate of Good Standing – **not included**
7. Correction Agreement
8. Garigliano Law Offices, LLP Non-Representation Letter – **not included**
9. UCC – Financing Statements – **not included**
   a) Membership Interest covered by Membership Interest Pledge Agreement
   b) Schedule of Collateral
10. Borrower's Counsel's Opinion
11. ALTA Loan Policy – **not included**
12. Closing Statement – **not included**
13. Copies of Checks – **not included**

Index

**A-152**

**LOAN AGREEMENT**

**BY AND AMONG**

**GAFFKEN & BARRIGER FUND, LLC**

**AS LENDER**

**AND**

_____

**AS BORROWER**

**AND**

_____

**AS GUARANTOR**

_____, 2005

Loan Agreement                                                                                     Page 1

## LOAN AGREEMENT

THIS LOAN AGREEMENT (as amended from time to time in accordance with the terms hereof and in effect, this "Agreement"), made as of _____, 2005, by and among _____, a New York limited liability company having an address of _____ ("Borrower"), _____, an individual residing at _____ ("Guarantor") and Gaffken & Barriger Fund, LLC, a Delaware limited liability company having an address of 198 Bridgeville Road, Monticello, New York 12701 (together with its successors and assigns, "Lender").

### WITNESSETH:

WHEREAS, Borrower is the respective owner of those certain parcels of land, together with the improvements thereon, located in the Town of _____, County of _____, State of New York, tax map designations, Section ___, Block ___, Lot ___, and more particularly described on Schedules A, annexed hereto and made a part hereof ("Property"); and

WHEREAS, Borrower desires to borrow the sum of _____ and 00/100 ($_____) Dollars (the "Loan") from Lender and Lender has agreed to make the Loan subject to the terms and conditions herein contained.

NOW, THEREFORE, for Ten and 00/100 ($10.00) Dollars and other good and valuable consideration, including, without limitation, the recitals hereinabove set forth which are hereby incorporated herein and made a part hereof, and the mutual promises and agreements herein contained, the parties hereto agree as follows:

Section 1.    Certain Definitions.   As used herein the following terms shall have the following meanings for all purposes of this Agreement:

1.1    "Acceleration Notice"  shall have the meaning ascribed thereto in Section 7 of this Agreement.

1.2    "Affiliate" shall mean, with respect to any Person (the "Person specified"), any other Person that:

1.2.1   directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified;

1.2.2   is a director or officer or manager of the Person specified or of any Person covered by subdivision 1.2.1 above;

1.2.3   is a direct or indirect general partner, beneficiary of a trust or other owner of

Loan Agreement                                                                    Page 2

any stock or membership interest or other evidences of beneficial ownership of or in the Person specified or any Person covered by subdivision 1.2.2 above; or

    1.2.4 is related by blood or marriage to the Person specified or any Person covered by subdivisions 1.2.1, 1.2.2 or 1.2.3 above or the spouse, if any, of the foregoing Persons.

The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting stock, partnership or membership interests, by contract or otherwise.

    1.3 "Bankruptcy Code" shall mean the United States Bankruptcy Reform Act of 1978, as amended, or any successor statute, and the rules promulgated thereunder.

    1.4 "Basic Interest" shall mean the amount of interest at the Basic Interest Rate payable from time to time on the Loan pursuant to this Agreement and the Note.

    1.5 "Basic Interest Rate" shall mean a per annum rate equal to fourteen (14%) percent, calculated on the basis of a 365-day year and charged for the actual number of days elapsed.

    1.6 "Borrower's Counsel Opinion" shall mean that certain opinion of Richard A. Newberg, Esquire, of even date herewith, reasonably acceptable to Lender, regarding Borrower, Guarantor and the Loan, issued as a condition precedent to the making of the Loan on the Effective Date.

    1.7 "Business Days " shall mean any day other than a Saturday, Sunday or other day on which Community Bank of Sullivan County is closed.

    1.8 "Collateral" shall have the meaning ascribed thereto in Section 4.14 of this Agreement.

    1.9 "Contingent Obligation" shall mean, as to any Person, any obligation, direct or indirect, contingent or otherwise, of such Person (a) with respect to any Debt or other obligation of another Person, including any direct or indirect guarantee of such Debt (other than any endorsement for collection in the ordinary course of business) or any other direct or indirect obligation, by agreement or otherwise, to purchase or repurchase any such Debt or obligation or any security therefore, or to provide funds for the payment or discharge of any such Debt or obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), (b) to provide funds to maintain the financial condition of the other Person, or (c) otherwise to assure or hold harmless the holders of Debt or other obligation of another Person against loss in respect thereof. The amount of any Contingent Obligation shall be an amount equal to the amount of the Debt or obligation guaranteed or otherwise supported thereby.

    1.10 "Debt" shall mean, with respect to any Person, the aggregate amount of, without duplication: (a) all obligations for borrowed money (secured or unsecured), (b) all obligations

Loan Agreement                Page 3

evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations to pay the deferred purchase price of property or services, except short term unsecured indebtedness arising in the ordinary course of business and paid timely by Borrower, (d) all capitalized leases, (e) all obligations or liabilities of others secured by a lien on any asset owned by such Person or Persons whether or not such obligation or liability is assumed, (f) all obligations of such Person or Persons, contingent or otherwise, in respect of any letters of credit or banker's acceptances and (g) all Contingent Obligations.

1.11    "Default"  shall mean any event or condition, which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

1.12 "Default Rate"  shall mean a rate of interest equal to the lesser of (a) twenty four (24%) percent per annum or (b) the highest rate permitted by applicable law, calculated on the basis of a 365-day year and charged for the actual number of days elapsed.

1.13    "Due Date"  shall mean January 5, 2006 and the fifth (5th) day of each and every calendar month thereafter through and including the Scheduled Maturity Date or, if the fifth (5th) day of any such calendar month is not a Business Day, the first Business Day thereafter.

1.14    "Effective Date"  shall mean the date of this Agreement.

1.15    "Environmental Laws"  shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601, et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. § 1801, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. § 6901, et seq.), the Toxic Substance Control Act, as amended (42 U.S.C. § 7401, et seq.), the Clean Air Act, as amended (42 U.S.C. § 7401, et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §1251, et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. § 651, et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. § 300f, et seq.), The Emergency Planning & Community Right to Know Act of 1986, as amended (42 U.S.C. § 11001 et seq.), any state or local counterpart or equivalent of any of the foregoing, and any Federal, state or local transfer of ownership notification or approval statutes.

1.16    "Event of Default"  shall have the meaning ascribed thereto in Section 6 of this Agreement.

1.17    "Formation Documents"  shall mean, (i) if Borrower is a corporation, its Certificate

Loan Agreement                                                                                          Page 4

of Incorporation (and any amendments thereto) and its By-Laws; and (ii) if Borrower is a limited liability company, its Articles of Organization (and any amendments thereto) and its Operating Agreement.

1.18   "Funding Fee"   shall mean the fee in the amount of Thirty Three Thousand and 00/100 ($33,000.00) Dollars payable by Borrower to Lender, on the Effective Date, as a condition precedent to Lender's obligation to fund the Loan.

1.19   "Hazardous Substances"   shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", "toxic pollutants" and "toxic substances" (or comparable term), as such terms are defined under the Environmental Laws, or any of them, (ii) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (iii) natural gas, synthetic gas and any mixtures thereof, (iv) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (v) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (vi) radon, (vii) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (viii) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring, reporting or remediation.

1.20   "Impositions"   shall mean all taxes, assessments (including, without limitation, all assessments for public improvements or benefits), sewer rents, water charges, license or permit fees, inspection fees and other governmental levies or payments, of every kind and nature whatsoever, general and special, ordinary and extraordinary, unforeseen as well as foreseen, which at any time may be assessed, levied, confirmed, imposed or which may become a lien upon the Property or any portion thereof, or which are payable with respect thereto, or upon the rents, issues, revenues, income or profits thereof, or on the occupancy, operation, use, possession or activities thereof, whether any or all of the same be levied directly or indirectly or as excise taxes or as income taxes and, except for Lender's state and federal income, franchise tax obligations and taxes and obligations of similar type which are not assessed in lieu of any of the foregoing, all taxes, assessments or charges which may be levied on this Agreement or the Note.

1.21   "Improvements"   shall mean all structures or buildings, and replacements thereof, now or hereafter located on the Property including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

1.22   "Improvement Advance Account"   shall have the meaning ascribed thereto in Section 2.2.4 of this Agreement.

1.23   "Indemnity"   shall have the meaning ascribed thereto in Section 27 of this Agreement.

1.24   "Interest Rate" shall mean either the Basic Interest Rate or the Default Rate, as the

Loan Agreement                                                                                          Page 5

A-157

context shall require.

1.25    "Interest Reserve Fund"  shall have the meaning ascribed thereto in Section 2.2.3 of this Agreement.

1.26    "Late Charge(s)"  shall mean the payment in the amount of five (5%) percent of any payment required to be made under any of the Loan Documents, not made on or prior to the expiration of any grace period which may be applicable to such payment set forth in this Agreement and/or the other Loan Documents.

1.27    "Leases"  shall mean any and all of the agreements or understandings (whether written or unwritten) granting rights of possession, use or occupancy of all or any portion of the Property to any Person (including any Affiliate), whether the same shall be entitled a lease, occupancy agreement or otherwise, now or hereafter affecting the Property.

1.28    "Loan"  shall (a) have the meaning ascribed thereto in the recitals of this Agreement and (b) mean and include the principal indebtedness evidenced by the Note, all accrued and unpaid Basic Interest, interest at the Default Rate, Late Charges and other sums and charges due and payable from time to time, and all other obligations of Borrower under this Agreement and the other Loan Documents.

1.29    "Loan Documents"  shall mean the documents, instruments, agreements, assignments and statements described in Section 3.1 of this Agreement and all other written matter now and/or from time to time hereafter executed by and/or on behalf of Borrower and the Guarantor, or at his direction, evidencing, guaranteeing, securing or in any way relating to the Loan or delivered in connection therewith and with this Agreement, and all amendments, modifications and supplements to the foregoing.

1.30    "Material", "Material Adverse Effect" or "Material Adverse Change"  shall mean (a) a condition or event material to, (b) a material adverse effect on or (c) a material adverse change in, as the case may be, any one or more of the following: (i) the business, assets, results of operations, financial condition or prospects of Borrower and the Guarantor, or (ii) the ability of Borrower and the Guarantor, to perform any of his respective obligations under any Loan Document to which it is a party.

1.31    "Maturity Date"  shall mean the earlier to occur of (a) the Scheduled Maturity Date, (b) the date on which Lender accelerates the Loan pursuant to the provisions of this Agreement or any other of the Loan Documents or (c) the date on which Borrower elects, in a Prepayment Notice, to pay in whole or in part the Outstanding Loan Obligations in accordance with and to the extent permitted by this Agreement.

1.32    "Mortgage"  shall mean that certain Mortgage encumbering the Property of even date herewith, granted by Borrower to Lender.

1.33   "Note"   shall mean that certain Mortgage Note in the original principal amount of One Million One Hundred Thousand and 00/100 ($1,100,000.00) Dollars, of even date herewith, executed by Borrower in favor of Lender.

1.34   "Outstanding Loan Obligations"   shall mean the sum, from time to time, of (a) the Outstanding Principal Amount, (b) accrued and unpaid Basic Interest, (c) accrued and unpaid interest at the Default Rate, (d) Late Charges and (e) all other amounts due and payable under this Agreement and the other Loan Documents.

1.35   "Outstanding Principal Amount"   shall mean the outstanding principal amount of the Loan from time to time.

1.36   "Permitted Estate/Family Transfer"   means, as applicable, a Transfer (a) upon the death of a member of Borrower or of a partner, shareholder or member of any partnership, corporation or limited liability company that is a member of Borrower, to the estate of such Person or to an inter vivos trust established and controlled by such Person, (b) to the legal representative of a member of Borrower or of a partner, shareholder or member of Borrower, in the event such Person is no longer legally competent to conduct his affairs, (c) to any beneficiary under the will of a member of Borrower or of a partner, shareholder or member of any partnership, corporation or limited liability company that is a member of Borrower, or any trust established pursuant thereto, upon the death of such Person or (d) to the spouse, child or parent of a member of Borrower or of a partner, shareholder or member of any partnership, corporation or limited liability company that is a member of Borrower, provided in all cases that no change of control shall have occurred as a result of any of such Transfer(s).

1.37   "Permitted Exceptions"   shall mean such exceptions to title in respect of the Property as shall be approved by Lender in its sole discretion on the Effective Date as set forth in the Title Policy delivered to Lender on the Effective Date in respect of the Property.

1.38   "Person"   shall mean an individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

1.39   "Prepayment Notice"   shall have the meaning ascribed thereto in Section 2.3 of this Agreement.

1.40   "Prohibited Action"   shall mean (a) the commencement of any action or proceeding by Borrower, the Guarantor or any Affiliate thereof seeking to or having the effect of (i) challenging the validity or enforceability of the Loan Documents, or any of them, whether in whole or in part, or any provision therein contained, (ii) rescinding the Loan Documents, or any of them, whether in whole or in part or (iii) modifying the Loan Documents, or any of them, in whole or in part, if the intent, purpose or effect thereof is to delay, hinder or postpone or otherwise interfere with the rights and remedies available to Lender under the Loan Documents, or any of them or (b) if Borrower, the Guarantor or any Affiliate thereof shall oppose any motion or application made by Lender to modify

or lift the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code upon any filing by or against Borrower or the Guarantor, of a petition in bankruptcy.

1.41   "Required Insurance"   shall have the meaning ascribed thereto in Section 8.1.6 of this Agreement.

1.42   "Restricted Transfer"   shall have the meaning ascribed thereto in Section 5.1.1 of this Agreement.

1.43   "Scheduled Maturity Date"   shall mean December 5, 2006 or, if December 5, 2006 is not a Business Day, the first Business Day thereafter.

1.44   "Short Period Interest"   shall mean Basic Interest at the Basic Interest Rate on the Outstanding Principal Amount for the period commencing on the Effective Date through and including December 5, 2005.

1.45   "Single Purpose Entity"   shall mean an entity that shall not modify or amend its Formation Documents, without the prior written consent of Lender, which Formation Documents shall, inter alia, provide that the sole and exclusive permitted activities of Borrower shall be the ownership, development and operation of the Property.

1.46   "Solvent"   shall mean, with respect to any Person, that (a) the total present fair salable value of such Person's assets on a going concern basis is in excess of the total amount of such Person's liabilities, including contingent liabilities, and (b) such Person is able to pay his or its liabilities and contingent liabilities as they become due.

1.47   "Title Company"   shall mean Upstate Abstract of New York, Inc., as agent for Chicago Title Insurance Company.

1.48   "Transfer"   shall mean any sale, conveyance, assignment, transfer, pledge, hypothecation, encumbrance, lien or security interest.

Section 2.    Amount and Terms of the Loan.

2.1    Agreement to Loan   Lender agrees, upon the terms and conditions set forth in this Agreement and in reliance upon Borrower's and Guarantor's representations, warranties, covenants and undertakings set forth in this Agreement and in the other Loan Documents, to make the Loan to Borrower as provided in this Agreement. Borrower's obligation to repay the Outstanding Loan Obligations shall be evidenced by the Note, which shall be due and payable on the Maturity Date.

2.2    Interest

2.2.1   Basic Interest

Loan Agreement                                                                                          Page 8

**A-160**

2.2.1.1    The Loan shall bear interest at the Basic Interest Rate on the Outstanding Principal Amount, from and including the Effective Date through and including the Scheduled Maturity Date.

2.2.1.2    On the Effective Date, Borrower shall pay the Short Period Interest.

2.2.1.3    On the Due Date occurring on December 5, 2005, and on each Due Date thereafter, Borrower shall pay to Lender Basic Interest, in arrears, at the Basic Interest Rate, on the Outstanding Principal Amount.

2.2.2    Default Interest    Interest shall accrue and be payable at the Default Rate (a) on all amounts not paid when due and payable under this Agreement, the Note or under any other Loan Document and (b) from and after the then Scheduled Maturity Date, on the Outstanding Loan Obligations.

2.2.3    Interest Reserve Fund    Borrower and Lender agree that Thirty-Eight Thousand and 00/100 ($38,000.00) Dollars (the "Interest Reserve Fund") shall be deposited into an account in the name of Lender (or as Lender shall otherwise require) such account to be in the sole dominion and control of Lender. All amounts deposited in the Interest Reserve Fund shall be maintained in a separate interest bearing account at Community Bank of Sullivan County. Borrower has provided to Lender its federal tax ID number, which shall be utilized in establishing the Interest Reserve Fund. Subject to Section 2.7, and provided that there are sufficient funds available in the Interest Reserve Fund, Lender shall, without the necessity of notifying Borrower, advance a portion of the Interest Reserve Fund on each Due Date, in an amount equal to Basic Interest due and payable under this Agreement, and the same shall be applied pursuant to the terms of this Agreement. Borrower agrees and acknowledges that neither the insufficiency of the amount of, nor the unavailability of, the Interest Reserve Fund is intended to, and shall therefore not, constitute a limitation on the obligation of Borrower to pay Basic Interest under this Agreement, it being understood and agreed that if, on any Due Date there shall have occurred and be continuing any Default or Event of Default or the undisbursed balance of the Interest Reserve Fund shall be insufficient to make any portion of the payment required to be made, Borrower shall nevertheless be obligated to make such payment as and when due. In the event that the total amount of Basic Interest shall be less than the amount now or hereinafter deposited in the Interest Reserve Fund, any undisbursed portion of the Interest Reserve Fund shall be applied by Lender in its sole discretion in accordance with Section 2.5. If the Lender determines that the Interest Reserve Fund is not or will not be sufficient to pay interest through the Maturity Date, Lender shall notify Borrower of such determination and Borrower shall increase the Interest Reserve Fund by the amount that Lender reasonably estimates is sufficient to make up the deficiency within thirty (30) days.

2.2.4    Improvement Advance Account    In the event of a sale of the portion of Property described in Schedule A-II annexed hereto ("Schedule A-II Parcel"), Borrower shall cause to be paid to Lender an initial deposit to a reserve account (the "Improvement Advance Account") of One Hundred Thousand and 00/100 ($100,000.00) Dollars. Borrower shall make the initial deposit to the Improvement Advance Account, in any event, upon the earlier of the date of the sale of the

Schedule A-II Parcel or December 31, 2005, whichever date is earlier, and the failure of Borrower to make the initial deposit as provided herein shall constitute an Event of Default. Upon payment of the Improvement Advance Account as provided herein, Borrower shall maintain with Lender at all times while the Outstanding Loan Obligations are unpaid, the Improvement Advance Account for the payment of costs and expenses associated with renovation of the Improvements and as an additional security for all of Borrower's obligations under this Agreement and the Loan Documents. So long as no event occurs, and no state of facts, which, with the giving of notice and or the passage of time, would constitute an Event of Default, all sums in the Improvement Reserve Advance Account shall be held by Lender in the Improvement Advance Account. The Improvement Advance Account shall not, unless otherwise explicitly required by applicable law, be, or be deemed, an escrow or trust fund. All amounts deposited in the Improvement Advance Account shall be maintained in a separate interest bearing account at Community Bank of Sullivan County. Borrower has provided to Lender its federal tax ID number, which shall be utilized in establishing the Improvement Advance Account. The Improvement Advance Account shall be established solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment following receipt of bills, invoices or statements therefore in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. In the event that the Mortgage securing the Outstanding Loan Obligations is assigned by Lender, any funds in the Improvement Advance Account shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto, shall terminate, except Lender, as mortgagee, shall remain liable to Borrower, as mortgagor, for any defalcations of mortgagee prior to the time such account is turned over. If the total funds in the Improvement Advance Account shall exceed the amount of payments actually applied by Lender for the purpose of the account, such excess may be credited by Lender on subsequent payments to be made hereunder, or, at the option of the Lender, refunded to the Borrower. No such application of the Improvement Advance Account shall be deemed to cure any Event of Default hereunder and any such application shall not limit Borrower's obligation to deposit any deficiency of which Lender gives notice. Upon full payment of the Outstanding Loan Obligations in accordance with the terms of this Agreement and the Loan Documents or at such earlier time as Lender may elect, the balance of the Improvement Advance Account then in Lender's possession, shall be paid over to Borrower and no other party shall have any right or claim thereto.

     2.3    Prepayment    Borrower may prepay the Loan without penalty or premium (in whole or in part and in each case in the minimum amount of Fifty Thousand and 00/l00 ($50,000.00) Dollars) upon (a) the delivery of at least ten (10) days prior written notice to Lender (the "Prepayment Notice") and (b) the payment of (i) all Basic Interest accrued on the amount so prepaid through and including the date of such prepayment and (ii) all Late Charges, interest at the Default Rate and other sums and charges due under this Agreement and under the other Loan Documents. Notwithstanding anything to the contrary contained in this Agreement, Lender shall not be obligated to discharge the Mortgage or the liens created by the other Loan Documents until Lender shall have been paid in full the Outstanding Loan Obligations under this Agreement, the Note and the other Loan Documents.

     2.4    Late Charges    Lender may collect a Late Charge on account of any payment required to be made hereunder or under any other Loan Document not made within five (5) Business Days of

Loan Agreement                                        Page 10

when due and payable.

2.5    Application of Payments    All payments made to Lender, and upon an Event of Default, any and all payments received by Lender in respect of the Loan from the Interest Reserve Fund shall be applied or disbursed by Lender as follows and in the following order of priority: first, to the payment of the costs, expenses and fees of taking possession of the Property and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Lender's right and remedies hereunder and under the other Loan Documents, including, but not limited to receivers' fees, court costs, attorneys', accountants', appraisers', managers' and other professional fees, title charges and transfer taxes, second, to payment of all sums expended by Lender under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Rate, third, to the payment of all Late Charges and other amounts due and payable under the Loan Documents and not specifically set forth below, fourth, to the payment of all interest at the Default Rate, fifth to the payment of all accrued and unpaid Basic Interest, and sixth, to the Outstanding Principal Amount, or in such other order of priority as Lender shall elect.

2.6    Maturity    On the Maturity Date, the entire Outstanding Loan Obligations due hereunder and under the other Loan Documents shall be paid in full.

2.7    Security Interest    The Interest Reserve Fund and the Improvement Advance Account shall be in the sole dominion and control of Lender. Borrower hereby pledges to Lender and grants to Lender a first lien priority perfected security interest in and to the Interest Reserve Fund and the Improvement Advance Account and all sums now or hereafter deposited therein or constituting a part thereof, as security and cash collateral for the Outstanding Loan Obligations, it being understood and agreed that, upon the happening of any Event of Default, Lender shall be entitled to withdraw all proceeds in the Interest Reserve Fund and the Improvement Advance Account and apply the same in accordance with the terms and provisions of Section 2.5 of this Agreement without regard to the terms and provisions of Section 2.2.3 or Section 2.2.4 of this Agreement. Borrower hereby authorizes Lender to file such UCC financing statements as Lender may from time to time require in respect of Lender's security interest in and to such cash collateral.

Section 3.    Conditions Precedent.    Lender's agreement to make the Loan is subject to the execution, delivery and performance by Borrower and Guarantor to Lender's satisfaction, of all of the following, unless and to the limited extent expressly waived by Lender:

3.1    Loan Documents    Lender shall have received the following Loan Documents, in addition to all other Loan Documents and other items as Lender shall require as a condition to the making of the Loan, all in form and substance satisfactory to Lender:

3.1.1    This Agreement;

3.1.2    Mortgage Note of even date herewith from Borrower to Lender in the principal amount of One Million One Hundred Thousand and 00/100 ($1,100,000.00) Dollars.

Loan Agreement                                                                                    Page 11

3.1.3   Mortgage securing the Mortgage Note referenced in Section 3.1.2 encumbering the Property, of even date herewith, granted by Borrower to Lender.

3.1.4   Closing Certificate of the _____:

3.1.5   Guaranty of _____;

3.1.6   Membership Interest Pledge Agreement of _____ relating to one hundred (100%) percent membership interest of _____;

3.1.7   The following instruments relating to Borrower's Membership Interest Pledge Agreement:

3.1.7.1   Assignment of Membership Interest – _____;

3.1.7.2   Durable Power of Attorney

3.1.8   Borrower's Counsel's Opinion

3.1.9   Such UCC Financing Statements as Lender may require in order to establish, preserve and perfect Lender's liens on the Interest Reserve Fund, the Improvement Advance Account, the Collateral and the membership interest covered by Membership Interest Pledge Agreement.

3.2   Closing Costs   Borrower shall have paid or cause to be paid, in immediately available federal funds:

3.2.1   to Barriger Capital LLC ("Barriger Capital"), the processing fee relating to the Loan in the amount of Three Hundred Ninety-Five and 00/100 ($395.00) Dollars;

3.2.2   to Barriger Capital, the underwriting fee relating to the Loan in the amount of Eight Hundred Ninety-Five and 00/100 ($895.00) Dollars.

3.2.3   to Barriger Capital, the tax service fee relating to the Loan in the amount of One Hundred and 00/100 ($100.00) Dollars.

3.2.4   to Barriger Capital, the appraisal fee relating to the Loan in the amount of Two Thousand Six Hundred Fifty and 00/100 ($2,650.00) Dollars.

3.2.5   to Lender, the Funding Fee in the amount of Thirty Three Thousand and 00/100 ($33,000.00) Dollars;

3.2.6   to Lender, Eleven Thousand Three Hundred Ninety One and 84/100 ($11,391.84) Dollars, the Short Period Interest;

3.2.7    to Lender, Thirty-Eight Thousand and 00/l00 ($38,000.00) Dollars required to be deposited into the Interest Reserve Fund;

3.2.8    to the Title Company or its representative, all title charges, recording fees, mortgage recording taxes, search fees and attendance charges in connection with the issuance of the Title Policy; and

3.2.9    to Lender's counsel, Lender's counsel's legal fees and disbursements incurred in connection with the due diligence of the Loan and the preparation, negotiation and delivery of the Loan Documents.

3.3    Title    Lender shall have received, at Borrower's sole cost and expense, a title insurance policy from the Title Company in respect of the Property (the "Title Policy"), dated as of the Effective Date, and acceptable to Lender, insuring marketability of the Property and insuring that the lien of the Mortgage constitute a valid first lien, subject only to the Permitted Exceptions. The Title Policy shall also contain any reinsurance and other endorsements as may be reasonably required by Lender.

3.4    Required Insurance    Borrower and Guarantor shall have provided to Lender certificates evidencing the Required Insurance, each in form and substance acceptable to Lender, together with receipts evidencing payment of the premiums on the Required Insurance.

3.5    Authorizations    If Borrower purports to be a corporation, Borrower shall have provided to Lender, each in form and substance acceptable to Lender and certified as true, correct and complete (a) a certified copy of Borrower's duly filed Certificate of Incorporation, and all amendments thereto, (b) a certified copy of the By-Laws of the Borrower, duly certified by the shareholders of Borrower, (c) corporate resolutions of Borrower authorizing the transactions contemplated hereby and (d) a certificate of good standing form the Secretary of the State of New York, dated not more than thirty (30) days prior to the Effective Date.

If Borrower purports to be a limited liability company, Borrower shall have provided to Lender, each in form and substance acceptable to Lender and certified as true, correct and complete (a) a certified copy of Borrower's duly filed Articles of Organization, and all amendments thereto, (b) a certified copy of the Operating Agreement of the Borrower, duly certified by the members of Borrower, (c) resolutions of Borrower authorizing the transactions contemplated hereby and (d) a certificate of good standing form the Secretary of the State of New York, dated not more than thirty (30) days prior to the Effective Date.

Section 4.    Representations and Warranties.    Borrower and Guarantor, to the extent applicable, represent and warrant to Lender as follows, which representations and warranties are true and correct as of the Effective Date, and which shall be deemed restated during the term of the Loan and, as restated, shall remain true and correct throughout the entire term of the Loan:

4.1     Due Formation, Organization and Authority   If Borrower purport to be a corporation, that (i) it is a corporation duly formed, validly existing and in good standing under the laws of the state in which it is incorporated, (ii) if required by the laws of the state in which the Property is located, it is duly qualified to do business and is in good standing therein, (iii) it has the corporate power, authority and legal right to own and operate its properties and assets, carry on the business now being conducted and proposed to be conducted by it, and to engage in the transactions contemplated by the Loan Documents, and (iv) the execution and delivery of this Agreement and the Loan Documents and all other documents and instruments to which it is a party relating to the Loan and the performance and observance of the provisions thereof have been duly authorized by all necessary corporate actions.

If Borrower is a limited liability company, that (i) it is duly formed and validly existing under the laws of the state in which it is formed, (ii) if required by the laws of the state in which the Property is located, it is fully qualified to do business therein, (iii) it has the power, authority and legal right to own and operate its properties and assets, to carry on the business conducted and proposed to be conducted by it, and to engage in the transactions contemplated by the Loan Documents, and (iv) the execution and delivery of the this Agreement and the Loan Documents and all other documents and instruments to which it is a party relating to the Loan and the performance and observance of the provisions thereof have all been duly authorized by all necessary actions of its members.

4.2     No Consent    The execution and delivery of this Agreement and the other Loan Documents by Borrower and Guarantor and the performance by Borrower and Guarantor of its and his obligations hereunder and thereunder and the creation of the security interests provided for herein and therein do not and will not require any consent or approval of, or notice to or any action by, any other Person, except for any consents or approvals delivered to Lender on or prior to the date hereof. This Agreement and the other Loan Documents constitute legal, valid and binding obligations of Borrower and Guarantor, enforceable against Borrower and Guarantor in accordance with their respective terms.

4.3     No Conflict; Full Delivery     The execution and delivery of this Agreement and the other Loan Documents by Borrower and Guarantor will not result in a breach of the terms or provisions of, or constitute a default, an event or condition which with the giving of notice or the lapse of time, or both, would constitute a default, or an event or condition which would give rise to a right or option on the part of any party to accelerate a payment, any indenture, agreement, instrument or obligation to which Borrower, Guarantor or the Property is bound, and will not constitute a violation of any law, order, rule or regulation applicable to Borrower, Guarantor or the Property. Borrower has delivered to Lender true, correct and complete copies of any and all agreements between Borrower and any Affiliate related in any way to the Property and any other documents or agreements materially affecting the use and operation of the Property

4.4     No Default or Event of Default    There exist no Default or Event of Default under this Agreement or the other Loan Documents.

Loan Agreement                                                                                   Page 14

**A-166**

4.5    No Proceedings Pending   There are no actions, suits or proceedings, pending or, to the best of Borrower's or Guarantor's knowledge, threatened with respect to Borrower, the Guarantor or the Property, which, in any way, would have or result in a Material Adverse Effect upon (a) the rights of Lender under this Agreement or any of the other Loan Documents, (b) Borrower's or Guarantor's ability to perform its or his obligations hereunder or (c) title to the Property.

4.6    No Offsets, etc.    Borrower and Guarantor have no offsets, deductions, defenses, counterclaims or similar rights with respect to its or his obligations of payment and performance hereunder, or under any of the Loan Documents.

4.7    Free and Clear Title; Lien Priority

4.7.1.   Property.    Borrower owns fee simple title to the Property free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interests and claims of others, except for the Loan Documents and Permitted Exceptions free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interests and claims of others, except for the Loan Documents and the Permitted Exceptions. Upon the proper recording of the Mortgage, it will constitute a valid and continuing first priority perfected mortgage lien encumbering the Property and Improvements in favor of Lender, prior to all other liens and rights of others, except liens for Impositions which are not yet due and payable, and is enforceable as such against all creditors of and purchasers from Borrower. The possession of the Property has been peaceful and undisturbed and title thereto has not been disputed or questioned to the best of Borrower's knowledge. Further, Borrower has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and mortgage its interest in the Property in the manner and form hereby done or intended. Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Lender against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions. The foregoing warranty of title shall survive the foreclosure of the Mortgage and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Property pursuant to any foreclosure.

4.8    Fair Statement of Facts   This Agreement and the other Loan Documents and all budgets, schedules, reports, information, data, opinions, certificates, confirmations, applications, affidavits, agreements, returns, site plans, permits and other materials, if any, submitted to Lender in connection with or in furtherance of this Agreement, or the other Loan Documents so submitted by or on behalf of Borrower and Guarantor, fully and fairly state the matters with which they purport to deal as of the respective dates thereof and none of the foregoing misstate any material fact nor, separately or in the aggregate, omit or fail to state any material fact known or which should have been known to Borrower or Guarantor necessary to make the statements made therein not misleading.

4.9    No Fraud   No fraud by Borrower or Guarantor or any Affiliate thereof has occurred in the negotiation of this Agreement or the other Loan Documents.

4.10    Solvency; No Bankruptcy    Borrower and Guarantor are and, after consummation of the transactions contemplated by this Agreement and the other Loan Documents, shall be, Solvent. Borrower and Guarantor have received no notice of, and have no knowledge or basis upon which to believe that it, he or any of its members, is or may become the subject of any bankruptcy, reorganization or insolvency proceeding. The Borrower and Guarantor (1) have not entered into the Loan or any Loan Document with the actual intent to hinder, delay or defraud any creditor and (2) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan contemplated by the Loan Documents, the fair saleable value of the Borrower's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed the Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of the Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than the Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. The Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. The Borrower do not intend to, and do not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of the Borrower).

4.11    Leases    Borrower shall not enter into any Lease in respect of the use, occupancy, rental or leasing of the Property or any part thereof, without Lender's prior written consent

4.12    No Violations    To the best of Borrower's and Guarantor's knowledge, there are no material alleged or asserted, violations of any law, ordinance, permit, order, rule or regulation, declaration, covenant or restriction which has been issued or noted by any governmental authority against the Property . The Property is in compliance with all zoning requirements (or appropriate variances have been obtained), building codes, and all covenants, conditions and restrictions of record.

4.13    No Condemnation    There is no condemnation or eminent domain proceeding pending or, to the best of Borrower's and Guarantor's knowledge after diligent inquiry, threatened with respect to the Property.

4.14    Collateral    As of the date hereof, and at all times hereafter, Lender will have a first priority perfected lien in all collateral security pledged, granted or mortgaged to Lender pursuant to the Loan Documents (collectively, the "Collateral"), subject to no prior liens or encumbrances, except for the Permitted Exceptions.

4.15    Special Flood Hazard Area    To the best of Borrower and Guarantor's knowledge, no building or structure located upon the Property is situated in a federally designated "special flood hazard area" as defined in the Flood Disaster Protection Act of 1973, as amended.

4.16    FIRPTA    Borrower is not and will not be, and no legal or beneficial interest of a member in Borrower is or will be held, directly or indirectly, by a "foreign corporation", "foreign partnership or membership interest", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of Internal Revenue Code Sections 897 and 1445, the Foreign Investments in Real Property Tax Act of 1980, the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

4.17    Consumer Credit Laws; Usury    The indebtedness evidenced by the Loan, including interest, fees and charges, are a business loan; are exempted transactions under the Truth in Lending Act, 15 U.S.C. 1601 et seq. and do not and will not, violate the provisions of the consumer credit laws or usury laws of any applicable jurisdiction. Borrower knows of no facts that would support a claim of usury to defeat or avoid its obligation to repay the principal of, interest on, and other sums or amounts due and payable under, the Loan Documents.

4.18    Tax Matters    All United States Federal income tax returns and all other tax returns required to be filed by Borrower and Guarantor have been filed (taking into account permitted extensions) all taxes due pursuant to such returns have been paid. There has not been asserted or to the best of Borrower's and Guarantor's knowledge, proposed to be asserted, any tax deficiency against Borrower or Guarantor that would be Material.

4.19    Ownership Interests    If Borrower purports to be a corporation, that no shareholder of Borrower has granted any options, warrants or rights to purchase any shares in Borrower. All shares of stock in Borrower have been validly issued and are owned free and clear of any liens, claims, encumbrances or charges of any kind, except as set forth in the Share Pledge Agreements.

If Borrower purports to be a limited liability company, that no member of Borrower has granted any options or rights to purchase any membership interest in Borrower. All membership interests in Borrower have been validly issued and are owned free and clear of any liens, claims, encumbrances or charges of any kind, except as set forth in the Membership Interest Pledge Agreements.

4.20    Tax Status    Borrower is a limited liability company for purposes of Federal income taxation and for purposes of the tax laws of any state or locality in which Borrower is subject to taxation it is a disregarded entity.

4.21    No Purchase Options    No tenant, person, party, firm, corporation or other entity has an option, right of first offer or right of first refusal, to purchase the Property or any portion thereof or any interest therein.

4.22    Forfeiture    There has not been and shall never be committed by Borrower or the Guarantor or any other person in occupancy of or involved with the operation or use of the Property, any act or omission affording the federal government or any state or local government the right of

Loan Agreement                                                                 Page 17

forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.23    Composition of Units    Borrower has inspected the Property and Improvements and has determined that the Property and Improvements thereon are suitable for renovation into fourteen (14) Units and that Borrower shall, upon approval of federal, state and local authorities, hereafter renovate fourteen (14) Units for the purpose of selling said Units to the public.

4.24    Reaffirmation    Borrower hereby remakes and reaffirms to and for the benefit of Lender each and all of the representations and warranties set forth in the Mortgage, which are incorporated herein by this reference as though set forth at length herein.

Section 5.    Covenants of Borrower and Guarantor    Borrower and Guarantor, to the extent applicable, hereby covenant and agree with Lender as follows:

5.1.    Transfers

5.1.1    Restricted Transfers    Except for a Permitted Estate/Family Transfer, Borrower and Guarantor shall not sell, assign, mortgage, encumber, pledge, hypothecate, grant a security interest in, Transfer, exchange or otherwise dispose of, or grant any option or warrant with respect to, or make any other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record), all or any part of the Property or the Collateral, or any part thereof or any interest therein, or any of the revenues to be earned therefrom, or any direct or indirect ownership interest in Borrower, at any level or tier of ownership, either of record or beneficially (any of the foregoing, except as specifically hereinabove permitted, being, herein referred to as a "Restricted Transfer"), or suffer or permit a Restricted Transfer to occur. Except for a Permitted Estate/Family Transfer, Guarantor shall not suffer or permit a Restricted Transfer of the Property or the Collateral. For purposes of this subsection, the issuance of capital stock, the creation of membership interests or the dilution in any manner, of an existing interest, direct or indirect, in Borrower, the Property or any of the other Collateral shall be deemed to be a Restricted Transfer.

5.1.2    Sale of Property.    Borrower may, upon prior written notice to Lender, sell each of the fourteen (14) Units that shall, upon approval of federal, state and local authorities, hereafter form a portion of the Improvements situate on the Property and upon each such sale, shall pay Lender Ninety Thousand ($90,000.00) Dollars plus all accrued and unpaid Basic Interest, accrued and unpaid interest at the Default Rate, if any, Late Charges (as hereafter defined), if any, and all other amounts then due and payable under this Agreement and the other Loan Documents. Upon such payment, provided such sale was on an arms length basis to a bonafide purchaser, Lender shall release the lien of the Mortgage with respect to the Unit conveyed by Borrower.

5.1.3    Sale of Schedule A-II Parcel    Borrower represents that it has executed a contract of sale to sell the Schedule A-II Parcel. Borrower further represents that the proceeds of such sale will exceed One Hundred Thousand and 00/100 ($100,000.00) Dollars. In the event of such sale, Borrower shall cause to be paid to Lender an initial deposit to the Improvement Advance

Account of One Hundred Thousand and 00/100 ($100,000.00) Dollars. Contemporaneously therewith, Lender shall release the lien on the Mortgage with respect to the Schedule A-II Parcel conveyed by Borrower.

5.2    Corrections    Borrower and Guarantor shall promptly correct, with the cooperation of Lender, any defect, which may be discovered in the contents of this Agreement or in any of the other Loan Documents.

5.3    Additional Information    Promptly upon request, Borrower and Guarantor shall furnish to Lender such other information as Lender may reasonably request with respect to the business, affairs or condition (financial or otherwise) of Borrower or Guarantor.

5.4    Material Events    Borrower and Guarantor shall promptly notify Lender of any condition or event suffered by Borrower or Guarantor that has resulted in (a) a Material Adverse Change, (b) a breach of or noncompliance with any term, condition or covenant contained herein or in any other Loan Document, or (c) a Material breach of or noncompliance with any Material contract to which Borrower or Guarantor is a party or by which any of its property may be bound.

5.5    Estoppel    Within five (5) Business Days after Lender's request, Borrower shall furnish to Lender and/or its designee, a statement, duly sworn, certifying as to the Outstanding Principal Amount of the Loan, and whether any offsets, deductions, defenses or counterclaims exist against the obligations of Borrower to repay the Loan, and in respect of such other matters relating to the Loan as Lender shall reasonably request, which statement shall expressly contemplate and permit the reliance thereupon by Lender and/or its designee for any purpose.

5.6    Further Assurances    Borrower and Guarantor shall promptly execute, acknowledge, deliver and record or file such documents or instruments and take such actions and do such further acts, as may be reasonably necessary, desirable or proper to carry out more effectively the purposes of this Agreement and of the other Loan Documents.

5.7    Covenant to Pay and Perform    Borrower shall fully and faithfully pay the Loan, without any offsets, deductions, defenses or counterclaims whatsoever, as and when due and fully and faithfully perform all of its obligations, in accordance with the provisions of this Agreement and the Loan Documents.

5.8    Solvency; Single Purpose Entity    Borrower and Guarantor are, and shall at all times be and remain, Solvent. Borrower hereby represents, warrants and covenants, as of the date hereof and until such time as the Obligations are paid in full, that without, in each case, the prior written consent of Lender (which may be withheld or conditioned by Lender in its sole and absolute discretion for any reason or for no reason):

5.8.1    The sole purpose of Borrower has been, is and will be, to acquire, own, hold, maintain, and operate the Property, together with such other activities as may be necessary or advisable in connection with the ownership of the Property. Borrower has not engaged, and does not

Loan Agreement                                                                    Page 19

and shall not engage, in any business, and it has and shall have no purpose, unrelated to the Property. Borrower has not owned, does not own and shall not acquire, any real property or own assets other than those related to the Property and/or otherwise in furtherance of the limited purposes of Borrower.

5.8.2    Neither Borrower, nor any general partner, manager or managing member (a "Controlling Entity") of Borrower, as applicable, shall have the authority to perform any act in respect of Borrower in violation of any (1) applicable laws or regulations or (2) any agreement between Borrower and Lender (including, without limitation, the Loan Documents).

5.8.3    Borrower shall not (1) make any loans to Guarantor or to any Affiliate of Borrower; (2) to the fullest extent permitted by law, dissolve, wind-up, or liquidate Borrower; (3) merge, consolidate or acquire all or substantially all of the assets of an Affiliate of same or other person or entity; (4) change the nature of the business conducted by Borrower; or (5) except as permitted by the Lender in writing, amend, modify or otherwise change the Formation Documents of Borrower.

5.8.4    The following provision shall apply only when Borrower is a limited liability company: The filing of a petition in bankruptcy by or against any member of Borrower shall not cause such member of Borrower to cease to be a member of Borrower and upon the occurrence of a filing of a petition in bankruptcy, Borrower shall continue without dissolution. Additionally, to the fullest extent permitted by law, if any member of Borrower, as applicable, ceases to be a member of Borrower, such event shall not terminate Borrower and Borrower shall continue without dissolution.

5.8.5    Borrower shall at all times observe the applicable legal requirements for the recognition of Borrower as a legal entity separate from any Affiliates of Borrower, including, without limitation, as follows: (1) Borrower shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate of Borrower or of any other person or entity, (2) Borrower shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account, (3) Borrower shall file or cause to be filed its own separate tax returns, (4) Borrower shall hold itself out to the public (including any of its Affiliates' creditors) under Borrower's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of Borrower, (5) Borrower shall observe all customary formalities regarding the existence of Borrower, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate of Borrower, (6) Borrower shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents. No Affiliate of Borrower shall be appointed or act as agent of Borrower, other than as a property manager or leasing agent with respect to the Property, (7) Except as required by Lender, Borrower shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Affiliate of Borrower, nor shall it make any loan, except as permitted in the Loan Documents, (8) Borrower shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to Borrower than is obtainable in the market from a person or entity that is not an

Affiliate of Borrower, and (9) Borrower shall correct any misunderstanding that is known by Borrower regarding its name or separate identity.

5.8.6 Any indemnification obligation of Borrower to the holder of any equity interest in Borrower shall (1) be fully subordinated to the Loan and (2) not constitute a claim against Borrower or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

5.9    Compliance with Laws    Borrower will do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges, and Borrower will timely comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental authority or court applicable to Borrower or the Property or any part thereof.

5.10    Impositions    Borrower and Guarantor, from time to time on or prior to the date on which the same shall become due and payable, will pay and discharge all Impositions and shall exhibit to Lender, within ten (10) Business Days after demand is made therefore, receipted bills showing the payment, to the extent then due, of such Impositions.

5.11    Entry    Lender and its authorized agents may enter upon and inspect the Property at all reasonable times upon notice given orally or in writing to Borrower.

5.12    Liens    Borrower shall not, directly or indirectly, create, incur, assume or permit to exist any lien on or with respect to any property or asset of Borrower (including, but not limited to, the Property and the Improvements), whether now owned or hereafter acquired, or any income or profits therefrom or rights in respect thereof, except (a) pursuant to or as permitted under this Agreement, (b) liens for Impositions which are not yet due and payable and (c) liens in connection with worker's compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bills, leases, contracts (other than the repayment of Debt), statutory obligations and other similar obligations or arising as a result of progress payments under contracts.

Guarantor shall not, directly or indirectly, create, incur, assume or permit to exist any lien on or with respect to any property or asset of Guarantor (including, but not limited to, the Property and the Improvements), whether now owned or hereafter acquired, or any income or profits therefrom or rights in respect thereof, except (a) pursuant to or as permitted under this Agreement, (b) liens for Impositions which are not yet due and payable and (c) liens in connection with worker's compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bills, leases, contracts (other than the repayment of Debt), statutory obligations and other similar obligations or arising as a result of progress payments under contracts.

5.13    Debt    Borrower shall not, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain liable with respect to, any Debt except the Loan.

5.14    No Merger, etc.    Except as otherwise herein provided, Borrower shall not enter into

Loan Agreement                                                                                                    Page 21

**A-173**

any merger, consolidation, reorganization, or recapitalization, reclassify its stock or interest, as applicable, liquidate, wind up or dissolve or sell, lease, transfer or otherwise dispose of, in one transaction or a series of transactions, all or substantially all of its business or assets, whether now owned or hereafter acquired.

5.15    No Amendment of Formation Documents    Borrower shall not amend, alter, change or repeal any provision of its Formation Documents.

5.16    No Material Agreements    Borrower shall not enter into any material agreements respecting the Property, without the prior written consent of Lender.

5.17    Reaffirmation    Borrower hereby remakes and reaffirms to and for the benefit of Lender each and all of the covenants set forth in the Mortgage, which are incorporated herein by this reference as though set forth herein in full.

Section 6.    Events of Default.    Any of the following shall constitute an Event of Default hereunder:

6.1    Monetary Default    If default shall be made in the payment of any Basic Interest, Late Charges, payment into the Interest Reserve Fund or payment of any other sum due under the Note, this Agreement or the other Loan Documents not specifically referenced in this Section 6, when and as the same shall become due and payable, or

6.2    Nonmonetary Default    If Borrower or Guarantor shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder and not specifically referenced in this Section 6, and such default shall have continued for a period of thirty (30) Business Days after Lender's written notice thereof, provided, however, that in the event such default cannot be cured by the payment of money and is not reasonably susceptible of cure within such thirty (30) Business Days and Borrower or Guarantor commence the cure thereof within such thirty (30) Business Days and continuously and diligently pursues completion thereof, Borrower or Guarantor shall be given such longer period as may be reasonably necessary in order to so complete such cure, in no event, however, to exceed sixty (60) Business Days in the aggregate; or

6.3    Default Under Loan Documents    If there shall occur a default or event of default under the Mortgage or under any other Loan Document, which is not governed by Sections 6.1 or 6.2 hereof, and such default or event of default shall have continued beyond the expiration of any cure or grace period specified in the Mortgage or such other Loan Document, as applicable; or

6.4    Breach of Representation, etc.    If any representation or warranty made by Borrower or Guarantor herein or any Affiliate of Borrower or Guarantor in any of the other Loan Documents, is false or erroneous in any material respect; or

6.5    Bankruptcy    If Borrower or Guarantor shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator, (b) be unable, or admit in writing its or his inability,

to pay its or his debts as they mature, (c) make an assignment for the benefit of creditors, (d) be adjudicated bankrupt or declared insolvent or (e) file a voluntary petition in bankruptcy or a petition or any answer seeking reorganization or an arrangement with creditors or to take advantage of any insolvency proceedings; or

6.6    Receiver, Trustee, etc.    If, by order of a court of competent jurisdiction, a receiver, trustee or liquidator of Borrower or Guarantor or the Property or any part thereof shall be appointed, and such order shall not be discharged or dismissed within thirty (30) Business Days after such appointment; or if any creditor of Borrower or Guarantor shall file a petition in bankruptcy against Borrower or Guarantor or for reorganization of Borrower or Guarantor and such petition shall not be discharged or dismissed within thirty (30) Business Days after the filing thereof; or

6.7    Judgments    If any court shall on or after the Effective Date render or there shall be otherwise entered or taken one or more final judgments against Borrower or Guarantor or if the Property is attached which attachment, in Lender's reasonable judgment, has a Material Adverse Effect and, in either such case, the same shall not be discharged, or bonded (with or without an appeal taken therefrom) within thirty (30) Business Days after the entry thereof; or

6.8    Restricted Transfers    If there shall occur a Restricted Transfer; or

6.9    Not Solvent    If at any time Borrower or Guarantor shall not be Solvent; or

6.10    No Single Purpose Entity    If at any time Borrower shall not be a Single Purpose Entity; or

6.11    Material Adverse Change    If there shall have occurred a Material Adverse Change; or

6.12    Prohibited Action    If there shall have occurred a Prohibited Action; or

6.13    Amendment of Formation Documents    If there shall have occurred a breach of the covenant set forth in Section 5.15 of this Agreement.

Section 7.    Remedies.    Upon the occurrence of an Event of Default under Section 6.5 or 6.6, whether or not a Prepayment Notice shall be outstanding, the Scheduled Maturity Date shall be accelerated automatically and immediately, and the Loan and all other obligations of Borrower hereunder and under the other Loan Documents shall become due and payable automatically and immediately, without presentment, demand, protest, notice of protest or other requirements of any kind, all of which are hereby expressly waived by Borrower. Upon the occurrence of an Event of Default other than under Section 6.5 or 6.6, whether or not a Prepayment Notice shall be outstanding, Lender may, at its option, give written notice (the "Acceleration Notice") to Borrower accelerating the Scheduled Maturity Date and declaring the Loan and all other obligations of Borrower hereunder and under the other Loan Documents to be due and payable immediately, without further presentment, demand, protest, notice of protest or other requirements of any kind, all of which are

expressly waived by Borrower. If the Loan shall not be fully paid immediately upon the occurrence of an Event of Default under Section 6.5 or 6.6 or the giving of the Acceleration Notice, then Lender shall be entitled to exercise any and all rights and remedies available to it under this Agreement, the Mortgage and the other Loan Documents, as well as all rights and remedies available to Lender at law or in equity.

Section 8.    Insurance; Casualty and Taking.

8.1    Insurance, Coverages   Borrower or Guarantor shall at all times herein provided prior to payment or satisfaction in full of the Outstanding Loan Obligations and performance of all of the obligations of Borrower or Guarantor, obtain or cause to be obtained in respect of Borrower and the Property, the following policies of insurance, to the extent applicable in Lender's discretion, issued by insurance companies and containing terms satisfactory to Lender in its sole discretion:

8.1.1    At all times, Borrower or Guarantor shall maintain comprehensive all risk insurance on the Improvements and the personal property of Borrower or any Affiliate of Borrower located on the Property (which may be carried on a blanket basis with other properties provided that the coverages and premiums therefor are separately allocated and stated) in each case (a) in an amount equal to 100% of the "Full Replacement Cost" (which for purposes hereof shall mean actual replacement value exclusive of costs of excavations, foundations, underground utilities and footings), with a waiver of depreciation, (b) containing an "Agreed Amount" endorsement with respect to the Improvements and personal property of Borrower or any Affiliate of Borrower located on the Property waiving all co-insurance provisions, (c) providing for no deductible in excess of $1,000.00 and (d) if applicable, containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall constitute legal non-conforming structures or uses ("Property Insurance");

8.1.2    At all times, Borrower shall maintain commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property ("Liability Insurance"), which Liability Insurance may be carried under one or more umbrella policies aggregating the minimum combined single limit herein below described and shall (a) be on the so-called "occurrence" form with a combined single limit of not less than Two Million and 00/100 ($2,000,000.00) Dollars, (b) continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making- such protection inadequate and (c) cover at least the following hazards: (i) premises and operations, (ii) products and completed operations on an "if any" basis, (iii) independent contractors, (iv) blanket contractual liability for all written and oral contracts and (v) contractual liability covering the indemnities contained in the Loan Documents;

8.1.3    At all times, Borrower or Guarantor shall maintain flood hazard insurance ("Flood Insurance") for buildings or structures, if any, as may be located on such portions of the Property as are located in a federally designated "special flood hazard area" and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended;

Loan Agreement

Page 24

8.1.4   At all times during which any work or construction, repairs or alterations are being made with respect to the Improvements or on the Property (a) owner's contingent or protective liability insurance covering claims not covered by or under the terms and provisions of the Liability Insurance and (b) Property Insurance, written on a so-called builder's risk completed value form (i) against all risks insured against under the Property Insurance, (ii) including permission to occupy the subject property, and (iii) with an "Agreed Amount" endorsement waiving co-insurance provisions ("Builders Risk Insurance");

8.1.5   At all relevant times, Borrower or Guarantor shall maintain worker's compensation, subject to the statutory limits of the State of New York, and employer's liability insurance with a limit pursuant to the New York Statutory Form in respect of any work or operations on or about the Property or in connection with the Property   ("Worker's Compensation Insurance");

8.1.6   Such other insurance as Lender may reasonably require from time to time (together with the Property Insurance, the Flood Insurance, the Builder's Risk Insurance and the Worker's Compensation Insurance, as applicable, the ("Required Insurance").

8.2   Identification of Lender   Lender's security interest in the Property shall be identified in the Required Insurance as follows:

8.2.1   The Property Insurance, the Flood Insurance and the Builder's Risk Insurance shall provide for at least thirty (30) days written notice to Lender in the event of policy cancellation and/or material chance and shall identify Lender and Lender's address under the "New York Standard Mortgagee Clause" (noncontributory) endorsement:

"Gaffken & Barriger Fund, LLC, its respective successors, and/or assigns, as their interests may appear, as Mortgagee"

8.2.2   The Liability Insurance and the Worker's Compensation Insurance shall provide for at least thirty (30) days written notice to Lender in the event of policy cancellation and/or material change, and the Liability Insurance shall name Lender as an additional insured.

8.3   Waiver of Subrogation   The Required Insurance, as applicable, and all renewals thereof shall contain, in form and substance reasonably acceptable to Lender, a standard "Waiver of Subrogation" endorsement, and an endorsement providing in general that any claim or defense the insurance company may have against Borrower or Guarantor to deny payment of any claim by Borrower or Guarantor thereunder shall not be effective against Lender (and affirmatively providing that the insurance company will pay the proceeds of such Required Insurance to Lender notwithstanding any claim or defense of the insurance company against Lender). Borrower or Guarantor shall pay the premiums for the Required Insurance as the same become due and payable. Not later than thirty (30) days prior to the expiration date of each of the Required Insurance, Borrower or Guarantor will deliver to Lender or cause to be delivered to Lender a renewal policy or policies for each of the Required Insurance marked "premium paid" or accompanied by other evidence of payment of premium satisfactory to Lender. If at any time Lender is not in receipt of

written evidence that all Required Insurance hereunder is in force and effect, Lender shall have the right to take such action as Lender deems necessary to protect its interest in the Property including, without limitation, obtaining such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower or Guarantor to Lender upon demand.

8.4    No Separate Insurance    Neither Borrower nor Guarantor nor any Affiliate will not take out separate insurance concurrent in form or contributing in the event of loss with the Required Insurance.

8.5    Damage and Destruction    In case of (a) any damage to or destruction of the Property or the Improvements or any part of either thereof or (b) any taking (whether for permanent or temporary use) of all or any part of the Property or the Improvements or any interest therein or right accruing thereto, as the result of or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, or a change of grade affecting the Property or the Improvements or any part thereof (a "Taking"), or the commencement of any proceedings or negotiations which might result in any such Taking, Borrower or Guarantor will promptly give written notice thereof to Lender, generally describing the nature and extent of such damage or destruction or of such Taking, the nature of such proceedings or negotiations and the nature and extent of the Taking which might result therefrom, as the case may be. To the extent of Borrower's or Guarantor's interest therein, Lender shall be entitled to all insurance proceeds payable on account of such damage or destruction and to all awards or payments allocable to the Property or the Improvements on account of such Taking, and Borrower and Guarantor hereby irrevocably assign to Lender all rights of Borrower or Guarantor to any such proceeds, award or payment and irrevocably authorizes and empowers Lender, at its option, in the name of Borrower or Guarantor or otherwise, to file and prosecute what would otherwise be Borrower's or Guarantor's claim for any such proceeds, award or payment and to collect, retain and apply the same in accordance with this Agreement. Notwithstanding the foregoing, in the event of any single instance of damage or destruction on account of which the insurance proceeds payable, net of all costs of collection and settlement, are Twenty Thousand and 00/100 ($20,000.00) Dollars or less, if there shall not have occurred and be continuing a Default or have occurred an Event of Default, Borrower or Guarantor shall be entitled to requisition such proceeds pursuant to Lender's customary disbursement procedures, and shall promptly commence and diligently prosecute to completion the repair and/or restoration of the affected portions of the Property; provided, however, that Lender shall disburse to Borrower or Guarantor such insurance proceeds, for application to restoration of the Property if the net amount thereof is less than Twenty Thousand and 00/100 ($20,000.00) Dollars, Borrower or Guarantor shall promptly commence and diligently prosecute to completion the repair and/or restoration of the affected portion of the Property irrespective of whether net insurance proceeds or net condemnation awards, as the case may be, are made available to Borrower or Guarantor or, if made available, are sufficient therefore.

8.6    Taking    In case of any Taking, the net awards received by Lender or Borrower or Guarantor on account of such Taking shall be applied by Lender in the manner specified in Section 8.5, regardless of whether part or all of the Loan shall then be matured or unmatured.

Loan Agreement                                                                 Page 26

A-178

Section 9.    Enforcement.

9.1    Lender's Expenses    If any action or proceeding is commenced to which Lender is made a party in connection with or in any way relating to the Loan or in which it becomes necessary to defend or uphold the lien of this Agreement, Borrower or Guarantor shall, on demand, reimburse Lender for all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection therewith, together with interest thereon at the Default Rate if such reimbursement is not made within five (5) Business Days of such demand, which sum shall become part of the Loan and, to the extent permitted by applicable law, be secured by the Mortgage and the other Loan Documents. Borrower or Guarantor shall bear and pay all expenses (including reasonable attorneys' fees and disbursements) of or incidental to the administration, enforcement, compromise or settlement of this Agreement or the Loan, and for defending or asserting the rights and claims of Lender in respect thereof, whether or not any action for such enforcement has been commenced. All such expenses incurred by Lender, together with interest thereon at the Default Rate if such reimbursement is not made within five (5) Business Days of demand for repayment thereof, shall be part of the Loan and, to the extent permitted by applicable law, secured by the Mortgage and the other Loan Documents.

9.2    Proceedings and Actions    Lender shall have the right to join in and defend, any action, proceeding or arbitration, which Lender, in its discretion, determines may adversely affect the Property or the other Collateral. Lender shall also have the right, after written notice to Borrower or Guarantor, to institute any action or proceeding, which Lender may, in its sole discretion, determine should be brought to protect its interest in the Property or the Collateral or its rights hereunder. All costs and expenses incurred by Lender in connection with such actions or proceedings (including reasonable attorneys' fees and disbursements), shall be paid by Borrower or Guarantor on demand, together with interest thereon at the Default Rate if not paid within five (5) Business Days of such demand, and all such costs and expenses, together with such interest, shall be part of the Loan and secured by the Mortgage and the other Loan Documents.

9.3    No Waiver    Application of a Late Charge shall not be construed as a consent by Lender to any extension of time or as a waiver of any Default or Event of Default that may be related to such or any other overdue payment or of any other Default or Event of Default. Application of interest at the Default Rate shall not be deemed to constitute a waiver of any Default or Event of Default or a consent to any extension of time for the payment or performance of any obligation with respect to which the Default Rate may be invoked hereunder.

Section 10.    Costs and Expenses.    Borrower or Guarantor agrees to pay to Lender, on demand, all costs and expenses incurred by Lender, including reasonable attorneys' fees and disbursements, in connection with any review or approval required by Lender under this Agreement, including, without limitation, the review, preparation and/or negotiation of any document, instrument, agreement or certificate requested by Borrower or Guarantor to be delivered by Lender or required or requested by Lender to be entered into by Lender and Borrower or Guarantor pursuant to the provisions of the Loan Documents, and in connection with this Agreement and the other Loan Documents and the transactions contemplated thereby and hereby, together with all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) expended for collection of any payment due hereunder, under the Note and under the other Loan Documents and

Loan Agreement    Page 27

A-179

all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection with a suit at law or equity, whether at the trial or appellate level, to foreclose Lender's lien on the Collateral and sell the Collateral or any part thereof whether or not such suit shall have proceeded to judgment, together with interest thereon at the Default Rate, and Borrower or Guarantor agree that such costs shall be deemed to be part of the Loan and shall be secured by the Mortgage and the other Loan Documents. Borrower or Guarantor agree to pay or to reimburse Lender, upon demand, the reasonable fees and out-of-pocket expenses incurred by Lender and by Lender's counsel in connection with the Loan transaction contemplated hereby, including, but not limited to, the fees of all third party consultants relating to the Lender's due diligence review, including, but not limited to, insurance review costs, appraisal fees, environmental reports, engineering and structural reports. Borrower or Guarantor shall also pay all other closing costs in connection with the transactions contemplated hereby and by the other Loan Documents, including, without limitation, recording fees, transfer taxes, mortgage recording taxes, brokerage commissions and title insurance premiums.

Section 11. <u>Notices.</u>    Unless otherwise provided for herein, all notices and other communications (including any service of process under Section 21) required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered, if delivered personally or (b) on the next Business Day, if sent by overnight mail or nationally recognized prepaid overnight courier, in each case to the parties at the following addresses or at such other addresses as shall be specified by like notice:

> If to Lender:
>> Gaffken & Barriger Fund, LLC
>> 198 Bridgeville Road
>> Monticello, New York 12701
>> Attn: Andrew McKean, Vice President
>
> with a copy to:
>> Garigliano Law Offices, LLP
>> 449 Broadway, P.O. Drawer 1069
>> Monticello, New York 12701
>> Attn: Barbara A. Garigliano, Esq.
>
> If to Borrower:

> with a copy to:
>> Law Firm of Borrower

> If to Guarantor:

Loan Agreement                                                          Page 28

with a copy to:

Law Firm of Guarantor

Section 12.    Place of Payment.    All payments of principal and interest on the Note and all other sums due to Lender hereunder and under the other Loan Documents shall be made in immediately available United States dollars and shall be paid to Gaffken & Barriger Fund, LLC, at 198 Bridgeville Road, Monticello, New York 12701, or to such other payee or at such other place as Lender shall notify Borrower in writing.

Section 13.    Remedies, Cumulative: No Waiver.    The rights, remedies and benefits herein expressly specified are cumulative and are not exclusive of any rights, remedies or benefits which Lender may have by operation of law or pursuant to any of the Loan Documents or otherwise.  No failure on the part of Lender to exercise, and no delay by Lender in exercising, any right under this Agreement, the Note or any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right.

Section 14.    Entire Agreement, Amendments.    This Agreement and the Loan Documents constitute the entire agreement between and among the parties hereto relating to the subject matter hereof, incorporate or rescind all prior agreements and understandings between and among the parties hereto relating to the Loan, cannot be changed or terminated orally and shall be deemed effective as of the date hereof.  No amendment or waiver of any provision of this Agreement, the Note or any other Loan Document shall be effective unless the same shall be in writing and signed by the party against whom such amendment or waiver is to be enforced.

Section 15.    Financing Statements.    If, in the opinion of Lender, UCC financing statements or UCC continuation statements are required to be filed at any time to perfect the security interests created hereby, then Lender is hereby authorized to file such UCC financing statements or UCC continuation statements.

Section 16.    Successors and Assigns.    Neither Borrower nor Guarantor shall assign nor delegate any of its rights, privileges or duties arising under this Agreement without the prior written consent of Lender and any such attempted or purported assignment or delegation without such prior written consent shall be null and void, ab initio.  Subject to the terms of the preceding sentence, all representations, covenants, provisions and agreements made by or on behalf of Borrower or Guarantor in this Agreement shall be binding upon the successors and assigns of Borrower or Guarantor as if they were Borrower or Guarantor hereunder and shall inure to the benefit of Lender.

Loan Agreement                                                                                                          Page 29

Section 17.    Waiver of Stay, Extension and Moratorium Laws, Appraisal and Valuation, Redemption and Marshaling; Preferences.    Borrower and Guarantor shall not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Property or any part thereof, wherever enacted, which may affect the covenants and terms of performance of the Loan Documents, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Property or any part of any thereof, prior to any sale or sales thereof which may be made pursuant to any provision of any Loan Document, or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after any such sale or sales, claim or exercise any right under any statute to redeem the property so sold, or any part thereof, and Borrower and Guarantor hereby expressly waive all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any power herein granted or delegated to Lender, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted. Borrower and Guarantor, for itself and himself, and all who may claim under it or him, waive, to the extent that they lawfully may, all right to have the Property marshaled upon any foreclosure of the Mortgage, or to a sale in the inverse order of alienation, or to direct the order in which any of the Property shall be sold in the event of foreclosure of the liens and security interests hereby created and agrees that any court having jurisdiction to foreclose such liens and security interests may order the Property sold as an entirety or in groups which would result in an increase in the value thereof at sale. To the extent Borrower or Guarantor make a payment to Lender, which payment or the proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to repaid to a trustee, receiver or any other party having requisite authority under the Bankruptcy Code or any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligation hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received.

Section 18.    Usury.    It is the intention of the parties hereto to conform strictly to the usury and other laws relating to the imposition and collection of interest from time to time in force, and all agreements between Borrower and Lender, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration or maturity or otherwise, shall the amount paid or agreed to be paid to Lender, or collected by Lender or for the use, forbearance or detention of the money to be loaned under the Note, this Agreement or otherwise, or for the payment or performance of any covenant or obligation contained herein or in any of the other Loan Documents or in any other security agreement given to secure the Loan or in any other document evidencing, securing or pertaining to the Loan, exceed the maximum amount of interest allowable under applicable law (the "Maximum Amount"). If under any circumstances whatsoever fulfillment of any provision hereof or any other Loan Document, at the time performance of such provision shall be due, shall involve transcending the Maximum Amount, then ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid and or payable, in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder of the Note for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, allocated and spread from the date of disbursement of the proceeds of the Loan until

payment in full of the Loan, so that the actual rate of interest on account of the Loan is uniform throughout the term hereof. If under any circumstances Lender shall ever receive an amount deemed interest by applicable law, which would exceed the Maximum Amount, such amount that would be excessive interest under applicable usury laws shall be deemed a payment in reduction of the principal amount owing under the Note and shall be so applied to principal and not to the payment of interest, or if such excessive interest exceeds the outstanding principal balance of the Loan, such excessive interest shall be deemed to have been a payment made by mistake and shall be refunded to Borrower or to any other person making such payment on Borrower's behalf.

Section 19.    Brokerage.    Borrower and Guarantor represent and warrant that, except for Barriger Capital, Borrower and Guarantor dealt with no broker, finder or like agent in connection with the Loan or the execution and delivery hereof. Borrower and Guarantor indemnify and hold harmless Lender from and against any expense, cost or liability arising from or incurred in connection with any claim by any other broker who shall claim to have dealt with Borrower or Guarantor. The rights of Lender granted in this Section 19 are in addition to and not in lieu of any indemnity granted elsewhere in this Agreement, the Loan Documents or otherwise at law.

Section 20.    Benefit of this Agreement.    The covenants, provisions, terms, conditions and obligations of the parties hereto are imposed solely and exclusively for the benefit of Lender (and Lender's successors or assigns) Borrower and Guarantor and no other Person (including, without limitation, any contractor, mechanic or materialmen performing work at the Property) shall have standing to require satisfaction of such covenants, provisions, terms, conditions and obligations in accordance herewith and no other Person (including, without limitation, any contractor, mechanic or materialmen performing work at the Property) shall, under any circumstances, be deemed to be a beneficiary of such covenants, provisions, terms, conditions and obligations, any or all of which may be freely waived in whole or in part by Lender at any time if in its sole discretion it deems it advisable to do so.

Section 21.    Governing Law, Service of Process.

21.1    This Agreement shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to its conflicts of law provisions.

21.2    All actions or proceedings arising in connection with the Loan Documents (including, without limitation, this Agreement) shall be tried and litigated in state court located in the State of New York, County of Sullivan unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. BORROWER AND GUARANTOR WAIVE ANY RIGHT IT/HE MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT/HE ARE NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH.

21.3    IN ANY ACTION AGAINST BORROWER OR GUARANTOR, SERVICE OF PROCESS MAY BE MADE UPON BORROWER OR GUARANTOR BY REGISTERED OR

CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS/HIS ADDRESSES ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

21.4   BORROWER AND GUARANTOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER UNDER THE LOAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, THIS AGREEMENT), ANY AND EVERY RIGHT BORROWER AND GUARANTOR MAY HAVE TO (A) INJUNCTIVE RELIEF, (B) A TRIAL BY JURY, (C) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH PROCEEDING, WOULD BE WAIVED) AND (D) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.

Section 22.  Jury Trial Waiver.   BORROWER AND GUARANTOR HEREBY WAIVE ITS/HIS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED AS DESCRIBED IN THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY BORROWER AND GUARANTOR, AND BORROWER AND GUARANTOR ACKNOWLEDGE THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. BORROWER AND GUARANTOR ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO THE SUBJECT BUSINESS RELATIONSHIP WITH BORROWER AND GUARANTOR, THAT LENDER HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT LENDER WILL CONTINUE TO RELY ON THIS WAIVER IN ALL RELATED FUTURE DEALINGS WITH BORROWER AND GUARANTOR.  BORROWER AND GUARANTOR FURTHER ACKNOWLEDGE THAT IT/HE HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL OF ITS/HIS OWN CHOSING.

Section 23.  Construction.

23.1   All defined terms used herein shall be applicable equally to the singular and plural forms of such terms.

23.2   Subject to the applicable grace periods provided herein and in the Loan Documents, TIME IS OF THE ESSENCE in this Agreement and the performance of each of the covenants and agreements on Borrower's and Guarantor's part to be performed hereunder.

23.3   This Agreement and all of the Loan Documents executed and delivered in connection with the Loan shall be interpreted without regard to any canons of construction which

require that a document be interpreted or construed against the party which caused the same to be drafted.

Section 24.   Severability.   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 25.   Section Headings.   All section headings herein have been inserted for convenience of reference only and shall not affect any construction or interpretation of this Agreement.

Section 26.   Execution Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 27.   Indemnity.

27.1   Nature of Indemnity   To the fullest extent permitted by applicable law, Borrower shall and does hereby indemnify and defend Lender and each director, officer, agent, member, partner and employee thereof and each Person, if any, who has the power, directly or indirectly, to direct or cause the direction of the management and policies, by contract or otherwise, of Lender from and against any and all losses, liabilities, suits, obligations, fines, damages, penalties, claims, costs, charges and expenses, (including, without limitation, reasonable attorneys' fees and disbursements), which may be imposed upon, incurred by or asserted against Lender arising out of or in connection with: (a) any breach or alleged breach on the part of Borrower or Guarantor pursuant to any of the terms, covenants, conditions or provisions of this Agreement or any of the other Loan Documents, (b) the execution, delivery and enforcement of any of the Loan Documents, (c) any action taken or omitted to be taken by Borrower or any Affiliate thereof, (d) the ownership of a mortgagee's interest in the Property, (e) any accident, injury to or death of Persons or loss of property occurring on or about the Property, (f) any use or non-use or condition of the Property, (g) in respect of the Property, the negligence or tortious acts of Borrower or any Affiliate thereof, any Lessee or lessor under any Leases or any of its contractors, servants, employees, licensees or invitees and (h) the payment of any tax, fee, assessment or other charge (except for income taxes and franchise taxes imposed upon Lender) imposed by any governmental authority which is attributable to the execution, delivery, filing or recording of any of the Loan Documents.

27.2   Absence of Insurance   The obligations of Borrower under this Section 27 shall not in any way be affected by the absence of insurance, or by the failure or refusal of any insurance company to perform any obligation on its part under any insurance policies.

27.3   Reimbursement   If any claim, action or proceeding is made or brought

Loan Agreement                                                                                    Page 33

against Lender by reason of any event as to which Borrower is obligated to indemnify Lender, then, upon demand by Lender, Borrower, at Borrower's sole cost and expense, shall resist or defend such claim, action or proceeding in Lender's name, if necessary, by the attorneys for Borrower's insurance company (if such claim, action or proceeding is covered by insurance) or such other attorneys as Lender shall reasonably approve. Notwithstanding the foregoing, Lender may engage its own attorneys in its reasonable discretion to defend itself or to assist in its defense with respect to any such matter, and Borrower shall pay the reasonable fees and disbursements of such attorneys. Any sums payable by Borrower to Lender pursuant to this Section 27 shall be payable on demand, together with interest thereon at the Default Rate if such reimbursement is not made within five (5) Business Days of such demand, and shall be secured by the Mortgage and the other Loan Documents.

Section 28.   Additional Obligations of Borrower.   Borrower is hereby, in addition to its other obligations under this Agreement and under the other Loan Documents, personally liable to and shall pay Lender on demand the amount of all of Lender's losses and/or damages arising out of, or in any way related to or on account of (a) any act of fraud committed by Borrower or any Affiliate of Borrower in respect of the Loan, (b) any Material misrepresentation or breach of warranty or indemnity in connection with the making of the Loan, (c) the occurrence of waste with respect to the Property or other Collateral or security provided under the Loan Documents, (d) the appropriation or application of insurance proceeds or condemnation awards relating to the Property or any other of the Collateral contrary to the applicable provisions of the Loan Documents, (e) the occurrence of any uninsured casualty to the Property or any other Collateral, (f) the existence of any liens on the Property other than the Permitted Exceptions, which, within thirty (30) days of demand therefore, are not removed, released or insured over to the satisfaction of Lender, (g) any removal of any personal property now or hereafter constituting a part of the Collateral in violation of the Loan Documents without the prior written consent of Lender, (h) Borrower's failure to execute and deliver to Lender, upon request, any forms, affidavits or returns, or to provide any information with respect to any such forms, affidavits or returns, required to be executed and delivered by Borrower pursuant to applicable law upon any foreclosure or sale of the Collateral provided under the Loan Documents, or any transfer of any of the Collateral provided under the Loan Documents in lieu thereof, (i) the interposition of any defense, claim or counterclaim, or the commencement of any action, whether or not in connection with any exercise of Lender's remedies under the Loan Documents, by Borrower, Guarantor, or any Affiliate of any of the foregoing, alleging that Lender is a partner or joint venturer with Borrower in connection with the Collateral and the transactions contemplated by the Loan Documents, (j) Borrower's failure to pay as required under the Loan Documents, for any loss, liability, damage, cost or expense (including, without limitation, attorney's or expert's fees and disbursements) incurred by Lender in connection with any claim, suit, proceeding, order, consent decree, settlement, judgment or verdict arising from the deposit, storage, disposal, burial, dumping, injecting, spilling, heating or other placement or release of Hazardous Substances in, on, under or about the Property or (k) any Prohibited Action.

Section 29.   Grant of Security Interest; UCC Rights.   As security for the due and punctual payment and performance of the Loan and Borrower's and Guarantor's obligations, covenants, agreements, and undertakings hereunder and under the other Loan Documents, Borrower

Loan Agreement                                                                                          Page 34

**A-186**

hereby unconditionally grants, assigns, pledges, transfers, sets over and conveys to Lender a continuing perfected, direct and exclusive, first priority security interest in and to all of Borrower's right, title and interest in, to and under the Collateral (including, without limitation, Interest Reserve Fund and the Improvement Advance Account). With respect to the Collateral, Lender shall have all of the rights and remedies of a secured party under the UCC and all other rights and remedies accorded to a secured party at equity or law. Any notice of sale or other disposition of or other realization on the Collateral given not less than twenty (20) days prior to such proposed action shall constitute reasonable and fair notice of such action. Lender may postpone or adjourn any such sale, from time to time, by announcement at the time and place of sale stated on the notice of sale or by announcement of any adjourned sale, without being required to give a further notice of sale. Lender shall have the right, but not the obligation, to bid at any such sale. Any such sale may be for cash, or unless prohibited by applicable law, upon such credit or installment as Lender may determine. Borrower shall be credited with the net proceeds of such sale only when such proceeds are actually received by Lender in immediately available funds. Lender may, either in the name of Borrower or in its own name, make and execute all conveyances, assignments and transfers of the Collateral sold pursuant to this Agreement; and Lender is hereby appointed the Borrower's limited attorney-in-fact (which limited power of attorney is coupled with an interest and shall be irrevocable during the term of this Agreement) for this purpose. Upon request of Lender, Borrower shall assemble the Collateral not already in Lender's possession and make it available to Lender at a time and place designated by Lender. The proceeds of any sale of or other realization on all or any part of the Collateral shall be applied as follows in the following order of priority: first to the payment of all costs and expenses of such sale or realization, including, without limitation, reasonable compensation to Lender and its agents, reasonable attorneys' fees and all other expenses, liabilities and advances incurred or made by Lender, its agents and attorneys, in connection with such sale or realization, any other expenses or liabilities incurred by Lender as a result of an Event of Default, and any other unreimbursed expenses for which Lender may be reimbursed pursuant to this Agreement; second, as provided in Section 2.5 of this Agreement and third, the balance, if any, to Borrower.

Section 30.    Right of Set-Off.    Upon the occurrence of any Event of Default, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law and to the extent of the Outstanding Loan Obligations, to set off and apply any and all deposits and reserves (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Agreement or the Note, irrespective of whether or not Lender shall have made any demand under this Agreement, the Note or any other Loan Document. The rights of Lender under this Section 30 are in addition to all other rights and remedies (including, without limitation, other rights of set-off) of Lender.

Section 31.    Injunctive Relief.    Borrower recognizes that, in the event Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy or law may prove to be inadequate relief to Lender; therefore, Borrower agrees that Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity or proving either actual or irreparable damages.

Loan Agreement                                                                                                    Page 35

Section 32.    Relationship of the Parties.    This Agreement provides for the making of a Loan by Lender, in its capacity as a lender, to Borrower in its capacity as a borrower, and for the payment of interest and the payment of principal by Borrower to Lender. The relationship between Lender and Borrower is limited to that of creditor/secured party, on the one hand, and debtor, on the other hand. The provisions herein for compliance with financial covenants are intended solely for the benefit of Lender to protect its interests as Lender in assuring payments of interest and repayment of principal, and nothing contained in this Agreement shall be construed as permitting or obligating Lender to act as a financial or business advisor or consultant to Borrower, as permitting or obligating Lender to control the Borrower or to control the Borrower's operations, as creating a fiduciary obligation on the part of Lender to Borrower or as creating any joint venture, agency or other relationship between the parties other than as explicitly and specifically stated in this Agreement. Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choosing in connection with the negotiation and execution of this Agreement and the other Loan documents and to obtain the advice of such counsel with respect to all matters contained herein including, without limitation, all provisions in this Agreement for waiver of trial by jury. Borrower further acknowledge that it is experienced with respect to financial and credit matters and has made its own independent decision to apply to Lender for credit and to execute and deliver this Agreement.

IN WITNESS WHEREOF, Borrower, Guarantor and Lender have executed this Agreement as of the day and year first above written.

BORROWER:

_____

By: _____, Sole Member

GUARANTOR:

_____

LENDER:

GAFFKEN & BARRIGER FUND, LLC

_____
By: Andrew McKean, Vice President

Loan Agreement                                                                                        Page 36

**A-188**

ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF SULLIVAN   )

On the _____ day of _____, in the year 2005, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF SULLIVAN   )

On the _____ day of _____, in the year 2005, before me, the undersigned, a Notary Public in and for said State, personally appeared ANDREW McKEAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Loan Agreement                                                                Page 37

---

**MORTGAGE NOTE**

in the principal amount of

$_____

**BY**

_____

**TO**

**GAFFKEN & BARRIGER FUND, LLC**

_____, 2005

---

# MORTGAGE NOTE

$_____                                                    _____, 2005
                                                                 Monticello, New York

        THIS MORTGAGE NOTE is the Mortgage Note described in and defined as the Note in that
certain Loan Agreement, of even date herewith, by and among _____, (____Guarantor____)
and Gaffken & Barriger Fund, LLC ("Loan Agreement"), from _____, a New York limited
liability company having an address of _____ ("Maker") to GAFFKEN &
BARRIGER FUND, LLC, a Delaware limited liability company having an address of 198 Bridgeville
Road, Monticello, New York 12701 (together with its successors and assigns, "Lender" or "Holder"). All
capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Loan
Agreement and all of the terms, conditions, provisions, covenants, representations and warranties
contained in the Loan Agreement are incorporated herein by this reference as if fully and expressly set
forth in this Note.

## WITNESSETH:

        FOR VALUE RECEIVED, the undersigned, _____ promises to pay to the order of
Holder, the principal sum of _____ and 00/100 ($_____) DOLLARS,
together with interest thereon as hereinafter set forth, and all other amounts due and payable to Holder
hereunder and under the Loan Documents, all payable in lawful money of the United States of America
(collectively, "Outstanding Loan Obligations"). All payments hereunder shall be made to Holder at such
address and in such manner as is set forth in the Loan Agreement.

        This Note is secured by the Mortgage of even date herewith ("Mortgage"), which Mortgage shall
be a lien upon those certain parcels of land, together with the improvements thereon, located in the
Town of _____, County of _____, State of New York, tax map designations,
Section ___, Block ___, Lot ___, more particularly described on Schedule A annexed to the Loan
Agreement ("Property").

        Section 1.      Basic Interest; Other Payments.

        1.1     Basic Interest.   Provided that no Event of Default shall have occurred under this Note,
the Mortgage, the Loan Agreement or the Loan Documents, Basic Interest shall accrue on the Outstanding
Principal Amount at the Basic Interest Rate of_____ (__%) percent per annum and Maker shall pay
to Holder Basic Interest at the Basic Interest Rate as and when provided for in the Loan Agreement.

        1.2     Other Payments.   Maker shall pay to Holder interest at the Default Rate, Late Charges
and all other amounts due and payable as and when provided for in the Loan Documents.

        Section 2.      Maturity.   The Outstanding Principal Amount, together with accrued and unpaid
Basic Interest, interest at the Default Rate, Late Charges and all other amounts due and payable to Holder
hereunder and under the Loan Documents shall be due and payable on the Maturity Date.

        Section 3.      Prepayment.   The Outstanding Principal Amount due under this Note shall be

Note                                                              Page 2

prepayable, in whole or in part, provided that in each case, in the minimum amount of Fifty Thousand and 00/100 ($50,000.00) Dollars upon (a) the delivery of at least ten (10) days prior written notice to Lender (the "Prepayment Notice") and (b) the payment of (i) unpaid Basic Interest accrued on the amount so prepaid through and including the date of such prepayment and (ii) interest at the Default Rate, Late Charges and other amounts due and payable to Holder hereunder and under the Loan Documents.

Section 4.    Default.

4.1    Events of Default.    The occurrence of any Event of Default under the Loan Agreement or the Mortgage shall constitute an Event of Default under this Note.

4.2    Remedies.    Upon the occurrence and during the continuance of an Event of Default: (a) interest shall accrue hereunder at the Default Rate, (b) Holder may, at its option and without notice (such notice being expressly waived), DECLARE AND DEMAND this Note immediately due and payable and (c) Holder may pursue all rights and remedies available hereunder or under the Loan Documents. Holder's rights, remedies and powers, as provided in this Note and in the Loan Documents, are cumulative and concurrent and may be pursued singly, successively or together against Maker, the Collateral and/or any other collateral given at any time to secure the payment hereof, all at the sole discretion of Holder. Additionally, Holder may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Holder's sole discretion. Failure of Holder, for any period of time or on more than one occasion, to DECLARE AND DEMAND this Note immediately due and payable shall not constitute a waiver of the right to exercise the same at any time from and after any Event of Default.

4.3    Costs of Collection.    Maker agrees to pay all costs and expenses of collection incurred by Holder, in addition to principal and interest (including, without limitation, reasonable attorneys' fees and disbursements), and including all costs and expenses incurred in connection with the pursuit by Holder of any of its rights or remedies hereunder or under the Loan Agreement or under the Loan Documents or the protection of or realization of Collateral or in connection with any of Holder's collection efforts, whether or not any action or proceeding on this Note, the Loan Agreement, any other Loan Document or any foreclosure proceeding is filed or asserted, and all such costs and expenses shall be payable within five (5) Business Days of demand, together with interest thereon at the Default Rate, and shall be secured by the Mortgage and all other Collateral.

Section 5.    Governing Law; Severability.    This Note shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York (without giving effect to New York's principles of conflicts of laws except those contained in Section 5-1401 of the New York General Obligations Law). The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to such end, the provisions of this Note are declared to be severable.

Section 6.    Waivers.    Without limiting any provision of the Loan Agreement, or any other Loan Document, Maker, for itself and all endorsers and sureties of this Note, and their respective heirs, legal representatives, successors and assigns, hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the

Note                                                                                        Page 3

payment of this Note, except as expressly provided herein or in the Loan Agreement, or any other Loan Document, and in connection with any suit, action or proceeding brought by Holder on this Note, any and every right the Maker and all such endorsers and sureties of this Note, their respective heirs, legal representatives, successors and assigns may have to (a) injunctive relief, (b) a trial by jury, (c) interpose any counterclaim therein (except for any compulsory counterclaim which, if not asserted in such proceeding, would be waived), and (d) have the same consolidated with any other or separate suit, action or proceeding, and agrees that their respective liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Holder. Maker, for itself and all endorsers and sureties of this Note, their heirs, legal representatives, successors and assigns, hereby consents to every extension of time, renewal, waiver or modification that may be granted by Holder with respect to the payment or other provisions of this Note, and to the release of any makers, endorsers or sureties, and their heirs, legal representatives, successors and assigns, and of any Collateral, with or without substitution, and agree that additional makers, endorsers or sureties and their heirs, legal representatives, successors and assigns, may become parties hereto without notice to Maker or to any endorser or surety and without affecting the liability of any of them.

Section 7.    Application of Payments; Revival.    Each and every payment made by Maker to Holder in accordance with the terms hereof and all other proceeds received by Holder with respect to the Outstanding Loan Obligations shall be applied by Holder as provided for in Section 2.5 of the Loan Agreement. To the extent that Maker makes a payment or Holder receives any payment or proceeds for Maker's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under the Bankruptcy Code or any other bankruptcy law, common law or equitable cause, then, to such extent, the obligations of Maker hereunder intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Holder.

Section 8.    Miscellaneous.

8.1.    Amendments.    This Note may not be terminated or amended orally, but only by a termination or amendment in writing signed by Holder.

8.2.    Usury.    It is the intention of Maker and Holder to conform strictly to the usury and other laws relating to interest from time to time in force, and all agreements between Maker and Holder, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by demand hereunder or otherwise, shall the amount paid or agreed to be paid to Holder, or collected by Holder for the use, forbearance or detention of the money to be loaned hereunder, or for the payment or performance of any covenant or obligation contained herein or in the Loan Agreement or in any other Loan Document, exceed the maximum amount of interest allowable under applicable law (the "Maximum Amount"). If under any circumstances whatsoever fulfillment of any provision hereof or of the Loan Agreement, or any other Loan Document, at the time performance of such provision shall be due, shall involve transcending the Maximum Amount, then ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid and/or payable, in respect of laws pertaining to usury or such other laws as may regulate the amount of interest payable under applicable law, all sums paid or agreed to be paid to Holder for the use, forbearance or detention of the indebtedness evidenced hereby

Note                                                                                                      Page 4

**A-193**

shall, to the extent permitted by applicable law, be amortized, allocated and spread from the date of disbursement of the proceeds thereof until payment in full of the Outstanding Loan Obligations, so that the actual rate of interest on account thereof is uniform throughout the term hereof. If under any circumstances Holder shall ever receive an amount deemed interest by applicable law, which amount would exceed the Maximum Amount, such amount that would be excessive interest under applicable usury or other such laws shall be deemed a payment in reduction of the principal balance owing under this Note and shall be so applied to principal and not to the payment of interest or, if such excessive interest shall be deemed to have been a payment made by mistake, it shall be refunded to Maker or to any other Person making such payment on Maker's behalf.

8.3   Captions.   The captions of the Sections of this Note are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

8.4.   Notices.   Any notice, demand, request, or other communication given under this Note or in connection herewith shall be given and deemed sufficient as provided in and subject to the terms and conditions of the Loan Agreement.

8.5   Time of Essence.   Subject to the applicable grace periods provided herein and in the Loan Documents, TIME IS OF THE ESSENCE with respect to this Note and the performance by Maker of each of the covenants and agreements on Maker's part to be performed hereunder.

Section 9.   Governing Law, Service of Process.

9.1   This Note shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to its conflicts of law provisions.

9.2   All actions or proceedings arising in connection with the Loan Documents (including, without limitation, this Note) shall be tried and litigated in state court located in the State of New York, County of Sullivan unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. MAKER WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH.

9.3   IN ANY ACTION AGAINST MAKER, SERVICE OF PROCESS MAY BE MADE UPON MAKER BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

9.4   MAKER HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER UNDER THE LOAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, THIS NOTE), ANY AND EVERY RIGHT MAKER MAY HAVE TO (A) INJUNCTIVE RELIEF, (B) A TRIAL BY JURY, (C) INTERPOSE ANY COUNTERCLAIM THEREIN (EXCEPT FOR ANY COMPULSORY COUNTERCLAIM WHICH, IF NOT ASSERTED IN SUCH PROCEEDING, WOULD BE WAIVED)

Note                                                                                          Page 5

AND (D) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.

Section 10.    Jury Trial Waiver.    MAKER HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS NOTE AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED AS DESCRIBED IN THE LOAN AGREEMENT. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY MAKER, AND MAKER ACKNOWLEDGES THAT NEITHER HOLDER NOR ANY PERSON ACTING ON BEHALF OF HOLDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. MAKER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO HOLDER TO ENTER INTO THE SUBJECT BUSINESS RELATIONSHIP WITH MAKER, THAT HOLDER HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS NOTE AND THAT HOLDER WILL CONTINUE TO RELY ON THIS WAIVER IN ALL RELATED FUTURE DEALINGS WITH MAKER. MAKER FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL OF ITS OWN CHOSING.

Section 11.    Use of Funds.  Maker hereby warrants, represents and covenants that the loan evidenced hereby is for business or commercial purposes only, and no advance of funds evidenced hereby shall be used by Maker for personal, family, agricultural or household purposes.

Section 12.    Unconditional Payment.    Maker is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.

IN WITNESS WHEREOF, Maker has caused this Note to be executed by its duly authorized representative as of the day and year first above written.

_____

_____
By: _____, Sole Member

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
FRANK OWENS,                              :
              Plaintiff,           :
                               :     **MEMORANDUM DECISION**
v.                                        :
                               :     13 CV 5948 (VB)
TEXTRON FINANCIAL CORPORATION,            :
                  Defendant.          :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiff Frank Owens brings this action arising out of his $2 million investment in a real estate investment fund, which plaintiff claims was operated as a Ponzi scheme. Neither the fund nor the fund's manager is named as a defendant. Instead, plaintiff seeks recovery from defendant Textron Financial Corporation, a lender that extended a line of credit to the investment fund pursuant to a loan agreement.

Defendant moves to dismiss the amended complaint under Rule 12(b)(6). (Doc. #17). For the following reasons, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

**BACKGROUND**

In deciding the pending motion, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in favor of plaintiff.

Plaintiff alleges he invested $2 million in Gaffken & Barriger Fund, LLC (the "Fund"). The Fund was in the business of "holding primarily real estate collateralized commercial mortgage loans, other mortgages, real estate related and non-real estate assets, and making loans at high interest rates to high risk borrowers," and "raised capital for its operation through sales of

1

securities to public investors and private borrowing."  (Am. Compl. ¶¶ 21-22).  It was managed

by its President and CEO, Lloyd V. Barriger.

Plaintiff alleges defendant is "a highly sophisticated money lender skilled in the business

of making high interest loans to high risk borrowers."  (Id. ¶ 5).  Defendant and the Fund entered

into a Loan and Security Agreement in January 2006, pursuant to which defendant extended

certain "Revolving Loan Advances" to the Fund.  (See Doc. #19-4).[1]  Under the Agreement,

defendant acquired a perfected first-priority lien on all of the Fund's assets.  (See id.).

The Agreement also provided defendant the right to review the Fund's financial

records—and defendant allegedly did so, "from time to time . . . thereby becoming fully familiar

with [the Fund's] financial condition" and its practice of "making payments to existing investors

from funds obtained from new investors."  (Am. Compl. ¶¶ 23, 30).

On April 18, 2007, defendant notified the Fund that the Fund was in default under the

Agreement.  Plaintiff alleges defendant therefore knew the Fund was insolvent as of that date.

On September 27, 2007—the same day plaintiff invested $2 million in the Fund—the

Fund allegedly "immediately wired" that money, which was to be applied towards the Fund's

outstanding debt, to defendant.  (See id. ¶ 44).

Plaintiff alleges Barriger was indicted by a federal grand jury in May 2011 "[w]ith regard

to crimes alleged" in the amended complaint.  (Id. ¶ 48).  On July 26, 2013, Barriger pleaded

---

[1]      The Court considers the entire Loan and Security Agreement, which is quoted
extensively in the amended complaint, as incorporated by reference therein.  See Chambers v.
Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also Allen v. Chanel Inc., 2013 WL
2413068, at *5 (S.D.N.Y. June 4, 2013) ("Multiple references to, and lengthy quotations from,
an outside document have been considered sufficiently substantial to incorporate the document
into the complaint by reference.").

2

guilty to conspiracy, securities fraud, and mail fraud, and on February 27, 2014, was sentenced principally to 66 months' imprisonment.[2]

Plaintiff commenced this action to recover his investment from defendant, the alleged "beneficiary and recipient of the proceeds" of Barriger's crimes.  (Id. ¶ 9).  Plaintiff contends that because defendant had a right to review the Fund's financial records—and allegedly did so—defendant "knew or should have known [the Fund] was a criminal enterprise engaged in the operation of a Ponzi Scheme."  (Id. ¶¶ 30-31).  Plaintiff further alleges defendant chose not to "declare a default[,] which would have had the effect of closing down the [Fund's] operations," so that the Fund would continue its activities and "fraudulently induce innocent third parties to lend, invest, and give it money."  (Id. ¶ 41).  Thus, plaintiff alleges, defendant aided and abetted the Fund's criminal activities.

The amended complaint does not identify specific claims.  In its moving papers, defendant suggests plaintiff "may be" asserting claims for fraudulent conveyance, unjust enrichment, and aiding and abetting fraud, and urges the Court to dismiss those claims.

In opposition, plaintiff rejects defendant's reading and disclaims reliance on the legal theories defendant suggests.  Plaintiff does not identify any claims in its brief, but asserts "[t]he law applicable is the New York law concerning tracing proceeds of a crime from the perpetrator of the crime to a third party receiving those proceeds," and urges "[o]ur paradigm involves a transfer which improves the equity of the transferee, improves the equity of the transferor, improves the net worth of the transferor which becomes available for creditors or judgment

---

[2]      The Court takes judicial notice of the docket sheet in United States v. Barriger, 11 CR 416 (S.D.N.Y.).  See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (holding "docket sheets are public records of which the [district] court could take judicial notice").

creditors, and negatively impacts Frank Owens who is the only loser as a crime victim and creditor." (Doc. #20, pp. 8, 14).

## DISCUSSION

I.    <u>Legal Standards</u>

    A.    <u>Rule 8</u>

    "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). The statement should be plain "so as to enable [the adverse party] to answer and prepare for trial." <u>Salahuddin v. Cuomo</u>, 861 F.2d 40, 42 (2d Cir. 1988).

    B.    <u>Rule 9(b)</u>

    Under Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "However, because courts 'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" <u>In re Agape Litig.</u>, 681 F. Supp. 2d 352, 361 (E.D.N.Y. 2010) (quoting <u>Acito v. IMCERA Grp., Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995)). A strong inference of fraudulent intent may be established either by facts showing that defendant had both motive and opportunity to commit fraud, or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 187 (2d Cir. 2004).

4

**A-199**

C.     Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the

sufficiency of the amended complaint under the "two-pronged approach" outlined by the

Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiff's legal

conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to

withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v.

Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the amended complaint must meet a

standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550

U.S. at 564.  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  Id.

II.    Motion to Dismiss

Defendant urges the amended complaint (i) fails to provide it with fair notice of the

claims against it, (ii) fails to meet the heightened pleading standards of Rule 9(b) with respect to

claims premised on alleged fraudulent conduct, and (iii) fails plausibly to plead any claims for

relief.

The Court agrees.

5

**A-200**

First, the amended complaint does not explicitly identify any legal claims.  In his opposition brief, plaintiff rejects the claims defendant suggests he <u>might</u> be pleading, but fails to clarify what claims he <u>is</u> pleading.  Plaintiff makes a vague reference to "the New York law" concerning the tracing of proceeds of crime and discusses a so-called "paradigm" of "a transfer which improves the equity of the transferee, improves the equity of the transferor, improves the net worth of the transferor which becomes available for creditors or judgment creditors, and negatively impacts [plaintiff]."  (Doc. #20, pp. 8, 14).  These statements provide little insight, however, into what particular claim(s) plaintiff seeks to assert, or how the underlying facts of this case would otherwise support any claim recognized by law.

Plaintiff has therefore failed to provide defendant fair notice of its claim or claims.

Second, to the extent plaintiff's claim(s) are premised on fraud, plaintiff has not met the heightened pleading standard of Rule 9(b), which requires such claims be pleaded with particularity.  Rule 9(b) applies not only to claims such as RICO claims and claims for common law fraud, "but also to elements of other claims that are premised on fraud."  <u>Daly v. Castro Llanes</u>, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (citing <u>O'Brien v. Nat'l Prop. Analysts Partners</u>, 936 F.2d 674, 676 (2d Cir. 1991)).

Here, plaintiff's central theory of defendant's alleged wrongdoing appears to be that defendant knew or should have known about the Fund's fraudulent scheme and nevertheless induced or encouraged the scheme by failing to "declare a default," which would have had the effect of shutting down the Fund.  But plaintiff has not pleaded facts supporting this theory with any particularity.  <u>See</u>, <u>e.g.</u>, <u>Rosner v. Bank of China</u>, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008), <u>aff'd</u>, 349 F. App'x 637 (2d Cir. 2009) ("[A] plaintiff does not satisfy Rule 9(b) by

alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence.").

In any event, plaintiff has not plausibly pleaded any claim for relief. To plausibly plead a claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" is not sufficient. Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 717 (2d Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. at 678).

Plaintiff's conclusory allegations of defendant's "knowledge" of the fraudulent scheme—based on defendant's right to review, and alleged review of, the Fund's records—are not entitled to the assumption of truth. See Ashcroft v. Iqbal, 556 U.S. at 679. Moreover, because plaintiff has not identified any cognizable legal theory applicable here, the Court cannot reasonably infer defendant is liable under any such theory. See Mallgren v. Microsoft Corp., 975 F. Supp. 2d 451, 457 (S.D.N.Y. 2013) ("Because it is impossible for the Court to draw any reasonable inference that Defendants are liable for any of the conduct alleged, the claims against them must be dismissed.").

In opposition, plaintiff argues: (i) he was a victim of a crime, (ii) property acquired fraudulently or through criminal activity "does not pass with title," (iii) title to his money thus never vested in the Fund and, therefore, (iv) his money was not subject to defendant's lien on the Fund's assets. Plaintiff concludes he is thus entitled to recover his investment on the basis of "New York public policy."

This argument is unavailing, because plaintiff provides no support for the notion that the alleged public policy constitutes an independent cause of action under New York law.

7

**A-202**

Moreover, the principal case plaintiff relies on for this proposition, <u>Stephens v. Bd. of Educ. of Brooklyn</u>, 79 N.Y. 183 (1879), actually undermines his position.  In <u>Stephens</u>, the Court of Appeals recognized a well-established rule that "money obtained by fraud or felony cannot be followed by the true owner into the hands of one who has received it <u>bona</u> <u>fide</u> and for a valuable consideration in due course of business."  <u>Id</u>. at 186.  Plaintiff has not plausibly pleaded defendant acquired his $2 million otherwise.[3]

    For these reasons, defendant's motion to dismiss the amended complaint is granted.

III.    <u>Leave to Replead</u>

    In his opposition brief, plaintiff informally requests further leave to replead.

    When defendant first filed its motion to dismiss, the Court <u>sua</u> <u>sponte</u> granted plaintiff leave to file an amended complaint, and plaintiff did so.  Plaintiff having failed to correct the complaint's pleading deficiencies when given the opportunity to do so, the Court sees no reason to give plaintiff yet another chance to replead.

    Moreover, plaintiff has not submitted a proposed second amended complaint.  Under Rule 15(a)(2), a party may amend its complaint only with the opposing party's written consent or leave of court.  Although leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, . . . or undue prejudice to the non-moving party."  <u>Burch v. Pioneer Credit Recovery, Inc.</u>, 551 F.3d 122, 126 (2d Cir. 2008) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

---

[3]    Plaintiff also provides no authority, and the Court is aware of none, supporting the proposition that the United States Bankruptcy Code—or bankruptcy-related caselaw—have any application to this non-bankruptcy case.  (Specifically, plaintiff cites 11 U.S.C. § 547 and cases interpreting the bankruptcy code.)

Because plaintiff has not submitted a proposed second amended complaint, plaintiff has not demonstrated amendment would not be futile.  See, e.g., Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995) (affirming denial of leave to amend when district court "examined plaintiffs' supplementary allegations and determined that the additional information did not cure the complaint"); In re Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 236 (D.N.J. 2002) (denying leave to amend when plaintiff "failed to proffer any proposed, substantive amendment that would satisfy applicable pleading requirements; indeed, it [did] not suggest any amendment at all").

Accordingly, plaintiff's request for leave to replead is denied.

## CONCLUSION

Defendant's motion to dismiss the amended complaint is GRANTED.

Plaintiff's request for further leave to replead is DENIED.

The Clerk is instructed to terminate the pending motion (Doc. #17) and close this case.

Dated: July 14, 2014
　　　White Plains, NY

　　　　　　　　　　SO ORDERED:

　　　　　　　　　　Vincent L. Briccetti
　　　　　　　　　　United States District Judge

9

**A-204**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
FRANK OWENS,

                     Plaintiff,                      13 **CIVIL** 5948 (VB)

        -against-                         **JUDGMENT**

TEXTRON FINANCIAL CORPORATION,
                     Defendant.
-----------------------------------------------------------------X

      Whereas, on December 13, 2013, Defendant having moved to dismiss the plaintiff's

amended complaint, and the matter having come before the Honorable Vincent L. Briccetti, United

States District Judge, and the Court thereafter, on July 14,  2014, having handed down its

Memorandum Decision (Doc. #24) granting Defendants' Motion to dismiss, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Decision, dated July 14,  2014, Defendants' Motion to dismiss is granted;

accordingly, the case is closed.

**Dated:** White Plains, New York
        July 15,  2014

                                          **RUBY J. KRAJICK**
                                          **Clerk of Court**

**United States District Court**
**Southern District of New York**
**Office of the Clerk**
**U. S. Courthouse**
**500 Pearl Street, New York, N.Y. 10007-1213**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FRANK OWENS,

                   Plaintiff,

    v.

TEXTRON FINANCIAL CORPORATION,

                   Defendant.
-----------------------------------------------------------X

**NOTICE OF APPEAL**

13 CV 5948 (VB)

      Notice is hereby given that plaintiff hereby appeals to the United States Court of Appeals

for the Second Circuit from the Memorandum Decision signed by Vincent L. Briccetti, U. S.

District Judge, on July 14, 2014 granting defendant's motion to dismiss plaintiff's amended

complaint and denying plaintiff's request for further leave to replead and entered on July 15,

2014.

Dated: July 25, 2014

                          BAUM LAW OFFICES, LLP

                          By: Morton I. Baum, Esq. (MB-1674)
                          Attorneys for Plaintiff
                          438 Broadway, P. O. Box 1260
                          Monticello, New York 12701
                          E-Mail: baumlawoffices@verizon.net
                          Tel: (845) 791-1000
                          Fax: (845) 794-5763

# BAUM LAW OFFICES, LLC

*Serving the Region Since 1961*

Morton I. Baum
*Admitted in NY and PA*

Richard S. Baum
*Admitted in NY, CT, NJ, DC & PA*

Elizabeth R. Baum, Esq., Of Counsel
*Admitted in NY*

*P.O. Box 1260, 438 Broadway
Monticello, New York 12701
(845) 791-1000*

Callicoon Office:
P.O. Box 248,  39 Lower Main Street
Callicoon, NY 12723
(845) 887-4425

July 25, 2014

**Via Electronic Filing**
**http://www.nysd.uscourts.gov**
Ruby J. Krajick, Clerk
United States District Court - Southern District
United States Courthouse
300 Quarropas Street, Room 630
White Plains, NY 10601

Re:     Case Name:  Frank Owens v. Textron Financial Corporation
        Case No. 7:13-CV-05948 (VB)

Dear Ms. Krajick:

        Enclosed are plaintiff's Notice of Appeal and Certificate of Service.

        Thank you.

                                        Respectfully,

                                        MORTON I. BAUM (MB-1674)

MIB:jb
Encl.

cc:     with enclosures:
        Via E-Mail and First Class Mail:
        GIBSON, DUNN & CRUTCHER
        Attn:  Mitchell A. Karlan, Esq.
        Attorneys for Defendant
        200 Park Avenue
        New York, New York 10166
        mkarlan@gibsondunn.com, aarias@gibsondunn.com

United States District Court
for the
Southern District of New York

FRANK OWENS,                        )
                                    )
                    Plaintiff,      )
v.                                  )        Civil Action No: 7:13-CV-5948 (VB)
                                    )
TEXTRON FINANCIAL CORPORATION,      )
                                    )
                    Defendant.      )

### CERTIFICATE OF SERVICE

Morton I. Baum, a member of the firm Baum Law Offices, LLP, attorneys for Plaintiff

Frank Owens hereby certifies that he has served a copy of Plaintiff's Notice of Appeal dated July

25, 2014 on:

> GIBSON, DUNN & CRUTCHER
> By: Mitchell A. Karlan, Esq.
> Attorneys for Defendant
> 200 Park Avenue
> New York, New York 10166
> mkarlan@gibsondunn.com, aarias@gibsondunn.com

by e-mail and First Class Mail on July 25, 2014.

BAUM LAW OFFICES, LLP

By: _____

Morton I. Baum, Esq. (MB 1674)
Attorneys for Plaintiff
428 Broadway - P.O. Box 1260
Monticello, New York 12701
E-Mail: baumlawoffices@verizon.net
Telephone: (845) 791-1000
Fax: (845) 794-5763

To:     GIBSON, DUNN & CRUTCHER
        By:  Mitchell A. Karlan, Esq.
        Attorneys for Defendant
        200 Park Avenue
        New York, New York 10166
        E-Mail: *mkarlan@gibsondunn.com*, aarias@gibsondunn.com
        Telephone:  (212) 351-3827
        Facsimile: (212) 351-4035